MARTORELL LAW APC
Eduardo Martorell (SBN 240027)
EMartorell@Martorell-Law.com
Megan Atkinson (SBN 282648)
MAtkinson@Martorell-Law.com
Harry A. Abraham (SBN 290298)
HAbraham@Martorell-Law.com
Howard Hughes Center
6100 Center Drive, Suite 1130
Los Angeles, CA 90045
Telephone: (323) 840-1200
Facsimile: (323) 840-1300

Attorneys for Plaintiff,
STARS AND BARS, LLC

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STARS AND BARS, LLC a Nevada limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>TRAVELERS CASUALTY INSURANCE COMPANY OF AMERICA, a Connecticut corporation; COREY ORTEGA, an individual, and DOES 1 through 20, inclusive,<br><br>Defendants.<br><br>TRAVELERS CASUALTY INSURANCE COMPANY OF AMERICA<br><br>Counterclaimant,<br><br>v.<br><br>STARS AND BARS, LLC,<br><br>Counterdefendant, | Case No. 8:16-cv-01397-CJC (SSx)<br>Assigned: Hon. Cormac J. Carney<br><br>**DECLARATION OF BRIAN ROCHE IN SUPPORT OF PLAINTIFF STARS AND BARS' OPPPOSITION TO TRAVELERS' MOTION FOR SUMMARY JUDGMENT**<br><br>**[EXHIBITS "A"-"KK"]**<br><br>[Filed concurrently with Opposition; Statement of Genuine Dispute of Material Facts and Proposed Statement of Further Uncontroverted Facts; Declarations of Eduardo Martorell, Mark Polifka, and Martina Silas, Esq.; Objections to Travelers' Declarations and Evidence]<br><br>Hearing<br>Date: August 27, 2018<br>Time: 1:30 pm<br>Courtroom: 9B<br><br>Action Filed: June 6, 2016<br>Action Removed: July 27, 2016<br>Trial Date: January 22, 2019 |

# **DECLARATION OF BRIAN ROCHE**

I, Brian Roche, declare as follows:

1.      I am the managing member of Stars and Bars, LLC ("Plaintiff").  I have personal knowledge of each of the matters set forth below and, if called as a witness, could and would testify thereto.

2.      On June 25, 2015, I took an examination under oath ("EUO").  True and correct copies of the relevant pages of my EUO transcript are attached hereto as **Exhibit A**.

3.      I am informed and believe that on July 25, 2017, Stars and Bars' prior counsel was provided with Production Bates TR000001-TR003204 from Defendant Travelers Casualty Insurance Company ("Travelers") in Response to Plaintiff's Request for Production of Documents—Set One.  A true and correct copy is attached hereto as **Exhibits B**.

4.      On June 8, 2018, I had my deposition taken at the office of Weston & McElvain ("Weston") in Los Angeles, California.  True and correct copies of the relevant pages of my deposition transcript are attached hereto as **Exhibit C**.

5.      On June 18, 2018, Plaintiff took the deposition of Jonathan Shumway ("Shumway") the owner of Inside Insurance ("Inside") at the office of Martorell Law APC ("Martorell") in Los Angeles, California.  Inside is based in Utah.  True and correct copies of the relevant pages of his deposition transcript are attached hereto as **Exhibit D**.

6.      On June 28, 2018 Plaintiff provided Travelers with Amended Responses to Request for Production—Set Two and has now produced to Travelers Bates S & B 000000-S & B002035 and S & B03000-S & B014076.

7.      On or about January 17, 2014, Stars and Bars entered into an Asset Purchase Agreement to purchase the assets and liquor license of the previous tenant The Derby Deli and Dueling Piano Bar ("Derby") located at the Kaleidoscope Mall ("Mall") in Mission Viejo, CA.

8.     On or about January 30, 2014, Stars and Bars entered into a written Fourth Amendment to Lease and Assignment and Assumption of Lease ("Lease") with Crown Valley Holdings ("Landlord") assuming the Derby's Lease with plans to operate a new American/Country themed restaurant, bar and nightclub called Stars and Bars.

9.     Beginning in January, 2014, prior to signing the Lease, Stars and Bars through myself and Operations Manager Bob Lehmeyer ("Lehmeyer") began having discussions with Inside about providing various insurance products including Business Personal Property, General Liability, Workman's Comp, and Liquor Liability among others.  Inside did not provide Stars with **_any_** quotes from **_any_** other company other than Travelers for Property and Business Loss coverage.  Inside **_only_** provided Stars and Bars with quotes from other companies for Workman's Comp and Liquor Liability, separate policies Stars and Bars paid additional money to have bound and issued with Inside.

10.    Stars and Bars submitted a signed Application and separate signed Questionnaire to Inside as requested on February 17, 2014. A true and correct copy is attached as **Exhibit E**.

11.    In March 2014, as discussions with Inside continued, escrow was paid for and opened by Stars and Bars and application to transfer the liquor license was filed with the Alcohol Beverage Control Board ("ABC") by Riptide and Stars and Bars.

12.    As of June, 2014, Stars and Bars had invested six (6) months of time and over One Hundred Thousand Dollars ($100,000) in pre-development, architectural and design plans in order to receive approval by the City of Mission Viejo Planning Department to begin its contemplated Five Hundred Thousand Dollar ($500,000)+ renovation.

13.    On or around June 23, 2014, as construction was about to commence, Stars and Bars, through myself and Lehmeyer, had numerous communications over

the phone and via email with Inside representing to Stars and Bars that it: a) had the ability to bind coverage on behalf of Travelers; and b) could provide a Certificate of Liability Insurance for Stars and Bars' Landlord.

14.     On June 24, 2014, Inside provided me with a "Master Pac" Restaurant Insurance Proposal with: a) the Travelers Logo and Red Umbrella on top; b) "*The Travelers Indemnity Company and Its Affiliates*" in bold font on top; c) a Proposal Number; and d) stating "*Policy Effective: 6/25/2014 thru 6/25/2015*" ("Proposal".) A true and correct copy of the email and Proposal attached as **Exhibit F**.

15.     The Proposal was eleven (11) pages long and listed all of the coverages Travelers was providing to Stars and Bars.

16.     In multiple emails exchanged on June 24, 2014 between myself, Lehmeyer, Jonathan and Spencer Shumway ("Inside Owners"), Sherlyn Simon ("Simon") and Joey Kirichkow ("Kirichkow") all employees/agents of Inside, I was informed in writing that "*this quote is bindable*" referring to the Proposal. A true and correct copy of the emails are attached as **Exhibit G**.

17.     On June 25, 2014, Stars and Bars submitted a second signed Commercial Insurance Application to Inside as requested.  A true and correct copy of this signed Application is attached as **Exhibit H**.

18.     On June 25, 2014, Stars and Bars submitted a signed One-Page Travelers Quote. A true and correct copy of this signed Quote is attached as **Exhibit I**.

19.     On June 25, 2014 Inside sent me and Lehmeyer another email again stating "*All of these quotes are bindable now*" referring to the Proposal. A true and correct copy of the email is attached as **Exhibit J**.

20.     On June 30, 2014 I sent two (2) emails to Inside with copies of the fully executed Proposal with a June 25, 2014 effective date and executed under the space for "*Signature of the Insured*" along with cash payment for the Travelers policy.  A true and correct copy of the emails are attached as **Exhibit K**.

DECLARATION OF BRIAN ROCHE

21.     I mailed the $948 down payment to Inside in cash and the acknowledged it was received by them in multiple telephone calls I had with Simon, Kirichkow, and Shaunna Gage ("Gage") another employee of Inside.  Although it was acknowledged received Inside was confused about how to apply it and to what policy.  The $948 that **_was_** paid for the Travelers policy in June, 2014 was the **_only_** amount required of S&B **_to_** pay.  A true and correct copy of the cash mailed to Inside it attached as **Exhibit L**.

22.     In a July 21, 2014 email to his co-workers, Royd Despain ("Despain") confirmed Inside's binding authority, stating: "_I see that the package was issued—it was within their authority_".  A true and correct copy is attached as **Exhibit M**.

23.     In another email to Inside on July 21, 2014, Despain again acknowledged the binding authority, stating: "_I see that you were able to get the package policy issued on this risk_. _Too bad we couldn't also work out the work comp policy on it._  _Thank you again for issuing the package!  Looks like a nice little risk!_" A true and correct copy is attached as **Exhibit N**.

24.     In mid-July, 2014, less than a week away from its Grand Opening, a backup of the mall's grease line pipe caused a tsunami of category 3 grey water sewage that ultimately destroyed Stars and Bars' business.

25.     Riptide, a big Sushi restaurant above Stars and Bars, was responsible for the damage and tendered a claim to its insurance carrier Nationwide who accepted all liability.

26.     I informed Inside during multiple telephone calls on July 17-18, 2014 to Krichkow, Gage, Simon, and Shumway about the sewage flood and was instructed by Inside to let Nationwide adjust the claim since it was Riptide's fault.

27.     I was aware at the time of Loss that property damage had occurred but  did not know that different types of loss such as loss of business interruption, continuing operating expenses, and rent obligations under the lease post Loss, would later ensue.

28.     On July 18, 2014 I received an email from Inside with a Certificate of Insurance for Stars and Bars' Landlord with an Effective Date of coverage of 6/25/2014. A true and correct copy is attached as **Exhibit P**.

29.     Believing Stars and Bars would only be delayed a short time due to the Loss, Inside bound coverages for Liquor Liability and Workman's Comp with an effective start date of July 22, 2014.  Swett and Crawford for Liquor Liability ("Swett") Policy Number: CL 1662044 and AmTrust North America for Workman's Comp ("AmTrust") Policy Number: SWC1052237.  A true and correct copy is attached as **Exhibit Q**.

30.     On July 23 and 29, 2014, I received emails from Inside with Binding Documents that stated Stars and Bars had coverage with us for "everything" with  coverage Effective Date of 6/25/2014 and "*This is truly confirmed for 6/25/14 start date.*" The Declarations for this first policy was never provided to S&B or produced by Travelers.  A true and correct copy of the emails are attached as **Exhibit R**.

31.     Beginning on July 21, 2014 Inside and Travelers began having discussions about cancelling the First Policy and issuing a second one.  In one email to Inside on July 21, 2014 Despain writes: "*If we go ahead and then issue the new policy, we will need written confirmation from you that you have destroyed (or will destroy when they arrive) the original copies of the policy*".  On July 30, 2014 Despain emails his Travelers co-worker Cynthia Curtis ("Curtis") saying: "*Please flat cancel 680007E97274*" and "*Please issue 680 008E901081" and "And they will destroy the 7/18/14 policy once they received the new policy with the June effective date.*" S&B was not privy or copied on any communications between Inside and Travelers regarding cancelling the first policy and issuing a second one.  A true and correct copy of the emails is attached as **Exhibit S**.

32.     On or around July 30, 2014, knowing that Nationwide had accepted all liability for the Loss, Stars and Bars was asked to sign a Statement of No Loss ("Statement").  The Statement read: "*I certify that I am not aware of any losses,*

DECLARATION OF BRIAN ROCHE

*accidents or circumstances that might give rise to a claim under the Insurance Policy whose number is shown above, from 12:01am on 6/25/2014 to 7/22/2014."* A true and correct copy of the Statement is attached as **Exhibit T**.

33.   The language "*might give rise to a claim*" was very ambiguous to me a as an ex-NFL Football player and I sought guidance from Inside over the phone and through email.

34.   I emailed Inside writing: "*The restaurant above us had their pipes backflow into our unit and caused some damage"* and *"Their insurance company Nationwide accepted all liability and covering the cost of clean up and replacement. What do we do with this form now that there is some loss but not my doing since we aren't open and the guys upstairs are taking full responsibility?"* A true and correct copy of the emails are attached as **Exhibit U**.

35.   I was instructed by Inside over the phone during multiple telephone calls on August 1-4, 2014 and in writing with the same bold underlined font as described here to: "**Go ahead; sign and date the form**….This form simply means that **YOU** have not had any losses for which you are responsible…The loss you describe below is not your responsibility…So, the Statement is  still correct..." A true and correct copy of the emails are attached as **Exhibit V**.

36.   The language used in the Statement "*might give rise to a claim*" was vague and ambiguous which is why I sought, and was provided, guidance from Inside.

37.   I was told by Inside that signing it would be accurate because a claim was only submitted under Riptide's policy with Nationwide.

38.   Defendants Travelers and Ortega knew separately from Inside within twenty-four (24) hours of the claim being filed on September 15, 2014 that: a) Riptide Rockin Sushi ("Riptide") the tenant above Plaintiff at the Kaleidoscope Mall in Mission Viejo, CA was responsible for the sewage flood; b) that its insurance carrier Nationwide Mutual Insurance Company ("Nationwide") had accepted ***all***

1   liability for Loss; and c) Travelers would be subrogating the claim with Nationwide
2   because I told the claim representative over the phone and Ortega in person on
3   September 16, 2014.

4         39.    I spoke to Jonathan Vesey ("Vesey") the Traveler subrogation
5   representative the same day and provided him with information for Kelly Garner
6   ("Garner") the Nationwide Adjuster.

7         40.    Defendants Travelers and Ortega were aware that Nationwide had
8   already advanced Stars and Bars Twenty Thousand Dollars ($20,000) immediately
9    upon accepting all liability for the Loss in July, 2014.  A true and correct copy of the
10  payment is also attached as **Exhibit W**.

11        41.    Multiple notes in the Travelers internal system were produced to Stars
12  and Bars through production, Bates TR001359-TR001369.  The notes, all written
13  within a 48 hour period of time prove Travelers knowledge of Loss, that Nationwide
14  had accepted all liability for the Loss, and that Travelers would be subrogating the
15  Loss.  Even two (2) months later there was "sewage odor" according to Ortega. They
16  unequivocally state:

17        a) "Upstairs restaurant had a clog in grease line that flooded insureds
18           restaurant with Sewage"

19        b)  "Restaurant flooded with sewage from upstairs business"

20        c) "Nationwide has accepted liability for claim but insured states that he is
21           having problems with them" and "Travpro remarks:  ***** Building damage
22           notes: Restaurant was flooded with sewage from upstairs business."

23        d) "An upstairs restaurant's drain was clogged with grease and overflowed
24           into insured's unit."

25        e) "Insured states that late report was due to the upstairs until owner accepting
26            liability."

27        f)  "Late report as insured was trying to pursue through other units insurance."

28        g)  "Nationwide accepted liability, Nationwide has been slow to act"

h)  "Received call from Kelly Garner—liability rep for Nationwide. She
confirmed she is the carrier for Riptide Restaurant and they have accepted
liability.  They have also issued an advance of $20,000 to insured for
damages.

i)  "Called insured—informed him that I received a call from Kelly and that
she confirmed what he has told me.  I wanted to make sure he still wants to
pursue the claim through Travelers—he confirmed.

42.     As of December 2, 2014, after tirelessly working with Travelers' hired
forensic accountant Timothy Gillihan ("Gillihan") of the firm Hagen, Streiff, Newton
& Oshiro, Accountants, PC ("HSNO") for almost three (3) months, Stars and Bars
was still owed at least hundreds of thousands of dollars in coverages covered under
the Policy which was told to Lehmeyer and I by Gillihan during multiple phone calls.
This consisted of "*measuring an increase in <u>documented</u> Operating Expenses of
another $56,300*" and for the first time, determination that Stars and Bars should be
paid at least $32,827 for his calculation of Business Loss.

43.     As of December 2, 2014, Travelers had not paid Stars and Bars one
penny towards Business Loss/Interruption.  Ortega arbitrarily determined S&B
would be open until August 1, 2014 and refused to pay any monies for July, 2014.
Ortega capped S&B's period of restoration and repair to October 31, 2014, despite
remediation work taking place for over six (6) months.

44.     I was told of the existence of the December 2, 2014 Report by Gillihan
over the phone but he did not tell me how much in Business Interruption Loss he had
determined and neither did Ortega.  A true and correct copy of the Notes and
Gillihan email and Report are attached as **Exhibit X**.

45.     Ortega disappeared for weeks and on our around December 17, 2014, I
received an email from Weston saying they were now representing Travelers and still
didn't pay any money that Stars and Bars was STILL owed in Continuing Operating
Expenses, Rent, or Business Loss among other coverages.

46.     I informed Weston via email on December 18, 2014 that "*I am not represented by counsel yet in regards to any issue related to Travelers.*" A true and correct copy of the email is attached as **Exhibit Y**.

47.     On or around December 29, 2014 I received a Letter from Weston requesting I sit down for an EUO, but I didn't read the email or letter until January 14, 2015 since I was traveling for the New Year and out of the country.

48.     On or around January 16, 2015, I informed Weston that "*I am now in receipt of your letter and am in the process of retaining new counsel to represent my company Stars and Bars v. Travelers*" and email concluded that "*once I have counsel engaged they will be in contact with you.*" A true and correct copy of the emails are attached as **Exhibit Z**.

49.     Less than 48 hours later, on Friday January 16, 2015 at 4:51pm with jury selection starting that Monday in an Unlawful Detainer Trial Stars and Bars was fighting for its life in, Weston sends me a letter via email denying the entire Travelers claim, on the sole ground that the "*insured purportedly knowingly failed and refused, without excuse, to submit to an examination under oath.*" A true and correct copy of the email and Letter is attached as **Exhibit AA**.

50.     As of this date Stars and Bars had not been paid ONE PENNY from Travelers towards the documented Operating Expenses of Gillihan Traveler's own forensic accountant, rental obligation post Loss, or Business Interruption/Business Loss.

51.     By going through the Travelers Production I found emails from Travelers to Nationwide between February, 2014-May, 2014 seeking reimbursement and payment through Subrogation for monies they supposedly paid Stars and Bars and ***HADN'T***, specifically emailing Nationwide and providing documents for "*Business Interruption to support our payments*" and "*Please find attached the calculation and supports for the business interruption.*" A true and correct copy of the emails are attached as **Exhibit BB**.

52.     Throughout 2014 and 2015 I was harassed incessantly with calls and letters by a collection agency Travelers hired called Receivable Management Services ("Collection Agency") for $258 finally paid towards unpaid "policy premium." All communications from the Collection Agency refence the "Policy Date 6-25-14". I also paid Inside separately $1247.95 through their online payment portal. A true and correct copy is attached as **Exhibit CC**.

53.     Travelers produced an internal notes dated April 22, 2015 stating theyare "Issuing payment" and "Approved payment" yet **_NO_** payment was ever made to Stars and Bars for 5 months prior to or after this, (Bates TR01334.)  A true and correct copy is attached as **Exhibit DD**.

54.     Travelers filed a complaint for Subrogation against Riptide in United States District Court Southern District on May 18, 2016, Case No.: 16CV1195 AJB JMA ("Subrogation Case"). A true and correct copy of Complaint is attached as **Exhibit EE**.

55.     Travelers dismissed the Subrogation Case with Prejudice on September 6, 2017. A true and correct copy of Order is attached as **Exhibit FF**.

56.     On November 17, 2018 I received an email from Shumway with his Travelers contract that he signed on February 15, 2011 called P & C Producer Appointment Form with Travelers listing the same Agency Code 0CLZ62, again re-affirming Inside's ability to provide coverage for every "Line of Business" Travelers offered including "All Commercial lines." A true and correct copy of the email is attached as **Exhibit GG**.

57.     On December 4, 2017 I received an email from Shumway with his California appointment attached. A true and correct copy of the email is attached as **Exhibit HH**.

58.     On December 14, 2018 I received an email from Shumway with his Original Agency Contract with Travelers contract attached executed by his former company Keystone Insurance Agency LLC with same Master Code: 0CLZ62. A true

1 | and correct copy of the email is attached as **Exhibit II**.

2 |     59.    On May 18, 2018 I received an email from Shumway with a Dropbox
3 | link of all documents, emails, files, and whatever was in Inside's possession that
4 | Shumway told me he also provided to Weston through a Subpoena they issued. A
5 | true and correct copy of the email is attached as **Exhibit JJ**.

6 |     60.    The Policies issued by Travelers each had coverage for: a) Appurtenant
7 | Buildings and Structures: $50,000; b) Newly Acquired or Constructed Property:
8 | $250,000; c) Debris removal:  $25,000; Eating Establishment Coverage Additions of
9 | Newly Acquired—Business Personal Property:  $500,000; and Newly Acquired—
10 | Business Income and Extra Expense:  $500,000, among other coverages.  A true and
11 | correct copy of the coverages under each signed Proposal and Declarations is
12 | attached as **Exhibit KK**.

13 |     61.    As of the date of this Declaration, Stars and Bars has ***not*** been able to
14 | take the deposition of ***any*** first party witness, including Defendant Ortega, Gillihan,
15 | or Travelers' employee Royd Despain ("Despain") among others.

17 | Executed this 30th day of July 2018, in _____, California.

20 | Brian Roche

EXHIBIT A

A906612

BRIAN ROCHE      JUNE 25, 2015

1                          EXAMINATION UNDER OATH

2

3

4    RE:   Insured:        STARS and BARS, LLC

5          Claim No:       EJG0625001H

6          Date of Loss:   July 18, 2014

7          Policy No:      680-8E901081-14-42

8          File No:        TRC776

9

10

11

12

13                              EXAMINATION OF

14                              BRIAN ROCHE

15                              JUNE 25, 2015

16

17

18

19

20

21

22

23    REPORTED BY:  PAULETTE VANTON, CSR NO. 6962

24    JOB NO. A906612

25

A906612
**BRIAN ROCHE      JUNE 25, 2015**

---

```
 1              EXAMINATION UNDER OATH
 2
 3
 4   RE:  Insured:        STARS and BARS, LLC
 5        Claim No:     EJG0625001H
 6        Date of Loss:  July 18, 2014
 7        Policy No:     680-8E901081-14-42
 8        File No:       TRC776
 9
10
11
12
13
14          TRANSCRIPT OF THE EXAMINATION UNDER OATH OF
15   BRIAN ROCHE taken at 1100 Town and Country Road, Orange,
16   California, commencing at 10:00 a.m., Thursday, June 25,
17   2015, before Certified Shorthand Reporter Paulette Vanton,
18   CSR No. 6962.
19
20
21
22
23
24
25
                                              Page 2
```

```
 1                  I N D E X
 2   WITNESS:  BRIAN ROCHE                       PAGE
 3        By:  Mr. Leo Ashley, III, Esq.          5
 4
 5               EXHIBITS
 6
 7   EXHIBIT       DESCRIPTION              PAGE
 8   Exhibit A   4-10-15 Letter w/attachments; 8 pages  35
 9   Exhibit B   Coordinator Job Description; 1 page   49
10   Exhibit C   Thomas Mackie Declaration; 3 pages    63
11   Exhibit D   Copy of Cashier's Check; 1 page       68
12   Exhibit E   Robert Lehmeyer Declaration; 1 page   71
13   Exhibit F   Check to Bob Lehmeyer 8-1-14; 1 page  80
14   Exhibit G   Evan Kennedy Declaration; 1 page      84
15   Exhibit H   11-9-14 e-mail string; 1 page         93
16   Exhibit I   Royce Mealin Declaration; 1 page     101
17   Exhibit J   Matt Connor Declaration; 1 page      105
18   Exhibit K   Bryan Sadler Declaration; 1 page     110
19   Exhibit L   Blake Stolo Declaration; 1 page      114
20   Exhibit M   Fourth Amendment to Lease; 10 pages  128
21   Exhibit N   Notice of Entry of Judgment; 11 pages 131
22   Exhibit O   11-5-14 HSNO Letter; 9 pages         173
23
24
25
                                              Page 4
```

---

```
 1                A P P E A R A N C E S
 2
 3   FOR THE TRAVELERS:
 4       WESTON & McELVAIN LLP
 5       BY:  LEO L. ASHLEY, ESQ.
 6       601 S. Figueroa Street, Suite 2350
 7       Los Angeles, California  90017
 8       (213) 596-8000
 9       E-MAIL:  lashley@wmattorneys.com
10
11   FOR THE DEPONENT:
12       THE KRISTY LAW FIRM
13       BY:  JAMES R. KRISTY, ESQ.
14       3020 Old Ranch Parkway, Suite 300
15       Seal Beach, California 90740
16       (562) 799-5448
17       E-MAIL:  James@kristylaw.com
18
19
20
21
22
23
24
25
                                              Page 3
```

```
 1        Thursday, June 25, 2015, Orange, California
 2            10:00 a.m. - 3:00 p.m.
 3
 4            EXAMINATION UNDER OATH
 5
 6            BRIAN ROCHE,
 7        having been first duly sworn, was examined and
 8   testified as follows:
 9
10                EXAMINATION
11
12   BY MR. ASHLEY:
13        Q   Mr. Roche, can I get you to state and spell your
14   name for the record?
15        A   Yes, Brian Roche, B-r-i-a-n, Roche, R-o-c-h-e.
16        Q   You have a middle name?
17        A   Yes.
18        Q   What is it?
19        A   Matthew.
20        Q   Do you know who Morgan Roche is?
21        A   Yes, my wife.
22        Q   Your wife.  Okay.
23            I should introduce myself.  My name is
24   Leo Ashley.  I represent Travelers Casualty Insurance
25   Company of America with respect to insurance claim filed
                                              Page 5
```

A906612
**BRIAN ROCHE        JUNE 25, 2015**

**Page 18**

1  located behind the bar in Suite 221.
2       That's a general description of the space.
3       Q   And your particular business or Stars' business
4  was going to be comprised of a bar area, a restaurant
5  area, and an area for live music, dancing?
6       A   No, it's an open concept.  So there was a live
7  music component, also a DJ component.  You have a
8  restaurant, bar, two sets of bars and a back lounge area.
9       And then we also got approved by the City of
10 Mission Viejo for a patio, so we were going to be opening
11 up a patio in the front of the space as well, which was
12 going to be right in the center of the first floor of the
13 mall.
14      So a restaurant club, a bar, all as an open
15 concept, open meaning the square footage was open.  You
16 could go from one side to the other and the space was open
17 that way.
18      Q   What specific renovations did you need to make in
19 the suite in order to prepare the suite for opening by
20 Stars -- to prepare the business for opening by Stars and
21 Bars?
22      A   There was a lot but I can tell you the top ticket
23 items.
24      We built a passthrough wall in front of the
25 kitchen which allowed the food to go from the kitchen to

**Page 19**

1  passthrough for the waiter staff to go grab.  We expanded
2  the bar approximately 25 feet from where it was.
3       A new floor, new layout of some of the booths and
4  stuff, so those were the big ticket items.
5       Q   And all that work commenced in or about
6  June 2014?
7       A   June or early July.
8       Q   At the time that you took possession, did you
9  have a plan in terms of how long it would take to do the
10 necessary renovations?
11      A   Yes, we had plans approved from the City of
12 Mission Viejo on June 3rd.  We anticipated a two to two
13 and a half week, no more than three weeks of, construction
14 renovation.
15      Original schedule opening was the July 4th
16 weekend and we ended up having to push it back about just
17 under two weeks because of the flooding.
18      Q   And the flooding is -- tell me about the
19 flooding.  What happened?
20      A   Well --
21      MR. KRISTY:  Calls for speculation, but to the
22 extent you know.
23      THE WITNESS:  I mean, as you know the reason we
24 are here is there was a sewage flood that took place that
25 caused a catastrophic destruction of our business.

**Page 20**

1       Originally, we thought it just pushed our opening
2  back, but when we found out the extent of the damage, it
3  was a lot more serious than anyone had imagined.
4       Do you want the details of what happened with the
5  flood as I know it?
6  BY MR. ASHLEY:
7       Q   Yeah, I'll get there.
8       A   That's what I figured.
9       Q   What date did the flood take place on, do you
10 know?
11      A   The flooding was taking place for a period.  It
12 started kind of late June, early July.  We were put on
13 notice from the mall on June 9th that our unit was
14 flooding, the unit below us, but we weren't running any
15 water, so we know it wasn't from us.
16      I talked to Dan Loriano, the person that owned
17 the business above us, and he had been experiencing
18 backups of his grease line from the grease trap and
19 causing flooding in his kitchen and flooding our unit
20 below us.
21      And so I'd say, generally, that's when it started
22 but, you know, it's more of an opinion than an expert in
23 plumbing is going to be giving.
24      Nonetheless, it culminated in what's called the
25 Tsunami of sewage that was pouring out over the place for

**Page 21**

1  a period of days, sometime in the middle of July.
2       Q   In July, is that the first time you saw sewage
3  enter the suite at --
4       A   No, our floor sinks had been backing up since
5  June, since late June, early July.  We had put the mall on
6  notice about it.  We told Dan about it.  And it wasn't
7  until something finally clogged up, Dan's grease line that
8  caused the sewage to flow up and flood our entire place.
9       Q   And what --
10      A   Have you been to the Kaleidoscope Mall yet?
11      Q   I have not.
12      A   I would encourage you to go, obviously, to kind
13 of get an idea of what's going on there.  And certainly if
14 this thing ever gets litigated you'd want to go by,
15 because it's not going to look good for a jury to say you
16 have never been by but nonetheless, he's above us, we're
17 below, so when his grease line backed up down below in the
18 garage, it naturally flooded us first because of gravity
19 and it flooded us through our floor sinks that were spread
20 throughout the bars in the kitchen areas.  And then also
21 in one area, it also flooded from above.
22      So most of the flooding came up from below
23 through the floor sinks which connect to the grease line
24 and, eventually, the grease trap in the mall, and also
25 some flooding from above.

6 (Pages 18 to 21)

A906612

**BRIAN ROCHE       JUNE 25, 2015**

1   answer is, no.
2         MR. KRISTY:  How about we do this?
3         Generally, can you describe what the source of
4   your income is?
5         THE WITNESS:  We receive residual monies that
6   stays in the come company, and I have an entity in Nevada
7   that owns my ownership interest in that that ends up
8   getting paid the residuals.
9   BY MR. ASHLEY:
10        **Q   What's the name of that Nevada entity that owns**
11  **your interest?**
12        A   Roche Investment Group.
13            This is off topic. Can you just object and let's
14  just move on to the real stuff, like why they denied the
15  claim?  Why they harass my employees by showing up with
16  investigators while we are sitting here six months later
17  wasting our time when we should just be suing them?
18  BY MR. ASHLEY:
19        **Q   Do you know how much money you individually made**
20  **in 2014?**
21        A   From Pop Payments?
22        **Q   From any source.**
23        MR. KRISTY:  That's private.  That's invasion of
24  privacy.
25        MR. ASHLEY:  How much money he made during --

Page 30

1         MR. ASHLEY:  Well, I mean, I think it's relevant
2   because we're talking about a claim for lost business
3   income and we are investigating all aspects of the claim,
4   and I think we have a right to know in terms of the
5   circumstances surrounding the claim, what type of
6   financial situation Mr. Roche was in, what financial
7   situation Stars and Bars was in in or around the claim.
8   So we would just like to know that information for that
9   specific purpose.
10        Again, I think it's relevant to the investigation
11  of the entire factual circumstances surrounding your
12  claim.
13        MR. KRISTY:  You know, just to reiterate that
14  Stars and Bars was its own business and that's the entity
15  that's making the claims here.
16        MR. ASHLEY:  Understood.
17        THE WITNESS:  Let me try to answer generally to
18  see if I can touch on enough to satisfy him.
19        The business interruption part of the claim is
20  based on sales that we would have generated once we opened
21  and based on the net profits that we would have generated.
22        When you say your inquiry about Stars and Bars
23  financial condition, it has nothing to do with the lost
24  potential sales or profit of the business at all, totally
25  irrespective of each other.

Page 32

1         THE WITNESS:  I'm not answering.
2         MR. KRISTY:  Right.
3         MR. ASHLEY:  Why is that --
4         THE WITNESS:  Your mouth is foaming up on the
5   side.
6         MR. KRISTY:  I want to take a break.  I need a
7   break.
8         THE WITNESS:  No, he's got some white on the
9   side.
10        MR. KRISTY:  I want to take a break.
11        THE WITNESS:  Why take a break because -- does
12  that mean I have to leave with you?
13        MR. KRISTY:  Sure.  I'd love your company.  Off
14  the record, please.
15        (A break was taken.)
16  BY MR. ASHLEY:
17        **Q   Just so I'm clear, you're not going to tell me**
18  **how much money you individually made in 2014?**
19        MR. KRISTY:  Yeah, I mean it's not relevant to
20  the claim.
21  BY MR. ASHLEY:
22        **Q   The same would be true if I asked you how much**
23  **money you made in 2013, you wouldn't tell me that either?**
24        MR. KRISTY:  Maybe you could help me as far as
25  the relevance to the claim here.

Page 31

1         With regards to Stars and Bars as an entity, we
2   had invested well over $400,000 to get to the point where
3   we were ready to open, including the hiring of all of our
4   staff, the renovations and the money we put into it.
5         That money came from the source of two loans and
6   also from me and my other business that I put the money in
7   myself.
8         So to say that Stars and Bars financial condition
9   we had capital of well over $400,000 to make those capital
10  improvements and to get to the point where we were ready
11  to open, and with regards to me individually it's
12  irrelevant to the point of what you're asking.
13        MR. ASHLEY:  Okay.
14        THE WITNESS:  I think that that generally should
15  satisfy you, I hope.  But it's your examination.
16        MR. ASHLEY:  And I understand you say that, but I
17  just want to be sure you're not going to provide me with
18  that information as we sit here today.
19        THE WITNESS:  No, I'm not declining providing you
20  with information.  I just answered your question to the
21  best of my ability.  I'm not declining.
22        I'm not not providing you information.  I resent
23  you taking that line of action because that's not what's
24  taking place here.
25        MR. ASHLEY:  Fair enough.

Page 33

9 (Pages 30 to 33)

A906612

**BRIAN ROCHE     JUNE 25, 2015**

1    He was actively engaged with us following up in
2  calls and e-mails about what was going on and stuff, so I
3  would say that he was still actively around.  And still
4  is.
5    Obviously actively around in October when you
6  guys were continuing to harass him for documents and
7  information, and the multiple calls he did with
8  Timothy Gillihan I think at HSNL, so he was active during
9  that time as well.
10    **Q   Was the location, a Permit for the location ever**
11  **approved by the City?**
12   A  Yes.
13    **Q   Do you know whether that happened?**
14   A  We had a Permit approved for the main square
15  footage on June 3rd.  We had a Permit approved for the
16  patio sometime in August, end of August.
17    **Q   I take it that Mr. Mackie wasn't involved in the**
18  **approval of the Permit for the square footage since that**
19  **was in June and he wasn't involved with Stars and Bars**
20  **until July; is that correct?**
21   A  Correct.
22    **Q   How about the approval relative to the patio, was**
23  **Mr. Mackie involved at all in that process?**
24   A  Yes.
25    **Q   Do you know what his role was in particular?**

Page 62

1    A  He was just the owner's Rep.  He would liaison
2  with our architect and designer, liaison with some of the
3  meetings that he had at the City.
4    The way it works is, you apply for a Permit and
5  the City Planner goes in and they wanted to make all these
6  changes.
7    But it's really interpersonal communication where
8  it's literally done at a countertop, so we have someone
9  who's really personable and credible, you know, those are
10  important.
11    So he was a part of that process to kind of help
12  smooth this.  So he was involved during that process in
13  July and August.
14    MR. ASHLEY:  Take a look at a document we'll mark
15  as Exhibit C.
16    (Exhibit C was marked for identification.)
17    MR. ASHLEY:  For the record, Exhibit C is a
18  Declaration.  It appears to be made by Mr. Mackie, dated
19  October 15th, 2014.
20  BY MR. ASHLEY:
21    **Q   Have you seen this document before?**
22   A  Yes.
23    **Q   Do you know who prepared this document?**
24    MR. KRISTY:  Are you talking about the first
25  page?

Page 63

1  BY MR. ASHLEY:
2    **Q   The first page.**
3   A  I believe I did.  I prepared the first page.  And
4  the second and third page consisting of his resume, slash,
5  biography is not something I prepared.
6    **Q   Why did you prepare the first page, the**
7  **Declaration?**
8   A  Because Timothy Gillihan, who was the hired
9  Forensic Accountant by Travelers, and his company HNSO had
10  a conversation with Tom Mackie and my other employees and
11  requested since part of his payment was made in cash that
12  he sign a Declaration stating as such, which he did.
13    **Q   This was prepared at the request of Mr. Gillihan?**
14   A  Yes, Tim Gillihan requested that the employees
15  all sign Declarations, which the at the happily did.
16    Not all the employees, the five or six people
17  that we had committed as paying salaries for.  So just to
18  clarify that, all the other employees were hourly
19  employees.
20    **Q   Mr. Mackie signed this document, the Declaration,**
21  **where indicated?**
22   A  Yes.
23    **Q   He dated it as well?**
24   A  It appears so, yes.
25    **Q   Were you present when he signed it?**

Page 64

1   A  No.  In fact, I believe he sent this directly to
2  Mr. Gillihan.
3    **Q   And it accurately describes what you or what**
4  **Stars and Bars expected from Mr. Mackie in the way of his**
5  **activities in relation to the business of Stars?**
6   A  Let me read it, please.
7    **Q   Sure.**
8   A  I'd say that it generally describes some of his
9  activities he was going to be doing on behalf of Stars and
10  Bars.  Not all of the activities.
11    **Q   Aside from what you've already talked about here**
12  **today, are there any other activities that Stars expected**
13  **from Mr. Mackie that aren't identified in the Declaration?**
14   A  Probably.
15    **Q   Can you tell me what these are?**
16   A  Other than what we talked about on the Program
17  Coordinator sheet?
18    **Q   Other than what you've talked about already.**
19   A  And other than what's listed on this Declaration?
20    **Q   Right.**
21   A  Probably.
22    **Q   There probably are?**
23   A  Yeah, there are probably other things that he was
24  going to be doing on behalf of Stars and Bars that weren't
25  listed and that we haven't discussed.

Page 65

17 (Pages 62 to 65)

A906612

**BRIAN ROCHE      JUNE 25, 2015**

1  paid other than the salaries that we paid and were
2  obligated to up a certain amount of time, and then money
3  for those employees for the extra work they did over and
4  above.
5      Q   Okay.  I gotcha.
6      A   Okay.
7      Q   At some point was the sewage that entered Stars
8  from the Tsunami cleared out?
9      A   Well, that's an interesting question.  I would
10  say that that's a question that only an expert can answer
11  based on testing.
12      As of the time we were evicted out from the
13  Sheriff after the Writ of Possession was signed, so let's
14  call it a March 1st date, up until March 1st, the sewage
15  was cleaned but you don't know, and it was remediated to
16  the extent that most of the drywall in the areas and the
17  flooring and all that stuff were pulled out, thrown away.
18      But you don't actually know if it's all out until
19  after you actually do the bacteria testing.  You have to
20  go back and do more testing after they cleaned it.  But
21  there wasn't anymore money left to do it.  It was going
22  towards the legal fees.
23      It was all cleaned and gutted and remediated to
24  the best that the contractors could do based on working
25  with Nationwide and their recommendations and their

Page 118

1      accepted liability.
2      And it never came out until the UD trial that the
3  Mall had never even filed their own claim with their own
4  insurance.  They were just relying on Nationwide.
5      Q   Okay.  Were there repairs to your suite that were
6  made following the sewage leak?
7      A   What do you mean repairs?
8      Q   Did someone come in to repair the conditions that
9  were created by the Tsunami in July 2014?
10      A   I would say between the companies, it was not
11  repair.  I consider repair like a fix or it's usable.
12      What was done was, it was gutted and remediated
13  and everything pulled out but nothing was actually put
14  back together yet, nothing was installed yet.
15      Until that bacteria testing took place, until we
16  had the money to do it, you're talking about hundreds and
17  hundreds of thousands of dollars was what was projected to
18  do all these things not including the contents.
19      It was determined demo'd and remediated but not
20  repaired or reconstructed.  I just want to be real clear
21  on the terms.
22      Q   I appreciate that.
23      A   It will help both of us.
24      Q   At the time that Stars and Bars vacated in March
25  of 2015, was that the condition of the property that it

Page 120

1  property people and their restoration company that they
2  brought in.
3      But unless you actually have new bacteria testing
4  done, you don't know if it's actually clean or sanitary or
5  able to be inhabited by humans.
6      Q   Nationwide, though -- well, let me ask you.
7      Did Nationwide fund repairs to Stars and Bars
8  suite as a result of the sewage Tsunami?
9      A   The only thing Nationwide funded was after they
10  accepted all the liability for the flood on behalf of the
11  guy above us, because it was his fault, the only thing
12  they paid me was $20,000 in advance on the first week of
13  August so I could hire my contractors to go in there and
14  start doing the remediation and the demo.
15      So that was just an advance towards the
16  contractor's $20,000.  That's the only monies that
17  Nationwide had ever paid me.
18      Q   Nationwide was the insurer of Stars' upstairs
19  neighbor?
20      A   Right.  There is a big Sushi restaurant above us
21  called Reptide Sushi.  It was his grease line that backed
22  up.
23      Whether the liability falls on him or the Mall is
24  to be determined.  But it was definitely not our fault, so
25  Nationwide on behalf of Reptide, the restaurant above us

Page 119

1  had been gutted and remediated but there was property that
2  still hadn't been put back into the location?
3      A   That's correct.
4      Q   What else needed to -- besides the testing, what
5  physical components of the suite needed to be put back
6  into the suite in March of 2015?
7      A   Okay.  You've seen the pictures?
8      Q   Yeah.
9      A   Okay.  This is more for the record, okay?
10      Everything from top to bottom.  So the entire
11  place was gutted.
12      Aside from the testing, to answer your question,
13  all of the drywall had to be put back in.  In some spaces
14  the metal studs had to be replaced.  Supports.  All of the
15  FF&E, the wood trim, finishes, all of the money that we
16  had expensed to build the place out, the floor, the bar,
17  all of the equipment.
18      I mean everything was -- the walk-in cooler
19  needed a new walk-in cooler.  That's just sort of the
20  physical, structural stuff.
21      And then, obviously, you have the contents-wise
22  which is all the kitchen equipment, bar equipment, the
23  jockey boxes, all of that.  Ice.
24      So, generally, the place looked like a bomb had
25  gone off in there.  The drapes on the outside were

Page 121

31  (Pages 118 to 121)

**BRIAN ROCHE        JUNE 25, 2015**

1  percentage rent that we had agreed to, which at the time
2  that it was negotiated was contemplated to be once we
3  opened to business.
4      Q  It was your understanding that the rent was not
5  going to be due until after you opened up for business?
6      A  Yeah.  That's what took place.  We thought the
7  Permitting process was going to take four weeks as we were
8  told by the landlord and ownership.  And it ended up
9  taking six months.
10        It was contemplated we would be open March 1st
11  and that's when it would start.  Even going through May
12  and June that's why we had multiple modifications by the
13  landlord and the management company modifying the terms of
14  the rent because there was no start date listed in this
15  agreement at all.
16     Q  Okay.  Did Stars ever pay rent to Crown Valley
17  Holdings during the time that Stars occupied the premises?
18     A  We didn't take possession or Star occupy the
19  premises the later part of June, around June 22nd or
20  so is when we actually took possession and got the keys.
21        We did pay some portion of rent to them just to
22  kind of show good faith because our permitting process was
23  taking longer.
24        I paid $6500 on April 15th to the landlord.  So
25  even though we didn't feel like we were obligated to pay

Page 130

1  the rent, I felt like we should show some good faith
2  because the Permitting process was taking longer, even
3  though it wasn't our fault, it's really the City's fault.
4  You know, they blamed us that it was taking longer, as if
5  there was something we could do.  So the answer is $6500
6  was paid to the landlord.
7     Q  Towards?
8     A  Towards rent.
9     Q  So that was the lone rent payment in conjunction
10  with the lease?
11     A  Yes.
12     Q  At some point Crown Valley Holdings commenced an
13  Unlawful Detainer for Stars and Bars for unpaid rent?
14     A  Yes.
15     Q  And the case went to a jury trial?
16     A  Yes.
17        MR. ASHLEY:  Let me show you what we'll mark as
18  Exhibit N.
19        (Exhibit N was marked for identification.)
20        MR. ASHLEY:  In order to clarify the record, I
21  will indicate that we are marking this document as Exhibit
22  N, which is a Notice of Entry of Judgment, dated
23  February 24, 2015, and the action on the Crown Valley
24  Holding versus Stars and Bars LLC on Orange County Case
25  No. 30201400738618.

Page 131

1  BY MR. ASHLEY:
2     Q  Mr. Roche, you've seen this document before,
3  correct?
4     A  Yes.
5     Q  And this is one of the documents you produced in
6  response to Travelers request for documents in conjunction
7  with this EUO, correct?
8     A  Correct.
9     Q  And this document reflects, among other things, a
10  Judgment that was entered against Stars and Bars in the
11  action commenced by Crown Valley Holdings; is that
12  correct?
13     A  Yes.  Judgment for $149,000 and -- there's no
14  and, actually.  It's $149,806.34.  There's no and after
15  you finish something like the hundred thousand there's no
16  and, you just go right into it.
17     Q  And the Judgment is broken down into two
18  portions; is that correct?
19     A  Right.  It's broken down into two portions.  The
20  first portion was the amount listed on the original 3-Day
21  Notice to Pay Rent or Quit, which is the $58,606.34, and
22  then the second amount, which is the amount that we were
23  stuck paying because we defended ourselves and took it
24  through trial of $91,000, and that was for rents from
25  July 18th, the posting of the 3-Day Notice, up until the

Page 132

1  verdict on February 8th.
2     Q  That latter category, the $91,000 and the date
3  that those damages or the period that those damages
4  concerned, was the beginning of that period the date of
5  the Tsunami in July 2014?
6     A  No.  The Tsunami took place the following day.
7  As the Emergency crews were there cleaning up, they posted
8  a Three-Day Notice to Pay or Quit because we told them we
9  are not paying the rent from this point on and any deal we
10  have is off.
11        So this was a daily rate that was calculated from
12  a number of days, from three days after the posting of the
13  Pay Rent or Quit Notice on July 20th is the date they're
14  claiming.  A daily rate from July 20th up until the
15  verdict on February 8th.
16        That day rate came out to 500-some dollars per
17  day and that's where the $91,000 came from that we hold
18  Travelers responsible for, among other things.
19     Q  Has any portion of the Judgment been paid by
20  Stars and Bars or by someone else on Stars and Bars
21  behalf?
22     A  No.
23     Q  Has Crown Valley commenced any proceeding to
24  enforce the Judgment?
25     A  There is no way they're going to enforce it, no.

Page 133

34  (Pages 130 to 133)

A906612
**BRIAN ROCHE     JUNE 25, 2015**

1  Rent is covered under the policy at least as of
2  your arbitrary $45,500.
3      Our position is that you guys owe us the rent
4  also up through the verdict because we got stung with
5  $91,000 of unpaid rent during this time trying to defend
6  ourselves because you guys wouldn't pay me my original
7  grant on my policy that I could have used to cure the
8  Three-Day Notice prior to the trial.
9      So, we're claiming that you owe us rent all the
10  way up through that March 1st, you know, which is, in
11  essence, that $91,000.
12      And then let's go through the rest of the stuff.
13      Legal fees.  We're gonna --
14  **Q   I'm sorry, I don't mean to interrupt you.**
15  **The $92,000 per month that you talked about**
16  **before in terms of business interruption cost, is that**
17  **essentially the net profit that you expected to make each**
18  **month?**
19  A   Right.  It's $92,4603 is what we projected to
20  make based on the previous business that was there and
21  based on some financials by Toby Keats "I love this Bar",
22  which was a tenant that was going above us and we were
23  basically a knock off of that, and based on Bob Lehmeyer's
24  30 years of experience.
25      Those numbers were prior to the approval of the

Page 150

1  So their reading of it is we shouldn't have to
2  pay rent.  It should have been abated.  That was my
3  reading of it but, unfortunately, the landlords continued
4  to pursue a trial date having depositions and a trial that
5  took place in January, so at that point in time when you
6  knew that was going on, you guys should have stepped up
7  and paid it and you didn't.
8      You chose to harass guys like Evan Kennedy by
9  sending investigators there instead of doing your job and
10  paying me what I'm owed under the policy.
11      So, business interruption we talked about.  Rent
12  we talked about.
13      Let's talk about the legal fees.  We are going to
14  say that us having to defend ourselves in that unlawful
15  detainer trial, the costs that I had to incur by paying my
16  lawyers to go defend it, my attorney's fees and costs and
17  also the attorney's fees and costs that we now got stung
18  with in the jury verdict is directly caused by Travelers.
19  You not paying under the policy, not paying the
20  rent, not paying any business interruption on the policy,
21  and shorting us on that 113 and shorting up on the
22  operating expenses when we justified well over $220,000 to
23  Timothy Gillihan, okay?  You shorted us by paying us like
24  83- or 85,000.
25      In addition to that, you arbitrarily,

Page 152

1  patio in August so those were projections done from June
2  and July prior to the patio improvement, so our contention
3  is it would have been higher than that number because we
4  would have the patio which meant more seats, more sales,
5  also more cost but it's a number.  It's about 25 percent
6  more because of that patio approval which was very unique.
7      The landlord told us that we would never get a
8  patio approved there, so much so that in the Fourth
9  Amendment, they actually told me if I ever get the patio
10  approved, they're going to give it to me for free.  I'm
11  not going to have to pay any rent towards it because
12  you'll never get it approved.
13      It's actually in the Fourth Amendment, Patio's
14  free.  And we ended up getting it approved through the
15  help of guys like TMac and my architect and such.
16      But nonetheless, so up until the October 31st
17  date should have in the very least been paid by you guys,
18  and I could have used some of that money to not have to
19  pay the legal fees and possibly pay the Three-Day Notice
20  and we wouldn't be sitting here today.
21      But you guys chose, through Cory's stupid letters
22  and Mr. Gillihan's little section in his stupid report
23  stating that it's his belief that rent should be abated,
24  and we're going to have to talk about this section later
25  is kind of how they did it.

Page 151

1  Mr. Gillihan and Corey, arbitrarily moved our projected
2  opening date from July 18th to August 1st, and by doing so
3  you deprived us of $26,050 of operational expenses that we
4  justified to Mr. Gillihan during that time.
5      He said, "Well, my belief is you probably
6  wouldn't have been open until August 1st, so we're going
7  to use that as a date."
8      So by moving that date to August 1st, you
9  deprived us of $26,050, you didn't pay any rent, and the
10  legal fees that we had to incur on our end, which are in
11  excess of $400,000 through the jury trial and costs, and
12  then the legal fees that now we are stuck having to pay
13  them from the judgment; their attorney's fees and the
14  costs.  Just their piece totaled $783,000.
15      The $149,000 verdict, their 572- of attorney's
16  fees and the $61,000 of costs.  Total $783,000 worth of
17  costs.
18      So our contention is Travelers is directly libel
19  and responsible to us for that, because we wouldn't have
20  been in the position to defend ourselves had you guys --
21      I'm going to take a little side note that,
22  personally, I am a little frustrated with this process
23  because we prepared diligently for the trial during the
24  holidays, and you requested an EUO through your letter and
25  I responded on January 14th saying that we are very busy

Page 153

39 (Pages 150 to 153)

A906612

**BRIAN ROCHE      JUNE 25, 2015**

1  preparing for this trial, I've been out of town, I need to
2  hire new Counsel to represent me because my Counsel is
3  totally locked and loaded -- I had three law firms --
4  locked and loaded on the trial preparation. I don't have
5  time to sit for it now, but I'm going to get new Counsel
6  and have them contact you.
7       And you took it upon yourself two days later on
8  January 16th to send me your letter denying our claim.
9       And that was on a Friday that I got that letter
10  and we started Jury selection on a Monday.
11       So it's not going to look too good for you or
12  Travelers when we say on the eave of our trial having to
13  defend ourselves for our lives, with hundreds of thousands
14  and possibly millions of dollars at stake, you deny our
15  claim because I was too busy to sit with you that week
16  when I told you I had to get new Counsel.
17       Ironically, when you reaccepted the claim, you
18  sent me the 7501.1, which is the California Insurance Code
19  which clearly states under Subsection 4 that I'm entitled
20  to have Counsel represent me in the EUO.
21       So my e-mail to you said that I need to get new
22  Counsel and they're going to be in contact with you.
23       You denied the claim.
24       I further clarified in a backup e-mail to you.
25       So our belief is that Travelers directly caused

Page 154

1  Court?
2       A   We haven't done anything with it. They had
3  initial costs that they provided that we didn't dispute so
4  I think that was added.
5       There is probably going to be a new filing for a
6  new Judgment over and above this Judgment of their
7  attorney's fees.
8       **Q   As we sit here today, do you know whether a**
9  **subsequent order has been issued by the Court regarding**
10  **them, Crown Valley, their claim, costs for attorney fees**
11  **and litigation costs?**
12       A   No. I can't imagine that it's not. They were
13  going after it.
14       **Q   As we sit here you don't know one way or the**
15  **other?**
16       A   No. You can probably go to LA County's website
17  and search and secure what the latest is. I know there
18  were some Hearing for it like two or three weeks ago that
19  we never showed on.
20       Do you want me to keep going on the rest of the
21  items I believe Travelers owes us for?
22       **Q   Yes, please.**
23       A   The other stuff is, we were told we were going to
24  be reimbursed for costs and time that were incurred for
25  the ton of hours that were spent on the phone with

Page 156

1  that UD trial and all the costs that were being incurred.
2  So that's what we are going after.
3       So to answer your question the fourth part of
4  that, we believe all the legal fees from our end and their
5  end, you're obligated to me because of your failure to pay
6  under the policy and do your job, so to speak, is a
7  breach of covenants of good faith and good dealing.
8       Then that's that area. Then there are a bunch or
9  like five or six small ones. I don't need to explain each
10  one. I can just itemize them out if you'd like.
11       **Q   Yeah, we'll get there. Before we do that, with**
12  **respect to the $783,000 of legal fees, those are fees of**
13  **Crown Valley Holdings; is that correct?**
14       A   Yes, as I stated, $783,859.24, to be exact, is
15  what we owe. That's a total of the Judgment of the
16  149,804, that's a total of their cost for the case, 61,594
17  bucks and that's a total of their legal fees, which was
18  573,000 and some change. And the total of that comes to
19  $783,000 and some change.
20       That's just theirs. And I have spent on my end
21  well over $400,000.
22       **Q   I saw one of the documents you provided in the**
23  **drop box with the Motion for Attorney's Fees by Crown**
24  **Valley Holdings.**
25       **Was that Motion subsequently granted by the**

Page 155

1  Tim Gillihan, e-mails and preparation of e-mails.
2       That's probably the most minor of them.
3       **Q   Who told you you would be reimbursed for that?**
4       A   He did. Tim Gillihan.
5       Here's what I would like to do. There are like
6  six or seven other things that I feel Travelers is libel
7  to us for that you haven't paid on and I'd like to maybe
8  take a break for like 20 minutes get a quick sandwich and
9  then come back and wrap all this up. Okay?
10       **Q   Fine with me.**
11       A   I'll just name them and move on unless you have
12  questions.
13       **Q   I may have questions about that.**
14       A   Okay. So --
15       MR. KRISTY:   Okay. Off the record.
16       MR. ASHLEY:   We'll go off the record now and it's
17  1:50. We can come back at 2:20.
18       (A lunch break was taken.)
19  BY MR. ASHLEY:
20       **Q   When we last left off we were talking about**
21  **amounts that you believe Stars and Bars were owed by**
22  **Travelers under the terms of the policy -- or otherwise.**
23       **I want to take a quick step back with respect to**
24  **the Judgment that was entered in favor of Crown Valley**
25  **Holding, in particular the portion of the Judgment**

Page 157

A906612

**BRIAN ROCHE      JUNE 25, 2015**

1  totaling $58,806.24.
2      The period of time that that Judgment concerns is
3  July 9th.
4      Do you know the beginning of the period of time
5  that that Judgment is concerned with?
6      A   It was part rent for March of the landlord's
7  claim, April, May and June and July.  That's what that
8  58,806.34 represents.
9      Q   That's, again, March through July of 2014?
10     A   The total was 58,500, and then they added an
11 extra 306 for some water usage, shared water usage that
12 they wanted.
13     Q   Do you have any reason to believe that Travelers
14 is responsible for that portion of the Judgment as well?
15     A   Yes.
16     Q   What's your understanding in that regard?
17     A   Had you paid me the rent that I'm entitled to
18 under my policy in late September -- I filed the claim
19 with you September 16th, so let's just say in September,
20 which was only less than a month after they filed the
21 actual lawsuit, that I could have cured that Three-Day
22 Notice to Pay or Quit had you paid me the rents.
23     So I wouldn't have been in the position to have
24 to defend myself through the entire Unlawful Detainer
25 process and trial.

Page 158

1      And that was rents that you were obligated to pay
2  me irrespective of any other operational expenses that we
3  were working for two months with Timothy Gillihan on or
4  anything else under the policy.  That rent was in the
5  policy.
6      The fact that the landlord at the time had just
7  filed the actual Unlawful Detainer action and that you
8  were aware of it and that Corey was aware of it.  You guys
9  should have just paid it instead of trying to litigate it
10 yourself by saying, well, we don't think that you should
11 have to pay it to the landlord.  Which is really what his
12 position is now.
13     And we don't -- and same as with Timothy
14 Gillihan, they're like talking parrots, we don't think you
15 should have to pay to the landlord.
16     Well, you know what, they suing us, and we have
17 the eave of a trial starting in four to six weeks, and
18 this was up to the time going back to September and
19 October, and you trying to litigate what's in my lease has
20 nothing to do with what the landlord's going to be doing.
21     You can say, oh, we don't think we should pay
22 you, which is what your position was and, in essence,
23 didn't pay me and, in essence, I couldn't pay them, so I
24 felt like had you paid that rent to me that I could have
25 cured that Three-Day Notice and we wouldn't be in this

Page 159

1  position.
2      And so that's why I feel like the whole cause of
3  that trial is going to fall to on Travelers' shoulders.
4  And it's not just me that feels that way.  My lawyers feel
5  that way.  My previous lawyers feel that way.  The other
6  lawyers for the law firms that I consulted with prior to
7  this feel that way.
8      And we're going to point it all on Travelers'
9  shoulders that you're the cause for that trial going
10 forward and the loss that incurred for me for the legal
11 feels and costs I had to pay and also what I'm obligating
12 them to pay.
13     MR. KRISTY:  Okay.  Next question.
14 BY MR. ASHLEY:
15     Q   Aside from what you've talked about already, has
16 Stars and Bars incurred any other amounts that you believe
17 Travelers is responsible for that Travelers hasn't
18 compensated Stars and Bars for today?
19     A   Yes.  Continuing what we have been discussing,
20 sure.
21     So there was a number of additional costs that I
22 had to incur from the sewage flood and the cleanup
23 remediations that weren't included in those ongoing
24 operational expenses.
25     That was just the first pass at what we kind of

Page 160

1  provided Mr. Gillihan as of October, but there was a lot
2  more during that time that we have been able to gather and
3  a lot more since separate from the legal fees.
4      Just talking about hard costs that we have had to
5  incur for operational expenses during the time up until
6  the jury verdict.  That would be another item.
7      We lost our liquor license because of your
8  failure to pay the claim and what's happened.
9      And I understand under the policy that the
10 policy, I believe, states that you're not -- you don't get
11 to reimburse us for the costs of any type of licensing
12 except and unless, and I read this a while ago, "unless
13 and except the loss of the license is incurred because of
14 the business stopping."
15     So the business stopped, and then some license or
16 something is lost because of it, then the policy covers
17 that.  But it doesn't cover just the loss from the
18 beginning.  It has to be because the loss of the license
19 happened because the business stopped.
20     And because our business had been stopped for a
21 certain period of time where we couldn't activate our
22 liquor license, we ended up losing our liquor license and
23 that was a $75,000 value.
24     So we're going to clearly point that we lost our
25 liquor license because we were unable to open our doors in

Page 161

A906612
**BRIAN ROCHE      JUNE 25, 2015**

1  time because Travelers didn't pay the claim when they
2  should have, and that you guys are solely responsible for
3  the loss of that license.
4  **Q   Was Stars and Bars ever licensed to sell liquor**
5  **at the subject location?**
6  A   Yes.
7  **Q   When was that license issued to Stars and Bars?**
8  A   I think we filled out the transfer paperwork with
9  the ABC in February of 2014, first or second week of
10  February 2014.
11  **Q   And you were subsequently informed that the**
12  **license was suspended because the business didn't open?**
13  A   Right.
14  **Q   Do you know when you were informed of that?**
15  A   I was informed of that -- let me think.  Sometime
16  around December.  Sometime around December we were told
17  that there was a time in which you have to be open for the
18  business or else the liquor license is going to be lost.
19        And the liquor license was part of our
20  acquisition of the business.
21        The FF&E furniture fixtures and equipment and
22  also assets but all the liquor license, which is the most
23  valuable, that liquor license alone was about $75,000.  If
24  you were to go put a market value on this today, that's
25  what they sell for.

Page 162

1        So we blame Travelers for their bad faith and not
2  paying me under the policy and my claim which ultimately
3  led to our business not being able to open and ultimately
4  lost our liquor license.
5        So there's another 75 grand.
6        The next item would be there was some monies that
7  we paid over and above past that October 31st date to
8  salary for Bob Lehmeyer and others -- let's just say
9  salary to Bob, and then other expenses that we had
10  incurred having to pay people to do things for us that we
11  would' have had to incur pay.
12        Just because you set an arbitrary end date of
13  October 31st, the fact that we had to take this through
14  the Unlawful trial up until March, we hold you responsible
15  for that entire time.  So there was some extra salary and
16  cost.
17  **Q   With respect to Bob Lehmeyer and the amounts that**
18  **were paid to him, are those the same amounts that we**
19  **discussed after October 2014 through, I think,**
20  **February 2015?**
21  A   Right, that was the 20 grand.  That was after
22  that date.
23  **Q   In terms of other moneys for payroll or other**
24  **expenses after October 2014, do you know what the total of**
25  **those expenses are?**

Page 163

1  A   No.  I take objection to the term payroll.  I
2  don't think it was actually payroll.  It was extra ongoing
3  expenses that I had to incur that I would never had had to
4  incur had the flood taken place which was after that date
5  which was paid to employees of ours but not really
6  categorized as payroll.
7        Payroll I define as somebody who signed a W-2 and
8  gets a check and runs through or ADP payroll company.
9  Payment for work performed, I term as something different.
10  **Q   Fair enough.**
11        **With respect to the monies paid to Bob Lehmeyer**
12  **after October 2014, would you consider those payments**
13  **payroll?**
14  A   Yeah, that was payroll.  The other stuff I'm
15  referencing goes to just kind of ongoing expenses of the
16  business.
17  **Q   What were some of those ongoing expenses?**
18  A   Storage fees for items.  Moving fees, moving.
19  Cost of moving stuff out.  Cleaning stuff.  Home Depot
20  things.  Lowe's receipts.
21        And, you know, let me comment on this.  I don't
22  even know how much you've read or how much you know but in
23  Mr. Gillihan's stupid report, he said that some of the
24  items that we originally listed, which were like four or
25  five Home Depot receipts which were for cleaning materials

Page 164

1  that we had, that he couldn't justify them, that he didn't
2  get the receipts.
3        But those were clearly on the bank statements
4  that we gave him.  So the bank statements are what you can
5  rely on at that time for charges that were related to the
6  sewage flood cleanup, which we would never have had to
7  incur had the flood not taken place.
8        So that is another reason why I take exception to
9  his report.  I'd love to just talk about that report and
10  just figure the ten errors or flaws that he had in that
11  report.
12        But that report is really his, or I guess on
13  behalf of Travelers, your governing doctrine as to what
14  you should be paying for the operating expenses up to
15  October 31st.
16        And as I stated, the amount you gave me was short
17  over $150,000.  And that includes from moving the opening
18  date to August 1st, which was just an arbitrary unilateral
19  decision that him and Corey made to try to squeeze us and
20  not pay us what we're due.  Not pay the rent, and then
21  squeeze us on some of the expenses stuff.
22  **Q   With respect to those expenses that you just**
23  **talked about that were incurred due to the flood that**
24  **would not have otherwise had to have been incurred, do you**
25  **know what the total of amount of those expenses were?**

Page 165

**BRIAN ROCHE        JUNE 25, 2015**

1      Even upon signing our Fourth Amendment and even
2  up to the trial we were never provided copies of that and
3  they admitted as such that they never provided copies of
4  it in their Request for Admissions and in trial testimony
5  and in deposition testimony.
6      But nonetheless, Section 17 references the
7  abatement.  And Section 17.4 specifically references the
8  abatement, and that says as long as the conditions of 17.1
9  one are met, and you go to 17.1 and it says that "If the
10  premises are damaged by fire or other peril," which sewage
11  flood would be, "and the conditions for the insurance
12  under Section 16 are met, we shall abate the rent
13  proportionally."
14      And what that one sentence meant was, and you go
15  back into that Section 16 and it's the insurance section,
16  and what it says is that it's the landlord who has to file
17  the claim with their own insurance for the abatement
18  provision to kick in.
19      So we weren't able to argue anything with regards
20  to whether they filed the claim with their insurance or
21  not, which they didn't.
22      The Judge prohibited any testimony for that.  He
23  prohibited any testimony or defense on that abatement
24  provision at all.
25      We were prohibited from talking about it.

                                                    Page 138

1      The answer to your question was we attempted to
2  make the defense.  It was a big part of our defense that
3  once an accident, in this case, a fire or other peril
4  takes place, rent should be stopped or abated, we were
5  prohibited from talking about that at the trial.
6      That's one of the reasons I felt we lost the case
7  was because of that, because anyone that reads that lease
8  would clearly state in if accident happens, the insurance
9  company steps in and they're supposed to pay and cover
10  you, you shouldn't have.  Especially if it's not your
11  fault.
12      MR. KRISTY:  Okay.  I think that was responsive
13  to his question.
14  BY MR. ASHLEY:
15      Q   You mentioned earlier that it was your
16  understanding at the time that you purchased the policy
17  that you had $500,000 worth of coverage?
18      A   Yes.
19      Q   Where does that particular number come from?  Is
20  that something you saw in the policy?
21      A   Yeah, I think the original thing we signed was
22  about eight or nine pages, and I think it says if there is
23  an eating establishment increase, it bumps it up to
24  $500,000 because it's a new eating establishment and a
25  newly acquired business, new business.

                                                    Page 139

1      I don't think it's called a Declaration.  I think
2  the Declaration is a 50 or 60 page thing.  I think it's in
3  the seven or eight page that kind of covers what your
4  coverage is.
5      MR. KRISTY:  You might be thinking of the
6  Declarations page or pages.  That's where usually the
7  premiums are stated.
8      THE WITNESS:  Okay.  So it's the initial eight or
9  nine page thing that we signed that's listed, we're a new
10  restaurant, eating establishment, and the increases the
11  coverage of the $500,000.
12  BY MR. ASHLEY:
13      Q   Do you know if that particular provision was ever
14  cited to Travelers by you or your attorneys?
15      A   Multiple times.  There are numerous e-mails,
16  between Corey Ortega and I, back and forth, from within
17  two days of us having our very first conversation stating,
18  please explain exactly my policy why you're saying this is
19  only covered.  Because according to my way that I read
20  this, and I cited the policy, I highlighted the areas, and
21  he waited and waited, and he didn't respond with an e-mail
22  to me until October 3rd when he first wrote an e-mail that
23  had a letter attached.
24      And it said, in this letter -- I'm unable to
25  address all your questions yet but you have an ongoing

                                                    Page 140

1  obligation to continue to do this and cooperate or
2  whatever.
3      And then it was like two weeks later I got on
4  another letter from him that he actually tried to break
5  down each question or answer.
6      I don't know if you have ever met Corey Ortega
7  before, have you?  He's a pimply-faced kid who was only in
8  this for a very short period of time, and his letters
9  weren't really responsive.  It was just here is what your
10  policy says and, basically, he would just cut and paste
11  text.
12      The font in the letter he was cut and pasting
13  were different than the actual font he was typing.
14      So there was enormous dialogue over the phone, in
15  person and between Corey and I probably at least 10 or 12
16  e-mails exchanged, his letters exchanged then a whole
17  other court of dialogue with Tim Gillihan where that was
18  also discussed, "my policy should be covering this."
19      Q   The $500,000, it's your understanding that that
20  was for personal business personal property, for damage to
21  the suite itself or for something else?
22      A   I think that's a legal term for a lawyer to
23  answer.
24      I was under the impression that we had $500,000
25  in coverage which would cover property, contents and also

                                                    Page 141

                                     36  (Pages 138 to 141)

A906612

**BRIAN ROCHE      JUNE 25, 2015**

1  cover any structural -- any money that we had put into
2  fixing the place up that were damaged that we should be
3  reimbursed for.
4      Q    Okay.
5      A    So it would be included in that.
6      Q    Do you have any understanding as to what the
7  total amount of those damages are that were suffered by
8  Stars in terms of the cost of damage to improvements made
9  by Stars and contents as a result of the sewage leak?
10     A    Yes.
11     Q    What's your understanding in that regard?
12     A    My understanding is that we had a detailed
13 contents inventory list that was put together which had a
14 total of about $158,000.
15          But that was a rough list.  That wasn't even the
16 final list we worked with Garland on.  So on a low end,
17 158.  On the high end, I think the first draft put
18 together was somewhere between 220.  Somewhere.  And
19 somewhere between 185 and 275 for structural repair.
20     Q    Again, those are structural repairs to components
21 of the suite that were installed by or on behalf of Stars?
22     A    Right.  And when I say structural, that's not
23 like the wood beams or the, supports in a mall.  That was
24 strictly stuff that we had put into the space, like the
25 new pathway that we built.  You know, we had to frame that

Page 142

1  and drywall all that.  That total is the total based on
2  what we had put in.
3          This wasn't just some arbitrary number.  This was
4  a number that was derived over two and a half months of
5  work.  My contractors working with Emergency, working with
6  Stephanie Lavette and Nationwide's property person, to get
7  this ESX file, that's what it's called.  ESX.  It's an
8  Appraiser's Report.
9          And by the time we were done with it, it
10 literally goes room by room, section by section, inch by
11 inch, line-by-line, exactly what needs to go back into
12 putting it back together.  It's very, very detailed.  I
13 think it was close to 45 or 50 pages.
14     Q    That's a document put together by J&B
15 Construction?
16     A    The first draft by J&B Construction but it was
17 not done right.  So then Nationwide brought in their
18 property person, Stephanie Lavette, and she brought in
19 Garland Restoration to help work with JB to tighten it up
20 so we could have a working draft of a number.
21          That was done in conjunction with JB, Garland and
22 Nationwide Insurance.
23          And even when they were done with it, I still had
24 issues with it.  It wasn't really a final document.  It
25 was just kind of the latest version that we had that had

Page 143

1  that $185,000 figure on.
2          There was me, my contractor and Garland
3  Restoration doing a complete walk-through of the property
4  with his first draft and him pointing out errors where it
5  needs to be fixed or adjusted and, you know, like the
6  first thing he said was, the first draft had was like
7  $220,000 on it.  And he goes, "I wouldn't do the job for
8  this.  You're way under budget.  You're not even close to
9  this.  There are a lot of things missing."
10          So that was the first thing he said was he
11 wouldn't even take the job on for his own company until he
12 spent time with us.
13          So the latest version representing that 185 was
14 my contractor accepting all of his recommendations and
15 changes during that walkthrough that we provided but then
16 they never paid anything.
17          And that's really what caused us to be sitting
18 here today.
19          Am I filibustering?
20          MR. KRISTY a little bit, yeah.
21          THE WITNESS:  Filibuster means you want to talk
22 and prolong it.  I think the term is probably bloviating.
23          MR. KRISTY:  You're fine.
24          THE WITNESS:  It's still responsive to your
25 question.  I just want to put it in context.  That's all.

Page 144

1  BY MR. ASHLEY:
2      Q    The reports that were prepared initially by J&B
3  Construction and then between Garland and J&B?
4      A    They were all provided to Corey.  He has seen all
5  of those.  If you need a copy, I would be happy to forward
6  those to Mr. Kristy today and I can send those to you and
7  the bank stuff as well.
8          Those are just our working drafts of the numbers.
9      Q    So as we sit here today, it's your understanding
10 that the repairs to the structural components that were
11 installed by or on behalf of Stars and Bars will cost
12 between $185,000 and $275,000?
13     A    Correct.  It was 185 as of that last draft of the
14 report in early September and then there was a lot more
15 that had to be done.  We had to pull out the working court
16 and other things, so that's where that range comes in.
17          That's separate from the actual contents that
18 were damaged or destroyed.
19     Q    In terms of the documents, do you have documents
20 that reflect the initial tenant improvement work that was
21 performed in the suite on behalf of Stars and Bars?
22     A    Yeah.
23     Q    Have those items that are in Stars and Bars
24 possession been provided to Travelers in connection with
25 the claim is the point.

Page 145

37 (Pages 142 to 145)

A906612

**BRIAN ROCHE      JUNE 25, 2015**

1    A   Do I have the invoices for the work that we did
2  to build the space out?
3    **Q   Correct.**
4    A   I think some have been.  Maybe some haven't been.
5        I don't think I was ever asked for how much money
6  did you put into the space and let me see the invoices.
7  It was really your space is damaged, what's it going to
8  cost to fix the space back up.  I think that's what the
9  focus was.
10   **Q   Okay.  Fair enough.**
11   **But you have in your possession documents that**
12 **reflect the scope and extent of the tenant improvements**
13 **that were made by and on behalf of Stars.**
14   A   Well, we've got our tenant improvements.
15       Remember we bought an existing business.  It
16 wasn't a shell.  We purchased that existing business and
17 made additional improvements on top of that.
18   **Q   You have those --**
19   A   Of course we have those documents.  We have
20 contractor invoices and we have, you know, we have fees
21 paid for all the money that was put into it.  That's why
22 we were getting ready to open.
23   **Q   Aside from the issues we have talked about in**
24 **relation to damage to contents within Stars' suite and**
25 **structural components of the suite, are there any other**

Page 146

1    portion.  He said since we weren't open, the law was very
2  clear that even though we are a new startup, in essence, I
3  think the case law was real clear about us being able to
4  be compensated for that.
5        And so what he asked us to do was provide him
6  with some other verifiable comps.  So I went out and found
7  five or six other restaurants and bars in the area that
8  were like us from a Farrell's to another bar and
9  restaurant called 10 Asian Bistro to Sutra.
10       So we provided him with five or six comps, so
11 that our sales were more than validated if, in fact, not
12 low.    In terms of business interruption, we would be
13 looking for the full $92,000 and change per month of net
14 profits that we would have received all the way up to
15 March 1st when we had to vacate.  Let's use that as the
16 date.
17       But as I discussed and Bob and I discussed over
18 two months with Tim Gillihan, those net profit amounts
19 were in our minds low because we got the patio approved
20 and the patio added an extra 48 seats to what we were
21 doing, so an extra 25 percent more over what that initial
22 projection would have been, I believe, we would have
23 achieved because of the patio.
24       So the 92 per month net was on a low number.  We
25 think it would have been higher because of the patio and

Page 148

1  **amounts that you believe Travelers owes you under the**
2  **policy as we sit here today for losses that Stars incurred**
3  **in connection with the sewage flooding?**
4    A   Yes.
5    **Q   What else is on that list?**
6    A   What else do I feel that Travelers owes me
7  separate from the contents and the structural part that we
8  already talked about?
9        MR. KRISTY:  And the business claim.  Business
10 interruption.
11       THE WITNESS:  Right.  Let's go through it.
12       Business interruption insurance.  Under my policy
13 I'm entitled to net profits.  You arbitrarily set the date
14 to the end of October three and a half months.
15       We say that date needs to be extended up until
16 the end of the jury verdict, so you should be responsible
17 for that period of time.  So lost profits for that eight
18 and a half months.  But some lost profits which I'm
19 entitled to under my policy.
20       While we are on that point, we provided you with
21 verifiable financials and Pro Formas on what we would have
22 been doing and it was based on previous businesses and
23 based on two other businesses that are in that same mall.
24       Mr. Gillihan said he was going to be
25 analyzing that business and he would be paying us some

Page 147

1  we're going to make that argument.
2        Our expert at trial is, you know, considered one
3  of the top restaurant guys in the world.  He's the founder
4  of Flemings and Chairman of the Board Outback Steak House
5  and my neighbor, and he's going to be our expert to
6  testify about our numbers, and I'm looking at all the
7  other businesses in the area.
8        But, nevertheless, we provided all the
9  information for Mr. Gillihan.  I stayed out of the
10 process.  I let him deal directly with those people for
11 all of their profit and loss, all of their sales, and they
12 would disclose it directly to him, which they did.
13       In fact, one of the guys who owns Buffalo Wings
14 right above us and owns eight.  He provided financials for
15 all eight of his Buffalo Wings, and clearly showed the one
16 above us was, you know, somewhere in line with what our
17 sales were.  They weren't anything near the comps of the
18 bar.
19       So, nonetheless, Timothy Gillihan pursued all of
20 that and he was in direct communication with all those
21 groups and he had all that on the business interruption
22 that you guys chose to pay me zero on it.  So that's
23 covered under my policy.
24       All the rest I'm just going to talk in items, not
25 going to detail it out.

Page 149

A906612

**BRIAN ROCHE      JUNE 25, 2015**

1    Rent is covered under the policy at least as of
2  your arbitrary $45,500.
3    Our position is that you guys owe us the rent
4  also up through the verdict because we got stung with
5  $91,000 of unpaid rent during this time trying to defend
6  ourselves because you guys wouldn't pay me my original
7  grant on my policy that I could have used to cure the
8  Three-Day Notice prior to the trial.
9    So, we're claiming that you owe us rent all the
10 way up through that March 1st, you know, which is, in
11 essence, that $91,000.
12    And then let's go through the rest of the stuff.
13    Legal fees. We're gonna --
14  **Q   I'm sorry, I don't mean to interrupt you.**
15    **The $92,000 per month that you talked about**
16  **before in terms of business interruption cost, is that**
17  **essentially the net profit that you expected to make each**
18  **month?**
19  A   Right. It's $92,4603 is what we projected to
20 make based on the previous business that was there and
21 based on some financials by Toby Keats "I love this Bar",
22 which was a tenant that was going above us and we were
23 basically a knock off of that, and based on Bob Lehmeyer's
24 30 years of experience.
25    Those numbers were prior to the approval of the

Page 150

1    So their reading of it is we shouldn't have to
2  pay rent. It should have been abated. That was my
3  reading of it but, unfortunately, the landlords continued
4  to pursue a trial date having depositions and a trial that
5  took place in January, so at that point in time when you
6  knew that was going on, you guys should have stepped up
7  and paid it and you didn't.
8    You chose to harass guys like Evan Kennedy by
9  sending investigators there instead of doing your job and
10 paying me what I'm owed under the policy.
11    So, business interruption we talked about. Rent
12 we talked about.
13    Let's talk about the legal fees. We are going to
14 say that us having to defend ourselves in that unlawful
15 detainer trial, the costs that I had to incur by paying my
16 lawyers to go defend it, my attorney's fees and costs and
17 also the attorney's fees and costs that we now got stung
18 with in the jury verdict is directly caused by Travelers.
19    You not paying under the policy, not paying the
20 rent, not paying any business interruption on the policy,
21 and shorting us on that 113 and shorting up on the
22 operating expenses when we justified well over $220,000 to
23 Timothy Gillihan, okay? You shorted us by paying us like
24 83- or 85,000.
25    In addition to that, you arbitrarily,

Page 152

1  patio in August so those were projections done from June
2  and July prior to the patio improvement, so our contention
3  is it would have been higher than that number because we
4  would have the patio which meant more seats, more sales,
5  also more cost but it's a number. It's about 25 percent
6  more because of that patio approval which was very unique.
7    The landlord told us that we would never get a
8  patio approved there, so much so that in the Fourth
9  Amendment, they actually told me if I ever get the patio
10 approved, they're going to give it to me for free. I'm
11 not going to have to pay any rent towards it because
12 you'll never get it approved.
13    It's actually in the Fourth Amendment, Patio's
14 free. And we ended up getting it approved through the
15 help of guys like TMac and my architect and such.
16    But nonetheless, so up until the October 31st
17 date should have in the very least been paid by you guys,
18 and I could have used some of that money to not have to
19 pay the legal fees and possibly pay the Three-Day Notice
20 and we wouldn't be sitting here today.
21    But you guys chose, through Cory's stupid letters
22 and Mr. Gillihan's little section in his stupid report
23 stating that it's his belief that rent should be abated,
24 and we're going to have to talk about this section later
25 is kind of how they did it.

Page 151

1  Mr. Gillihan and Corey, arbitrarily moved our projected
2  opening date from July 18th to August 1st, and by doing so
3  you deprived us of $26,050 of operational expenses that we
4  justified to Mr. Gillihan during that time.
5    He said, "Well, my belief is you probably
6  wouldn't have been open until August 1st, so we're going
7  to use that as a date."
8    So by moving that date to August 1st, you
9  deprived us of $26,050, you didn't pay any rent, and the
10 legal fees that we had to incur on our end, which are in
11 excess of $400,000 through the jury trial and costs, and
12 then the legal fees that now we are stuck having to pay
13 them from the judgment; their attorney's fees and the
14 costs. Just their piece totaled $783,000.
15    The $149,000 verdict, their 572- of attorney's
16 fees and the $61,000 of costs. Total $783,000 worth of
17 costs.
18    So our contention is Travelers is directly libel
19 and responsible to us for that, because we wouldn't have
20 been in the position to defend ourselves had you guys --
21    I'm going to take a little side note that,
22 personally, I am a little frustrated with this process
23 because we prepared diligently for the trial during the
24 holidays, and you requested an EUO through your letter and
25 I responded on January 14th saying that we are very busy

Page 153

A906612
**BRIAN ROCHE        JUNE 25, 2015**

1  preparing for this trial, I've been out of town, I need to
2  hire new Counsel to represent me because my Counsel is
3  totally locked and loaded -- I had three law firms --
4  locked and loaded on the trial preparation.  I don't have
5  time to sit for it now, but I'm going to get new Counsel
6  and have them contact you.
7          And you took it upon yourself two days later on
8  January 16th to send me your letter denying our claim.
9          And that was on a Friday that I got that letter
10  and we started Jury selection on a Monday.
11          So it's not going to look too good for you or
12  Travelers when we say on the eave of our trial having to
13  defend ourselves for our lives, with hundreds of thousands
14  and possibly millions of dollars at stake, you deny our
15  claim because I was too busy to sit with you that week
16  when I told you I had to get new Counsel.
17          Ironically, when you reaccepted the claim, you
18  sent me the 7501.1, which is the California Insurance Code
19  which clearly states under Subsection 4 that I'm entitled
20  to have Counsel represent me in the EUO.
21          So my e-mail to you said that I need to get new
22  Counsel and they're going to be in contact with you.
23          You denied the claim.
24          I further clarified in a backup e-mail to you.
25          So our belief is that Travelers directly caused

Page 154

1  that UD trial and all the costs that were being incurred.
2  So that's what we are going after.
3          So to answer your question the fourth part of
4  that, we believe all the legal fees from our end and their
5  end, you're obligated to me because of your failure to pay
6  under the policy and do your job, so to speak, is a
7  breach of covenants of good faith and good dealing.
8          Then that's that area.  Then there are a bunch or
9  like five or six small ones.  I don't need to explain each
10  one.  I can just itemize them out if you'd like.
11      **Q   Yeah, we'll get there.  Before we do that, with**
12  **respect to the $783,000 of legal fees, those are fees of**
13  **Crown Valley Holdings; is that correct?**
14      A   Yes, as I stated, $783,859.24, to be exact, is
15  what we owe.  That's a total of the Judgment of the
16  149,804, that's a total of their cost for the case, 61,594
17  bucks and that's a total of their legal fees, which was
18  573,000 and some change.  And the total of that comes to
19  $783,000 and some change.
20          That's just theirs.  And I have spent on my end
21  well over $400,000.
22      **Q   I saw one of the documents you provided in the**
23  **drop box with the Motion for Attorney's Fees by Crown**
24  **Valley Holdings.**
25          **Was that Motion subsequently granted by the**

Page 155

1  **Court?**
2      A   We haven't done anything with it.  They had
3  initial costs that they provided that we didn't dispute so
4  I think that was added.
5          There is probably going to be a new filing for a
6  new Judgment over and above this Judgment of their
7  attorney's fees.
8      **Q   As we sit here today, do you know whether a**
9  **subsequent order has been issued by the Court regarding**
10  **them, Crown Valley, their claim, costs for attorney fees**
11  **and litigation costs?**
12      A   No.  I can't imagine that it's not.  They were
13  going after it.
14      **Q   As we sit here you don't know one way or the**
15  **other?**
16      A   No.  You can probably go to LA County's website
17  and search and secure what the latest is.  I know there
18  were some Hearing for it like two or three weeks ago that
19  we never showed on.
20          Do you want me to keep going on the rest of the
21  items I believe Travelers owes us for?
22      **Q   Yes, please.**
23      A   The other stuff is, we were told we were going to
24  be reimbursed for costs and time that were incurred for
25  the ton of hours that were spent on the phone with

Page 156

1  Tim Gillihan, e-mails and preparation of e-mails.
2          That's probably the most minor of them.
3      **Q   Who told you you would be reimbursed for that?**
4      A   He did.  Tim Gillihan.
5          Here's what I would like to do.  There are like
6  six or seven other things that I feel Travelers is libel
7  to us for that you haven't paid on and I'd like to maybe
8  take a break for like 20 minutes get a quick sandwich and
9  then come back and wrap all this up.  Okay?
10      **Q   Fine with me.**
11      A   I'll just name them and move on unless you have
12  questions.
13      **Q   I may have questions about that.**
14      A   Okay.  So --
15          MR. KRISTY:  Okay.  Off the record.
16          MR. ASHLEY:  We'll go off the record now and it's
17  1:50.  We can come back at 2:20.
18          (A lunch break was taken.)
19  BY MR. ASHLEY:
20      **Q   When we last left off we were talking about**
21  **amounts that you believe Stars and Bars were owed by**
22  **Travelers under the terms of the policy -- or otherwise.**
23          **I want to take a quick step back with respect**
24  **to the Judgment that was entered in favor of Crown Valley**
25  **Holding, in particular the portion of the Judgment**

Page 157

**BRIAN ROCHE      JUNE 25, 2015**

Page 158

1  totaling $58,806.24.
2      The period of time that that Judgment concerns is
3  July 9th.
4      Do you know the beginning of the period of time
5  that that Judgment is concerned with?
6      A   It was part rent for March of the landlord's
7  claim, April, May and June and July.  That's what that
8  58,806.34 represents.
9      Q   That's, again, March through July of 2014?
10     A   The total was 58,500, and then they added an
11  extra 306 for some water usage, shared water usage that
12  they wanted.
13     Q   Do you have any reason to believe that Travelers
14  is responsible for that portion of the Judgment as well?
15     A   Yes.
16     Q   What's your understanding in that regard?
17     A   Had you paid me the rent that I'm entitled to
18  under my policy in late September -- I filed the claim
19  with you September 16th, so let's just say in September,
20  which was only less than a month after they filed the
21  actual lawsuit, that I could have cured that Three-Day
22  Notice to Pay or Quit had you paid me the rents.
23     So I wouldn't have been in the position to have
24  to defend myself through the entire Unlawful Detainer
25  process and trial.

Page 159

1      And that was rents that you were obligated to pay
2  me irrespective of any other operational expenses that we
3  were working for two months with Timothy Gillihan on or
4  anything else under the policy.  That rent was in the
5  policy.
6      The fact that the landlord at the time had just
7  filed the actual Unlawful Detainer action and that you
8  were aware of it and that Corey was aware of it.  You guys
9  should have just paid it instead of trying to litigate it
10  yourself by saying, well, we don't think that you should
11  have to pay it to the landlord.  Which is really what his
12  position is now.
13     And we don't -- and same as with Timothy
14  Gillihan, they're like talking parrots, we don't think you
15  should have to pay to the landlord.
16     Well, you know what, they suing us, and we have
17  the eave of a trial starting in four to six weeks, and
18  this was up to the time going back to September and
19  October, and you trying to litigate what's in my lease has
20  nothing to do with what the landlord's going to be doing.
21     You can say, oh, we don't think we should pay
22  you, which is what your position was and, in essence,
23  didn't pay me and, in essence, I couldn't pay them, so I
24  felt like had you paid that rent to me that I could have
25  cured that Three-Day Notice and we wouldn't be in this

Page 160

1  position.
2      And so that's why I feel like the whole cause of
3  that trial is going to fall to on Travelers' shoulders.
4  And it's not just me that feels that way.  My lawyers feel
5  that way.  My previous lawyers feel that way.  The other
6  lawyers for the law firms that I consulted with prior to
7  this feel that way.
8      And we're going to point it all on Travelers'
9  shoulders that you're the cause for that trial going
10  forward and the loss that incurred for me for the legal
11  feels and costs I had to pay and also what I'm obligating
12  them to pay.
13     MR. KRISTY:  Okay.  Next question.
14  BY MR. ASHLEY:
15     Q   Aside from what you've talked about already, has
16  Stars and Bars incurred any other amounts that you believe
17  Travelers is responsible for that Travelers hasn't
18  compensated Stars and Bars for today?
19     A   Yes.  Continuing what we have been discussing,
20  sure.
21     So there was a number of additional costs that I
22  had to incur from the sewage flood and the cleanup
23  remediations that weren't included in those ongoing
24  operational expenses.
25     That was just the first pass at what we kind of

Page 161

1  provided Mr. Gillihan as of October, but there was a lot
2  more during that time that we have been able to gather and
3  a lot more since separate from the legal fees.
4      Just talking about hard costs that we have had to
5  incur for operational expenses during the time up until
6  the jury verdict.  That would be another item.
7      We lost our liquor license because of your
8  failure to pay the claim and what's happened.
9      And I understand under the policy that the
10  policy, I believe, states that you're not -- you don't get
11  to reimburse us for the costs of any type of licensing
12  except and unless, and I read this a while ago, "unless
13  and except the loss of the license is incurred because of
14  the business stopping."
15     So the business stopped, and then some license or
16  something is lost because of it, then the policy covers
17  that.  But it doesn't cover just the loss from the
18  beginning.  It has to be because the loss of the license
19  happened because the business stopped.
20     And because our business had been stopped for a
21  certain period of time where we couldn't activate our
22  liquor license, we ended up losing our liquor license and
23  that was a $75,000 value.
24     So we're going to clearly point that we lost our
25  liquor license because we were unable to open our doors in

A906612

**BRIAN ROCHE      JUNE 25, 2015**

1  time because Travelers didn't pay the claim when they
2  should have, and that you guys are solely responsible for
3  the loss of that license.
4      **Q   Was Stars and Bars ever licensed to sell liquor**
5  **at the subject location?**
6      A   Yes.
7      **Q   When was that license issued to Stars and Bars?**
8      A   I think we filled out the transfer paperwork with
9  the ABC in February of 2014, first or second week of
10  February 2014.
11      **Q   And you were subsequently informed that the**
12  **license was suspended because the business didn't open?**
13      A   Right.
14      **Q   Do you know when you were informed of that?**
15      A   I was informed of that -- let me think.  Sometime
16  around December.  Sometime around December we were told
17  that there was a time in which you have to be open for the
18  business or else the liquor license is going to be lost.
19          And the liquor license was part of our
20  acquisition of the business.
21          The FF&E furniture fixtures and equipment and
22  also assets but all the liquor license, which is the most
23  valuable, that liquor license alone was about $75,000.  If
24  you were to go put a market value on this today, that's
25  what they sell for.

Page 162

1      So we blame Travelers for their bad faith and not
2  paying me under the policy and my claim which ultimately
3  led to our business not being able to open and ultimately
4  lost our liquor license.
5      So there's another 75 grand.
6          The next item would be there was some monies that
7  we paid over and above past that October 31st date to
8  salary for Bob Lehmeyer and others -- let's just say
9  salary to Bob, and then other expenses that we had
10  incurred having to pay people to do things for us that we
11  would' have had to incur pay.
12          Just because you set an arbitrary end date of
13  October 31st, the fact that we had to take this through
14  the Unlawful trial up until March, we hold you responsible
15  for that entire time.  So there was some extra salary and
16  cost.
17      **Q   With respect to Bob Lehmeyer and the amounts that**
18  **were paid to him, are those the same amounts that we**
19  **discussed after October 2014 through, I think,**
20  **February 2015?**
21      A   Right, that was the 20 grand.  That was after
22  that date.
23      **Q   In terms of other moneys for payroll or other**
24  **expenses after October 2014, do you know what the total of**
25  **those expenses are?**

Page 163

1      A   No.  I take objection to the term payroll.  I
2  don't think it was actually payroll.  It was extra ongoing
3  expenses that I had to incur that I would never had had to
4  incur had the flood taken place which was after that date
5  which was paid to employees of ours but not really
6  categorized as payroll.
7          Payroll I define as somebody who signed a W-2 and
8  gets a check and runs through or ADP payroll company.
9  Payment for work performed, I term as something different.
10      **Q   Fair enough.**
11          **With respect to the monies paid to Bob Lehmeyer**
12  **after October 2014, would you consider those payments**
13  **payroll?**
14      A   Yeah, that was payroll.  The other stuff I'm
15  referencing goes to just kind of ongoing expenses of the
16  business.
17      **Q   What were some of those ongoing expenses?**
18      A   Storage fees for items.  Moving fees, moving.
19  Cost of moving stuff out.  Cleaning stuff.  Home Depot
20  things.  Lowe's receipts.
21          And, you know, let me comment on this.  I don't
22  even know how much you've read or how much you know but in
23  Mr. Gillihan's stupid report, he said that some of the
24  items that we originally listed, which were like four or
25  five Home Depot receipts which were for cleaning materials

Page 164

1  that we had, that he couldn't justify them, that he didn't
2  get the receipts.
3          But those were clearly on the bank statements
4  that we gave him.  So the bank statements are what you can
5  rely on at that time for charges that were related to the
6  sewage flood cleanup, which we would never have had to
7  incur had the flood not taken place.
8          So that is another reason why I take exception to
9  his report.  I'd love to just talk about that report and
10  just figure the ten errors or flaws that he had in that
11  report.
12          But that report is really his, or I guess on
13  behalf of Travelers, your governing doctrine as to what
14  you should be paying for the operating expenses up to
15  October 31st.
16          And as I stated, the amount you gave me was short
17  over $150,000.  And that includes from moving the opening
18  date to August 1st, which was just an arbitrary unilateral
19  decision that him and Corey made to try to squeeze us and
20  not pay us what we're due.  Not pay the rent, and then
21  squeeze us on some of the expenses stuff.
22      **Q   With respect to those expenses that you just**
23  **talked about that were incurred due to the flood that**
24  **would not have otherwise had to have been incurred, do you**
25  **know what the total of amount of those expenses were?**

Page 165

A906612
**BRIAN ROCHE        JUNE 25, 2015**

1      A   Right.  That was your original question and I
2  went off on other things.
3          I don't have an exact total.  I can give you a
4  range.
5      Q   Okay.  What is your range as we sit here?
6      A   Does this include Bob Lehmeyer's, what we
7  consider payroll or salary?
8      Q   I'd like to keep that separate.
9      A   So the range of additional expenses that I had to
10  incur would be somewhere between 25 and $50,000.
11      Q   And those expenses were incurred between --
12  what's the time period that they were incurred?
13      A   The expenses that we've proved up to Mr. Gillihan
14  were as of the middle of October when we first put
15  together, I think it was like the first or second week in
16  October when he asked me to gather some stuff.  I told him
17  this isn't 100 percent of it.  This is kind of what's
18  readily available.  I have stacks of receipts and
19  invoices.  I said, let me just send this for now, let's
20  just get a number.
21          I was hoping he would really do the right thing
22  and say, you know, Nationwide is going to be subrogating
23  to us anyways.  Whatever we pay you as long as we can
24  justify it, they're going to be paying it back to us,
25  which is kind of what we discussed anyways.  So I didn't

Page 166

1  really go to the dollar to dollar of those.
2          So those numbers that I gave him were $227,000.
3  That was as of the middle of October.  So I say part of it
4  was built in there and part of it was after that date from
5  October up until let's call it March 1st.  That was the
6  day we were evicted.
7          I don't want to call that the drop dead date
8  because my policy covers up to 12 months during the repair
9  and restoration, and as of March you hadn't paid me for
10  the repair and restoration so, technically, we're if we
11  want to add another three months on after that and we're
12  going to go after a full 12 months, which is allowed under
13  the policy, from what I'm owed from you people.
14          So the amount is somewhere between 25 to $50,000.
15      Q   When we first came back on the record, one of the
16  categories of unpaid items that you mentioned or the first
17  category of unpaid items that you mentioned were costs
18  from the sewage flood that weren't included in items that
19  you provided initially to Gillihan?
20      A   That's what we just discussed.
21      Q   So the 25 to $50,000 in costs, were those costs
22  that weren't provided to Gillihan be included in that 25
23  to $50,000 figure?
24      A   Yes.  We are talking about it two of the same
25  things.

Page 167

1      Q   They would be.  Okay.
2      A   And I have every expectation during normal AI
3  discovery of litigation, assuming we get there, that it's
4  all going to be produced and when the time comes, we'll be
5  doing that.
6      Q   But as it stands right now, the cost reflecting
7  or documents reflecting that 25 to $50,000 in costs have
8  not been provided to Mr. Gillihan and/or Travelers?
9      A   No, some of it was provided to him.  Some of it
10  was provided to him after the report.  He made a request
11  of me.  We had a phone call on November 10th in which he
12  made a request for more stuff from me, which we provided
13  to him.  So, yeah, it was.
14          And then it was four weeks of not hearing
15  anything, he said he was focussing on the business
16  interruption stuff and that he would kind of put that
17  stuff on hold and get back to it.  I said, fine, let's get
18  this business interruption because I wanted to get some
19  money in the drawer for it because I knew that you guys
20  paying some portion of that interruption, I could cure the
21  Notice and solve everything.
22          So I wanted to focus on resolving that business
23  interruption which meant him dealing with all of those
24  five or six restaurant and bar owners that I put him in
25  touch with to use as comparable to our project, which he

Page 168

1  did.
2          So he spent a month doing that and then sometime
3  in December is when you guys start harassing my employees
4  and then everything just kind of went by the wayside.
5          He told me numerous times in e-mail in late
6  November, December that he was finalizing the business
7  interruption, he was able to justify all the numbers,
8  everyone's been have been helpful in providing him with
9  profit and loss and sales reports and everything.
10          So I think we're at that tai lend when you
11  started your harassment tactics of my employees Ted Mackie
12  and Evan, which led me to blow up, and which led the
13  matter to be referred over to you and your firm in the
14  middle of December.
15          I'm not privy to any of his internal notes or
16  anything other than our e-mails and that list he issued,
17  but I didn't get until November 7th, but it was dated like
18  November 1st or November 2nd.  It was his preliminary
19  report; which is how can him as a forensic accountant
20  squeeze us as best as possible so that you guys don't have
21  to pay, which your obligated to pay under the policy.
22          He squeezes us from 273,000 down to some 80,000
23  and some change, which I have already discussed.
24      Q   Any other items that Travelers hasn't paid for
25  that you believe Travelers is responsible for in relation

Page 169

EXHIBIT B

WESTON & McELVAIN LLP
Aaron C. Agness (State Bar No. 221943)
Bryan A. Reynolds (SBN 296434)
1960 E. Grand Avenue, Suite 400
El Segundo, CA 90245
Telephone:  (213) 596-8000
Facsimile:  (213) 596-8039
E-mail:      aagness@wmattorneys.com
               breynolds@wmattorneys.com

Attorneys for Defendants
**TRAVELERS CASUALTY INSURANCE
COMPANY OF AMERICA** and **COREY
ORTEGA**

UNITED STATES DISTRICT COURT FOR THE

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STARS AND BARS, LLC a Nevada limited liability company;<br><br>                    Plaintiff,<br><br>          vs.<br><br>TRAVELERS CASUALTY INSURANCE COMPANY OF AMERICA,  a Connecticut corporation; COREY ORTEGA, an individual, and DOES 1 through 20, inclusive,<br><br>                    Defendants. | Case No.: 8:16-cv-01397-CJC (SSx)<br>Assigned to Judge Cormac J. Carney<br><br>**DEFENDANT TRAVELERS CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**<br><br>Complaint Filed:  June 6, 2016<br>Trial Date:        January 23, 2018 |

**PROPOUNDING PARTY**:          PLAINTIFF STARS AND BARS, LLC

**RESPONDING PARTY**:          DEFENDANT TRAVELERS CASUALTY
                              INSURANCE COMPANY OF AMERICA

**SET NUMBER**:                ONE (1)

DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO
PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

1      **<u>REQUEST FOR PRODUCTION OF DOCUMENTS</u>**

2 **<u>REQUEST FOR PRODUCTION NO. 1</u>:**

3      All DOCUMENTS that evidence, concern, relate to, reflect or support the First

4 Affirmative Defense in YOUR ANSWER to PLAINTIFF'S COMPLAINT.

5 **<u>RESPONSE TO REQUEST FOR PRODUCTION NO. 1</u>:**

6      Travelers objects to the extent the request seeks documents which are not in the

7 possession, custody, or control of Travelers.  Travelers further objects to the request

8 as overly broad, vague and ambiguous, and not properly limited in scope or time.

9 Travelers further objects to the extent that this request seeks information protected by

10 the attorney-client privilege, the work-product doctrine, and/or the litigation privilege.

11 Travelers also objects to the extent the request seeks documents that are confidential,

12 private, proprietary, and/or subject to trade secret protection.

13      Subject to and without waiving said objections, Travelers responds as follows:

14 Travelers has already produced responsive documents.  Travelers will produce the

15 non-confidential, non-privileged portions of its claim file responsive to the request

16 that have not already been produced, which may contain additional responsive

17 documents.  Travelers also refers propounding party to the documents produced by

18 Crown Valley Holdings, LLC, Sentinel Development Services, Inc., and AMCO

19 Insurance Company in response to subpoenas, as well as the documents produced by

20 Plaintiff, which contain additional responsive documents and are equally available to

21 propounding party.

22 **<u>REQUEST FOR PRODUCTION NO. 2</u>:**

23      All DOCUMENTS that evidence, concern, relate to, reflect or support the

24 Second Affirmative Defense in YOUR ANSWER to PLAINTIFF'S COMPLAINT.

25 **<u>RESPONSE TO REQUEST FOR PRODUCTION NO. 2</u>:**

26      Travelers objects to the extent the request seeks documents which are not in the

27 possession, custody, or control of Travelers.  Travelers further objects to the request

28

- 2 -          8:16-cv-01397-CJC (SSx)

**DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

1  as overly broad, vague and ambiguous, and not properly limited in scope or time.

2  Travelers further objects to the extent that this request seeks information protected by

3  the attorney-client privilege, the work-product doctrine, and/or the litigation privilege.

4  Travelers also objects to the extent the request seeks documents that are confidential,

5  private, proprietary, and/or subject to trade secret protection.

6       Subject to and without waiving said objections, Travelers responds as follows:

7  Travelers has already produced responsive documents.  Travelers will produce the

8  non-confidential, non-privileged portions of its claim file responsive to the request

9  that have not already been produced, which may contain additional responsive

10  documents.  Travelers also refers propounding party to the documents produced by

11  Crown Valley Holdings, LLC, Sentinel Development Services, Inc., and AMCO

12  Insurance Company in response to subpoenas, as well as the documents produced by

13  Plaintiff, which contain additional responsive documents and are equally available to

14  propounding party.

15  **REQUEST FOR PRODUCTION NO. 3:**

16       All DOCUMENTS that evidence, concern, relate to, reflect or support the

17  Third Affirmative Defense in YOUR ANSWER to PLAINTIFF'S COMPLAINT.

18  **RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

19       Travelers objects to the extent the request seeks documents which are not in the

20  possession, custody, or control of Travelers.  Travelers further objects to the request

21  as overly broad, vague and ambiguous, and not properly limited in scope or time.

22  Travelers further objects to the extent that this request seeks information protected by

23  the attorney-client privilege, the work-product doctrine, and/or the litigation privilege.

24  Travelers also objects to the extent the request seeks documents that are confidential,

25  private, proprietary, and/or subject to trade secret protection.

26       Subject to and without waiving said objections, Travelers responds as follows:

27  Travelers has already produced responsive documents.  Travelers will produce the

28

**DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO
PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

1  non-confidential, non-privileged portions of its claim file responsive to the request
2  that have not already been produced, which may contain additional responsive
3  documents. Travelers also refers propounding party to the documents produced by
4  Crown Valley Holdings, LLC, Sentinel Development Services, Inc., and AMCO
5  Insurance Company in response to subpoenas, as well as the documents produced by
6  Plaintiff, which contain additional responsive documents and are equally available to
7  propounding party.

8  **REQUEST FOR PRODUCTION NO. 4:**

9      All DOCUMENTS that evidence, concern, relate to, reflect or support the
10 Fourth Affirmative Defense in YOUR ANSWER to PLAINTIFF'S COMPLAINT.

11 **RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

12     Travelers objects to the extent the request seeks documents which are not in the
13 possession, custody, or control of Travelers. Travelers further objects to the request
14 as overly broad, vague and ambiguous, and not properly limited in scope or time.
15 Travelers further objects to the extent that this request seeks information protected by
16 the attorney-client privilege, the work-product doctrine, and/or the litigation privilege.
17 Travelers also objects to the extent the request seeks documents that are confidential,
18 private, proprietary, and/or subject to trade secret protection.

19     Subject to and without waiving said objections, Travelers responds as follows:
20 Travelers has already produced responsive documents. Travelers will produce the
21 non-confidential, non-privileged portions of its claim file responsive to the request
22 that have not already been produced, which may contain additional responsive
23 documents. Travelers also refers propounding party to the documents produced by
24 Crown Valley Holdings, LLC, Sentinel Development Services, Inc., and AMCO
25 Insurance Company in response to subpoenas, as well as the documents produced by
26 Plaintiff, which contain additional responsive documents and are equally available to
27 propounding party.

28

- 4 -                                    8:16-cv-01397-CJC (SSx)

**DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

1  **REQUEST FOR PRODUCTION NO. 5:**

2      All DOCUMENTS that evidence, concern, relate to, reflect or support the Fifth

3  Affirmative Defense in YOUR ANSWER to PLAINTIFF'S COMPLAINT.

4  **RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

5      Travelers objects to the extent the request seeks documents which are not in the

6  possession, custody, or control of Travelers.  Travelers further objects to the request

7  as overly broad, vague and ambiguous, and not properly limited in scope or time.

8  Travelers further objects to the extent that this request seeks information protected by

9  the attorney-client privilege, the work-product doctrine, and/or the litigation privilege.

10  Travelers also objects to the extent the request seeks documents that are confidential,

11  private, proprietary, and/or subject to trade secret protection.

12      Subject to and without waiving said objections, Travelers responds as follows:

13  Travelers has already produced responsive documents.  Travelers will produce the

14  non-confidential, non-privileged portions of its claim file responsive to the request

15  that have not already been produced, which may contain additional responsive

16  documents.  Travelers also refers propounding party to the documents produced by

17  Crown Valley Holdings, LLC, Sentinel Development Services, Inc., and AMCO

18  Insurance Company in response to subpoenas, as well as the documents produced by

19  Plaintiff, which contain additional responsive documents and are equally available to

20  propounding party.

21  **REQUEST FOR PRODUCTION NO. 6:**

22      All DOCUMENTS that evidence, concern, relate to, reflect or support the Sixth

23  Affirmative Defense in YOUR ANSWER to PLAINTIFF'S COMPLAINT.

24  **RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

25      Travelers objects to the extent the request seeks documents which are not in the

26  possession, custody, or control of Travelers.  Travelers further objects to the request

27  as overly broad, vague and ambiguous, and not properly limited in scope or time.

28

**DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

1  Travelers further objects to the extent that this request seeks information protected by

2  the attorney-client privilege, the work-product doctrine, and/or the litigation privilege.

3  Travelers also objects to the extent the request seeks documents that are confidential,

4  private, proprietary, and/or subject to trade secret protection.

5      Subject to and without waiving said objections, Travelers responds as follows:

6  Travelers has already produced responsive documents.  Travelers will produce the

7  non-confidential, non-privileged portions of its claim file responsive to the request

8  that have not already been produced, which may contain additional responsive

9  documents.  Travelers also refers propounding party to the documents produced by

10 Crown Valley Holdings, LLC, Sentinel Development Services, Inc., and AMCO

11 Insurance Company in response to subpoenas, as well as the documents produced by

12 Plaintiff, which contain additional responsive documents and are equally available to

13 propounding party.

14 **REQUEST FOR PRODUCTION NO. 7:**

15     All DOCUMENTS that evidence, concern, relate to, reflect or support the

16 Seventh Affirmative Defense in YOUR ANSWER to PLAINTIFF'S COMPLAINT.

17 **RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

18     Travelers objects to the extent the request seeks documents which are not in the

19 possession, custody, or control of Travelers.  Travelers further objects to the request

20 as overly broad, vague and ambiguous, and not properly limited in scope or time.

21 Travelers further objects to the extent that this request seeks information protected by

22 the attorney-client privilege, the work-product doctrine, and/or the litigation privilege.

23 Travelers also objects to the extent the request seeks documents that are confidential,

24 private, proprietary, and/or subject to trade secret protection.

25     Subject to and without waiving said objections, Travelers responds as follows:

26 Travelers has already produced responsive documents.  Travelers will produce the

27 non-confidential, non-privileged portions of its claim file responsive to the request

28

- 6 -                                    8:16-cv-01397-CJC (SSx)

1  that have not already been produced, which may contain additional responsive

2  documents.  Travelers also refers propounding party to the documents produced by

3  Crown Valley Holdings, LLC, Sentinel Development Services, Inc., and AMCO

4  Insurance Company in response to subpoenas, as well as the documents produced by

5  Plaintiff, which contain additional responsive documents and are equally available to

6  propounding party.

7  **REQUEST FOR PRODUCTION NO. 8:**

8      All DOCUMENTS that evidence, concern, relate to, reflect or support the

9  Eighth Affirmative Defense in YOUR ANSWER to PLAINTIFF'S COMPLAINT.

10  **RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

11      Travelers objects to the extent the request seeks documents which are not in the

12  possession, custody, or control of Travelers.  Travelers further objects to the request

13  as overly broad, vague and ambiguous, and not properly limited in scope or time.

14  Travelers further objects to the extent that this request seeks information protected by

15  the attorney-client privilege, the work-product doctrine, and/or the litigation privilege.

16  Travelers also objects to the extent the request seeks documents that are confidential,

17  private, proprietary, and/or subject to trade secret protection.

18      Subject to and without waiving said objections, Travelers responds as follows:

19  Travelers has already produced responsive documents.  Travelers will produce the

20  non-confidential, non-privileged portions of its claim file and underwriting file

21  responsive to the request that have not already been produced, which may contain

22  additional responsive documents.  With respect to the underwriting file, some portions

23  will be produced pursuant to a protective order.  Travelers also refers propounding

24  party to the documents produced by Crown Valley Holdings, LLC, Sentinel

25  Development Services, Inc., and AMCO Insurance Company in response to

26  subpoenas, as well as the documents produced by Plaintiff, which contain additional

27  responsive documents and are equally available to propounding party.

28

**DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO
PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

1    **REQUEST FOR PRODUCTION NO. 9:**

2       All DOCUMENTS that evidence, concern, relate to, reflect or support the

3    Ninth Affirmative Defense in YOUR ANSWER to PLAINTIFF'S COMPLAINT.

4    **RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

5       Travelers objects to the extent the request seeks documents which are not in the

6    possession, custody, or control of Travelers.  Travelers further objects to the request

7    as overly broad, vague and ambiguous, and not properly limited in scope or time.

8    Travelers further objects to the extent that this request seeks information protected by

9    the attorney-client privilege, the work-product doctrine, and/or the litigation privilege.

10    Travelers also objects to the extent the request seeks documents that are confidential,

11    private, proprietary, and/or subject to trade secret protection.

12       Subject to and without waiving said objections, Travelers responds as follows:

13    Travelers has already produced responsive documents.  Travelers will produce the

14    non-confidential, non-privileged portions of its claim file responsive to the request

15    that have not already been produced, which may contain additional responsive

16    documents.  Travelers also refers propounding party to the documents produced by

17    Crown Valley Holdings, LLC, Sentinel Development Services, Inc., and AMCO

18    Insurance Company in response to subpoenas, as well as the documents produced by

19    Plaintiff, which contain additional responsive documents and are equally available to

20    propounding party.

21    **REQUEST FOR PRODUCTION NO. 10:**

22       All DOCUMENTS that evidence, concern, relate to, reflect or support the

23    Tenth Affirmative Defense in YOUR ANSWER to PLAINTIFF'S COMPLAINT.

24    **RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

25       Travelers objects to the extent the request seeks documents which are not in the

26    possession, custody, or control of Travelers.  Travelers further objects to the request

27    as overly broad, vague and ambiguous, and not properly limited in scope or time.

28

**DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

1  Travelers further objects to the extent that this request seeks information protected by

2  the attorney-client privilege, the work-product doctrine, and/or the litigation privilege.

3  Travelers also objects to the extent the request seeks documents that are confidential,

4  private, proprietary, and/or subject to trade secret protection.

5  Subject to and without waiving said objections, Travelers responds as follows:

6  Travelers has already produced responsive documents.  Travelers will produce the

7  non-confidential, non-privileged portions of its claim file responsive to the request

8  that have not already been produced, which may contain additional responsive

9  documents.  Travelers also refers propounding party to the documents produced by

10  Crown Valley Holdings, LLC, Sentinel Development Services, Inc., and AMCO

11  Insurance Company in response to subpoenas, as well as the documents produced by

12  Plaintiff, which contain additional responsive documents and are equally available to

13  propounding party.

14  **REQUEST FOR PRODUCTION NO. 11:**

15  All DOCUMENTS that evidence, concern, relate to, reflect or support the

16  Eleventh Affirmative Defense in YOUR ANSWER to PLAINTIFF'S COMPLAINT.

17  **RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

18  Travelers objects to the extent the request seeks documents which are not in the

19  possession, custody, or control of Travelers.  Travelers further objects to the request

20  as overly broad, vague and ambiguous, and not properly limited in scope or time.

21  Travelers further objects to the extent that this request seeks information protected by

22  the attorney-client privilege, the work-product doctrine, and/or the litigation privilege.

23  Travelers also objects to the extent the request seeks documents that are confidential,

24  private, proprietary, and/or subject to trade secret protection.

25  Subject to and without waiving said objections, Travelers responds as follows:

26  Travelers has already produced responsive documents.  Travelers will produce the

27  non-confidential, non-privileged portions of its claim file responsive to the request

28

**DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO
PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

1  that have not already been produced, which may contain additional responsive

2  documents.  Travelers also refers propounding party to the documents produced by

3  Crown Valley Holdings, LLC, Sentinel Development Services, Inc., and AMCO

4  Insurance Company in response to subpoenas, as well as the documents produced by

5  Plaintiff, which contain additional responsive documents and are equally available to

6  propounding party.

7  **REQUEST FOR PRODUCTION NO. 12:**

8        All DOCUMENTS that evidence, concern, relate to, reflect or support the

9  Twelfth Affirmative Defense in YOUR ANSWER to PLAINTIFF'S COMPLAINT.

10  **RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

11        Travelers objects to the extent the request seeks documents which are not in the

12  possession, custody, or control of Travelers.  Travelers further objects to the request

13  as overly broad, vague and ambiguous, and not properly limited in scope or time.

14  Travelers further objects to the extent that this request seeks information protected by

15  the attorney-client privilege, the work-product doctrine, and/or the litigation privilege.

16  Travelers also objects to the extent the request seeks documents that are confidential,

17  private, proprietary, and/or subject to trade secret protection.

18        Subject to and without waiving said objections, Travelers responds as follows:

19  Travelers has already produced responsive documents.  Travelers will produce the

20  non-confidential, non-privileged portions of its claim file responsive to the request

21  that have not already been produced, which may contain additional responsive

22  documents.  Travelers also refers propounding party to the documents produced by

23  Crown Valley Holdings, LLC, Sentinel Development Services, Inc., and AMCO

24  Insurance Company in response to subpoenas, as well as the documents produced by

25  Plaintiff, which contain additional responsive documents and are equally available to

26  propounding party.

27  ///

28

**DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

1  **REQUEST FOR PRODUCTION NO. 13:**

2       All DOCUMENTS that evidence, concern, relate to, reflect or support the

3  Thirteenth Affirmative Defense in YOUR ANSWER to PLAINTIFF'S

4  COMPLAINT.

5  **RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

6       Travelers objects to the extent the request seeks documents which are not in the

7  possession, custody, or control of Travelers.  Travelers further objects to the request

8  as overly broad, vague and ambiguous, and not properly limited in scope or time.

9  Travelers further objects to the extent that this request seeks information protected by

10 the attorney-client privilege, the work-product doctrine, and/or the litigation privilege.

11 Travelers also objects to the extent the request seeks documents that are confidential,

12 private, proprietary, and/or subject to trade secret protection.

13      Subject to and without waiving said objections, Travelers responds as follows:

14 Travelers has already produced responsive documents.  Travelers will produce the

15 non-confidential, non-privileged portions of its claim file responsive to the request

16 that have not already been produced, which may contain additional responsive

17 documents.  Travelers also refers propounding party to the documents produced by

18 Crown Valley Holdings, LLC, Sentinel Development Services, Inc., and AMCO

19 Insurance Company in response to subpoenas, as well as the documents produced by

20 Plaintiff, which contain additional responsive documents and are equally available to

21 propounding party.

22 **REQUEST FOR PRODUCTION NO. 14:**

23      A certified copy of the POLICY.

24 **RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

25      Travelers objects to the extent the request is vague and ambiguous.

26      Subject to and without waiving said objections, Travelers responds as follows:

27 A certified copy of policy No. 680-8E901081 has previously been produced.

28

**DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

**REQUEST FOR PRODUCTION NO. 15:**

Any and all complete, original claim files (including those in the native format) that relate to the SEWAGE FLOOD at the PREMISES reported to YOU, which CLAIM is the subject of this lawsuit, including all file covers, jackets, notes, memoranda, diary entries and any other writings attached to, written on or made part of each claim file. (The scope of this request includes any and all separate field or claim files maintained by any field, branch, regional or home office of YOU or affiliated entity which reference the subject claim. If any such office now maintains or previously maintained a separate file for the subject claim, all such files should be produced in their entirety and in the form they were maintained by that office.)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

Travelers objects to the extent the request seeks documents which are not relevant to the subject matter of this lawsuit or proportional to the needs of the case. Travelers further objects to the extent the request seeks documents which are not in the possession, custody, or control of Travelers.  Travelers further objects to the request as overly broad, vague and ambiguous, and not properly limited in scope or time.  Travelers further objects to the extent that this request seeks information protected by the attorney-client privilege, the work-product doctrine, and/or the litigation privilege.  Travelers also objects to the extent the request seeks documents that are confidential, private, proprietary, and/or subject to trade secret protection. Travelers also objects to the extent the requests seeks documents equally available to propounding party.

Subject to and without waiving said objections, Travelers responds as follows: Travelers has already produced responsive documents.  Travelers will produce the non-confidential, non-privileged portions of its claim file responsive to the request that have not already been produced, which may contain additional responsive documents.

1 **REQUEST FOR PRODUCTION NO. 16:**

2      A CD or DVD containing all e-mails and text messages (including those in the

3 native format) generated by YOUR employees, adjusters, independent adjusters and

4 consultants that refer to the CLAIM regarding the PREMISES, whether or not those

5 e-mails and text messages are considered part of any claim file produced in response

6 to Request for Production No. 15 above.

7 **RESPONSE TO REQUEST FOR PRODUCTION NO. 16:**

8      Travelers objects to the extent the request seeks documents which are not

9 relevant to the subject matter of this lawsuit or proportional to the needs of the case.

10 Travelers further objects to the extent the request seeks documents which are not in

11 the possession, custody, or control of Travelers.  Travelers further objects to the

12 request as overly broad, vague and ambiguous, and not properly limited in scope or

13 time.  Travelers further objects to the extent that this request seeks information

14 protected by the attorney-client privilege, the work-product doctrine, and/or the

15 litigation privilege.  Travelers also objects to the extent the request seeks documents

16 that are confidential, private, proprietary, and/or subject to trade secret protection.

17 Travelers also objects to the extent the requests seeks documents equally available to

18 propounding party.

19      Subject to and without waiving said objections, Travelers responds as follows:

20 Travelers has already produced responsive documents.  Travelers will produce the

21 non-confidential, non-privileged portions of its claim file responsive to the request

22 that have not already been produced, which may contain additional responsive

23 documents.

24 **REQUEST FOR PRODUCTION NO. 17:**

25      All DOCUMENTS received from any consultant, investigator, contractor,

26 engineer or other expert prior to the filing of this lawsuit concerning the CLAIM,

27 including any and all draft reports or estimates sent or delivered to YOU by that

28

**DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO
PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

1   consultant, investigator, contractor, engineer or other expert.    (All such

2   DOCUMENTS must be produced whether or not YOU actually relied on the writing

3   in making decisions concerning the CLAIM.)

4   **RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

5        Travelers objects to the request as overly broad, vague and ambiguous, and not

6   properly limited in scope or time.   Travelers further objects to the extent that this

7   request seeks information protected by the attorney-client privilege, the work-product

8   doctrine, and/or the litigation privilege.    Travelers also objects to the extent the

9   request seeks documents that are confidential, private, proprietary, and/or subject to

10  trade secret protection.   Travelers objects to the extent the request seeks documents

11  already in the possession, custody or control of propounding party, and/or equally

12  available.

13       Subject to and without waiving said objections, Travelers responds as follows:

14  Travelers has already produced responsive documents.   Travelers will produce the

15  non-confidential, non-privileged portions of its claim file responsive to the request

16  that have not already been produced, which may contain additional responsive

17  documents.

18  **REQUEST FOR PRODUCTION NO. 18:**

19       If YOU are asserting reliance on advice of counsel as a defense in this lawsuit,

20  produce all DOCUMENTS referencing the CLAIM that were sent to or received from

21  the attorney or attorneys, who provided such legal advice to YOU concerning the

22  CLAIM.

23  **RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

24       Travelers objects to the extent the request seeks information that is not relevant

25  to the subject matter of this lawsuit or proportional to the needs of the case.   Travelers

26  further objects to the extent the request seeks documents not in the possession,

27  custody, or control of Travelers.   Travelers also objects to this demand as being

28

1  overbroad, vague and ambiguous, including as to "YOU." Travelers further objects to

2  the extent the request seeks the disclosure of information protected by the attorney-

3  client privilege, the work-product doctrine, and/or the litigation privilege. Travelers

4  also objects to the extent the request seeks documents that are confidential, private,

5  proprietary, and/or subject to trade secret protection.

6      Subject to and without waiving said objections, Travelers responds as follows:

7  not applicable as Travelers is not asserting a reliance on advice of counsel defense at

8  this time.

9  **REQUEST FOR PRODUCTION NO. 19:**

10      All DOCUMENTS that evidence, concern, relate to, reflect or show reserves

11  assigned to the CLAIM at any time by any of YOUR representatives.

12  **RESPONSE TO REQUEST FOR PRODUCTION NO. 19:**

13      Travelers objects to the extent the request seeks information that is not relevant

14  to the subject matter of this lawsuit or proportional to the needs of the case. Travelers

15  further objects to the extent the request seeks documents not in the possession,

16  custody, or control of Travelers. Travelers also objects to this demand as being

17  overbroad, vague and ambiguous, including as to "YOUR." Travelers further objects

18  to the extent the request seeks the disclosure of information protected by the attorney-

19  client privilege, the work-product doctrine, and/or the litigation privilege. Travelers

20  also objects to the extent the request seeks documents that are confidential, private,

21  proprietary, and/or subject to trade secret protection.

22  **REQUEST FOR PRODUCTION NO. 20:**

23      All DOCUMENTS that evidence, concern, relate to, or reflect the complete

24  underwriting file applicable to the POLICY, including copies of any inspection

25  reports generated during the underwriting process or as part of a re-inspection of the

26  property or renewal of coverage.

27  ///

28

**DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO
PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

1  **RESPONSE TO REQUEST FOR PRODUCTION NO. 20:**

2      Travelers objects that the request is overbroad and unduly burdensome as it is

3  not limited in scope or time.   Travelers objects to the extent the request seeks

4  information that is not relevant to the subject matter of this lawsuit or proportional to

5  the needs of the case.   Travelers further objects to the extent the request seeks

6  documents not in the possession, custody, or control of Travelers.   Travelers also

7  objects to this demand as being overbroad, vague and ambiguous.   Travelers further

8  objects to the extent the request seeks the disclosure of information protected by the

9  attorney-client privilege, the work-product doctrine, and/or the litigation privilege.

10  Travelers also objects to the extent the request seeks documents that are confidential,

11  private, proprietary, and/or subject to trade secret protection.

12      Subject to and without waiving said objections, Travelers responds as follows:

13  Travelers will produce all underwriting materials leading up to the issuance of the

14  POLICY.  A portion of said materials will be produced pursuant to protective order.

15  **REQUEST FOR PRODUCTION NO. 21:**

16      All  DOCUMENTS,  including  photographs  and  videos,  which  evidence,

17  concern, relate to, or reflect inspections of the PREMISES by or on behalf of YOU at

18  any time. This request includes inspections requested by YOUR underwriting

19  department prior to issuance of the POLICY.

20  **RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**

21      Travelers objects to the extent the request seeks information that is not relevant

22  to the subject matter of this lawsuit or proportional to the needs of the case.  Travelers

23  further objects to the extent the request seeks documents not in the possession,

24  custody, or control of Travelers.   Travelers also objects to this demand as being

25  overbroad, vague and ambiguous, including as to "YOU" and "YOUR."  Travelers

26  further objects to the extent the request seeks the disclosure of information protected

27  by the attorney-client privilege, the work-product doctrine, and/or the litigation

28

DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO
PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

1  privilege.  Travelers also objects to the extent the request seeks documents that are

2  confidential, private, proprietary, and/or subject to trade secret protection.

3      Subject to and without waiving said objections, Travelers responds as follows:

4  Travelers has already produced responsive documents.  Travelers will produce the

5  non-confidential, non-privileged portions of its claim file responsive to the request

6  that have not already been produced, which may contain additional responsive

7  documents.

8  **REQUEST FOR PRODUCTION NO. 22:**

9      The daily CLAIM reports (including those in the native format) that that

10  evidence, concern, relate to, reflect or show the highest and lowest reserve set for this

11  CLAIM.

12  **RESPONSE TO REQUEST FOR PRODUCTION NO. 22:**

13      Travelers objects to the extent the request seeks information that is not relevant

14  to the subject matter of this lawsuit or proportional to the needs of the case.  Travelers

15  further objects to the extent the request seeks documents not in the possession,

16  custody, or control of Travelers.  Travelers also objects to this demand as being

17  overbroad, vague and ambiguous, including as to "daily CLAIM reports."  Travelers

18  further objects to the extent the request seeks the disclosure of information protected

19  by the attorney-client privilege, the work-product doctrine, and/or the litigation

20  privilege.  Travelers also objects to the extent the request seeks documents that are

21  confidential, private, proprietary, and/or subject to trade secret protection.

22  **REQUEST FOR PRODUCTION NO. 23:**

23      YOUR entire underwriting file for the POLICY (this request includes, but is

24  not limited to, all DOCUMENTS that evidence, concern, relate to or reflect the

25  negotiation, underwriting, or placement of the POLICY).

26  ///

27  ///

28

**DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

**RESPONSE TO REQUEST FOR PRODUCTION NO. 23:**

Travelers objects that the request is overbroad and unduly burdensome as it is not limited in scope or time.  Travelers objects to the extent the request seeks information that is not relevant to the subject matter of this lawsuit or proportional to the needs of the case.  Travelers further objects to the extent the request seeks documents not in the possession, custody, or control of Travelers.  Travelers also objects to this demand as being overbroad, vague and ambiguous.  Travelers further objects to the extent the request seeks the disclosure of information protected by the attorney-client privilege, the work-product doctrine, and/or the litigation privilege. Travelers also objects to the extent the request seeks documents that are confidential, private, proprietary, and/or subject to trade secret protection.

Subject to and without waiving said objections, Travelers responds as follows: Travelers will produce all underwriting materials leading up to the issuance of the POLICY.  A portion of said materials will be produced pursuant to protective order.

**REQUEST FOR PRODUCTION NO. 24:**

Underwriting manuals (including superseded pages of volumes that are periodically revised) and other guidelines and instructional materials (including, without limitation, workbooks, training manuals, seminar materials, policy annotations, and guideline memoranda) used or prepared by YOU during the time YOU issued the POLICY.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 24:**

Travelers objects to the extent the request seeks information that is not relevant to the subject matter of this lawsuit or proportional to the needs of the case.  Travelers further objects to the extent the request seeks documents not in the possession, custody, or control of Travelers.  Travelers also objects to this demand as being overbroad, vague and ambiguous, including as to "underwriting manuals."  Travelers further objects to the extent the request seeks the disclosure of information protected

by the attorney-client privilege, the work-product doctrine, and/or the litigation privilege.  Travelers also objects to the extent the request seeks documents that are confidential, private, proprietary, and/or subject to trade secret protection.

**REQUEST FOR PRODUCTION NO. 25:**

All invoices for work done on the underlying CLAIM on YOUR behalf by engineers, contractors, adjusters, and/or experts.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 25:**

Travelers objects to the extent the request seeks information that is not relevant to the subject matter of this lawsuit or proportional to the needs of the case.  Travelers further objects to the extent the request seeks documents not in the possession, custody, or control of Travelers.  Travelers also objects to this demand as being overbroad, vague and ambiguous, including as to "YOUR."  Travelers further objects to the extent the request seeks the disclosure of information protected by the attorney-client privilege, the work-product doctrine, and/or the litigation privilege.  Travelers also objects to the extent the request seeks documents that are confidential, private, proprietary, and/or subject to trade secret protection.

**REQUEST FOR PRODUCTION NO. 26:**

All DOCUMENTS that evidence, concern, relate to, or reflect YOUR document retention policy.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 26:**

Travelers objects to the extent the request seeks information that is not relevant to the subject matter of this lawsuit or proportional to the needs of the case.  Travelers further objects to the extent the request seeks documents not in the possession, custody, or control of Travelers.  Travelers also objects to this demand as being overbroad, vague and ambiguous, including as to "YOUR" and "DOCUMENT retention policy."  Travelers further objects to the extent the request seeks the disclosure of information protected by the attorney-client privilege, the work-product

**DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

1   doctrine, and/or the litigation privilege.   Travelers also objects to the extent the
2   request seeks documents that are confidential, private, proprietary, and/or subject to
3   trade secret protection.

4   **REQUEST FOR PRODUCTION NO. 27:**

5        All DOCUMENTS relied upon in YOUR investigation of the CLAIM.

6   **RESPONSE TO REQUEST FOR PRODUCTION NO. 27:**

7        Travelers objects that the request is vague and ambiguous as to "relied upon in
8   YOUR investigation."   Travelers objects to the extent the request seeks information
9   that is not relevant to the subject matter of this lawsuit or proportional to the needs of
10  the case.   Travelers further objects to the extent the request seeks documents not in
11  the possession, custody, or control of Travelers.   Travelers also objects to this demand
12  as being overbroad, vague and ambiguous.   Travelers further objects to the extent the
13  request seeks the disclosure of information protected by the attorney-client privilege,
14  the work-product doctrine, and/or the litigation privilege.   Travelers also objects to
15  the extent the request seeks documents that are confidential, private, proprietary,
16  and/or subject to trade secret protection.

17       Subject to and without waiving said objections, Travelers responds as follows:
18  Travelers has already produced responsive documents.   Travelers will produce the
19  non-confidential, non-privileged portions of its claim file responsive to the request
20  that have not already been produced, which may contain additional responsive
21  documents.

22  **REQUEST FOR PRODUCTION NO. 28:**

23       All DOCUMENTS relied upon in YOUR adjustment of the CLAIM.

24  **RESPONSE TO REQUEST FOR PRODUCTION NO. 28:**

25       Travelers objects that the request is vague and ambiguous as to "relied upon in
26  YOUR adjustment."   Travelers objects to the extent the request seeks information that
27  is not relevant to the subject matter of this lawsuit or proportional to the needs of the

28

DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO
PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

1  case.  Travelers further objects to the extent the request seeks documents not in the

2  possession, custody, or control of Travelers.  Travelers also objects to this demand as

3  being overbroad, vague and ambiguous.  Travelers further objects to the extent the

4  request seeks the disclosure of information protected by the attorney-client privilege,

5  the work-product doctrine, and/or the litigation privilege.  Travelers also objects to

6  the extent the request seeks documents that are confidential, private, proprietary,

7  and/or subject to trade secret protection.

8          Subject to and without waiving said objections, Travelers responds as follows:

9  Travelers has already produced responsive documents.  Travelers will produce the

10  non-confidential, non-privileged portions of its claim file responsive to the request

11  that have not already been produced, which may contain additional responsive

12  documents.

13  **REQUEST FOR PRODUCTION NO. 29:**

14          YOUR entire employment record of and concerning Corey Ortega, including,

15  but not limited to, employment application, write-ups, disciplinary actions, and

16  reprimand letters from the beginning of his employment to the present.

17  **RESPONSE TO REQUEST FOR PRODUCTION NO. 29:**

18          Travelers objects to the extent the request seeks information that is not relevant

19  to the subject matter of this lawsuit or proportional to the needs of the case.  Travelers

20  further objects to the extent the request seeks documents not in the possession,

21  custody, or control of Travelers.  Travelers also objects to this demand as being

22  overbroad, vague and ambiguous, as to "employment record," "employment

23  application," "write-ups," "disciplinary actions," "reprimand letters," and in general.

24  Travelers further objects to the extent the request seeks the disclosure of information

25  protected by the attorney-client privilege, the work-product doctrine, and/or the

26  litigation privilege.  Travelers also objects to the extent the request seeks documents

27  that are confidential, private, proprietary, and/or subject to trade secret protection.

28

DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO
PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

**REQUEST FOR PRODUCTION NO. 30:**

All photographs and videotapes (including those in the native format) taken regarding the CLAIM.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 30:**

Travelers objects to the extent the request seeks information that is not relevant to the subject matter of this lawsuit or proportional to the needs of the case. Travelers further objects to the extent the request seeks documents not in the possession, custody, or control of Travelers. Travelers also objects to this demand as being overbroad, vague and ambiguous. Travelers further objects to the extent the request seeks the disclosure of information protected by the attorney-client privilege, the work-product doctrine, and/or the litigation privilege. Travelers also objects to the extent the request seeks documents that are confidential, private, proprietary, and/or subject to trade secret protection. Travelers also objects to the extent it seeks documents equally available to propounding party.

Subject to and without waiving said objections, Travelers responds as follows: Travelers has already produced responsive documents. Travelers also refers propounding party to the documents produced by Crown Valley Holdings, LLC, Sentinel Development Services, Inc., and AMCO Insurance Company in response to subpoenas, which contain additional responsive documents and are equally available to propounding party.

**REQUEST FOR PRODUCTION NO. 31:**

A copy of all Xactimate files in (.esx) format, maintained in the original form, regarding the CLAIM.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 31:**

Travelers objects to the extent the request seeks information that is not relevant to the subject matter of this lawsuit or proportional to the needs of the case. Travelers further objects to the extent the request seeks documents not in the possession,

- 22 -

8:16-cv-01397-CJC (SSx)

1  custody, or control of Travelers.  Travelers also objects to this demand as being
2  overbroad, vague and ambiguous.  Travelers further objects to the extent the request
3  seeks the disclosure of information protected by the attorney-client privilege, the
4  work-product doctrine, and/or the litigation privilege.  Travelers also objects to the
5  extent the request seeks documents that are confidential, private, proprietary, and/or
6  subject to trade secret protection.

7  Subject to and without waiving said objections, Travelers responds as follows:
8  Travelers has already produced copies of the responsive documents.  Travelers also
9  refers propounding party to the documents produced by Crown Valley Holdings,
10  LLC, Sentinel Development Services, Inc., and AMCO Insurance Company in
11  response to subpoenas, which contain additional responsive documents and are
12  equally available to propounding party.

13  **REQUEST FOR PRODUCTION NO. 32:**

14  All DOCUMENTS evidencing, concerning, relating to or reflecting any
15  agreements between YOU and PLAINTIFF, other than the POLICY and
16  endorsements issued, including but not limited to, retrospective rating agreements that
17  YOU contend may affect the amount or scope of coverage available to PLAINTIFF
18  under the POLICY.

19  **RESPONSE TO REQUEST FOR PRODUCTION NO. 32:**

20  Travelers objects to the extent the request seeks information that is not relevant
21  to the subject matter of this lawsuit or proportional to the needs of the case.  Travelers
22  further objects to the extent the request seeks documents not in the possession,
23  custody, or control of Travelers.  Travelers also objects to this demand as being
24  overbroad, vague and ambiguous, including as to "retrospective rating agreements."
25  Travelers further objects to the extent the request seeks the disclosure of information
26  protected by the attorney-client privilege, the work-product doctrine, and/or the

27
28

**DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

1   litigation privilege.  Travelers also objects to the extent the request seeks documents

2   that are confidential, private, proprietary, and/or subject to trade secret protection.

3   **REQUEST FOR PRODUCTION NO. 33:**

4       All DOCUMENTS exchanged by YOU and PLAINTIFF that evidence,

5   concern, relate to, or reflect the CLAIM.

6   **RESPONSE TO REQUEST FOR PRODUCTION NO. 33:**

7       Travelers objects that the request is vague and ambiguous, and overbroad as it

8   is not limited in scope and time.  Travelers objects to the extent the request seeks

9   information that is not relevant to the subject matter of this lawsuit or proportional to

10  the needs of the case.  Travelers further objects to the extent the request seeks

11  documents not in the possession, custody, or control of Travelers.  Travelers also

12  objects to this demand as being overbroad, vague and ambiguous.  Travelers further

13  objects to the extent the request seeks the disclosure of information protected by the

14  attorney-client privilege, the work-product doctrine, and/or the litigation privilege.

15  Travelers also objects to the extent the request seeks documents that are confidential,

16  private, proprietary, and/or subject to trade secret protection.

17      Subject to and without waiving said objections, Travelers responds as follows:

18  Travelers has already produced responsive documents.  Travelers will produce the

19  non-confidential, non-privileged portions of its claim file that have not already been

20  produced, which may contain additional responsive documents.  Travelers also refers

21  propounding party to the documents produced by Crown Valley Holdings, LLC,

22  Sentinel Development Services, Inc., and AMCO Insurance Company in response to

23  subpoenas, as well as the documents produced by Plaintiff, which contain additional

24  responsive documents and are equally available to propounding party.

25  **REQUEST FOR PRODUCTION NO. 34:**

26      All DOCUMENTS that evidence, concern, relate to, reflect, or constitute

27  COMMUNICATIONS between YOU and PLAINTIFF relating to the CLAIM.

28

**DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO
PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

1   **RESPONSE TO REQUEST FOR PRODUCTION NO. 34:**

2       Travelers objects to the extent the request seeks information that is not relevant

3   to the subject matter of this lawsuit or proportional to the needs of the case.  Travelers

4   further objects to the extent the request seeks documents not in the possession,

5   custody, or control of Travelers.   Travelers also objects to this demand as being

6   overbroad, vague and ambiguous.  Travelers further objects to the extent the request

7   seeks the disclosure of information protected by the attorney-client privilege, the

8   work-product doctrine, and/or the litigation privilege.  Travelers also objects to the

9   extent the request seeks documents that are confidential, private, proprietary, and/or

10  subject to trade secret protection.

11      Subject to and without waiving said objections, Travelers responds as follows:

12  Travelers has already produced responsive documents.  Travelers will produce the

13  non-confidential, non-privileged portions of its claim file responsive to the request

14  that have not already been produced, which may contain additional responsive

15  documents.  Travelers also refers propounding party to the documents produced by

16  Crown Valley Holdings, LLC, Sentinel Development Services, Inc., and AMCO

17  Insurance Company in response to subpoenas, as well as the documents produced by

18  Plaintiff, which contain additional responsive documents and are equally available to

19  propounding party.

20  **REQUEST FOR PRODUCTION NO. 35:**

21      All DOCUMENTS exchanged between YOU and any PERSON, including but

22  not limited to adjusters, consultants, brokers, agents, insurers, and reinsurers, relating

23  to the CLAIM.

24  **RESPONSE TO REQUEST FOR PRODUCTION NO. 35:**

25      Travelers objects to the extent the request seeks information that is not relevant

26  to the subject matter of this lawsuit or proportional to the needs of the case.  Travelers

27  further objects to the extent the request seeks documents not in the possession,

28

DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO
PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

1  custody, or control of Travelers.  Travelers also objects to this demand as being
2  overbroad, vague and ambiguous.  Travelers further objects to the extent the request
3  seeks the disclosure of information protected by the attorney-client privilege, the
4  work-product doctrine, and/or the litigation privilege.  Travelers also objects to the
5  extent the request seeks documents that are confidential, private, proprietary, and/or
6  subject to trade secret protection.  Travelers also refers propounding party to the
7  documents produced by Crown Valley Holdings, LLC, Sentinel Development
8  Services, Inc., and AMCO Insurance Company in response to subpoenas, as well as
9  the documents produced by Plaintiff, which contain additional responsive documents
10  and are equally available to propounding party.

11  **REQUEST FOR PRODUCTION NO. 36:**

12  All DOCUMENTS that evidence, concern, relate to, reflect, or constitute
13  YOUR internal COMMUNICATIONS concerning the CLAIM.

14  **RESPONSE TO REQUEST FOR PRODUCTION NO. 36:**

15  Travelers objects to the extent the request seeks information that is not relevant
16  to the subject matter of this lawsuit or proportional to the needs of the case.  Travelers
17  also objects to this demand as being overbroad, vague and ambiguous.  Travelers
18  further objects to the extent the request seeks the disclosure of information protected
19  by the attorney-client privilege, the work-product doctrine, and/or the litigation
20  privilege.  Travelers also objects to the extent the request seeks documents that are
21  confidential, private, proprietary, and/or subject to trade secret protection.

22  Subject to and without waiving said objections, Travelers responds as follows:
23  Travelers has already produced responsive documents.  Travelers will produce the
24  non-confidential, non-privileged portions of its claim file responsive to the request
25  that have not already been produced, which may contain additional responsive
26  documents.

27  ///

28

**DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO
PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

**REQUEST FOR PRODUCTION NO. 37:**

All COMMUNICATIONS exchanged between YOU and PLAINTIFF that evidence, concern, relate to, or reflect the negotiation, purchase, sale, underwriting, placement, and/or renewal of the POLICY.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 37:**

Travelers objects to the extent the request seeks information that is not relevant to the subject matter of this lawsuit or proportional to the needs of the case. Travelers further objects to the extent the request seeks documents not in the possession, custody, or control of Travelers. Travelers also objects to this demand as being overbroad, vague and ambiguous.

Subject to and without waiving said objections, Travelers responds as follows: Travelers will produce all underwriting materials leading up to the issuance of the POLICY. A portion of said materials will be produced pursuant to protective order.

**REQUEST FOR PRODUCTION NO. 38:**

All COMMUNICATIONS exchanged between YOU and any PERSON, including any broker, that evidence, concern, relate to, or reflect the negotiation, underwriting, and/or placement of the POLICY.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 38:**

Travelers objects that the request is overbroad and unduly burdensome as it is not limited in scope or time. Travelers objects to the extent the request seeks information that is not relevant to the subject matter of this lawsuit or proportional to the needs of the case. Travelers further objects to the extent the request seeks documents not in the possession, custody, or control of Travelers. Travelers also objects to this demand as being overbroad, vague and ambiguous. Travelers further objects to the extent the request seeks the disclosure of information protected by the attorney-client privilege, the work-product doctrine, and/or the litigation privilege.

DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO
PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

1    Travelers also objects to the extent the request seeks documents that are confidential,

2    private, proprietary, and/or subject to trade secret protection.

3           Subject to and without waiving said objections, Travelers responds as follows:

4    Travelers will produce all underwriting materials leading up to the issuance of the

5    POLICY.  A portion of said materials will be produced pursuant to protective order.

6    **REQUEST FOR PRODUCTION NO. 39:**

7           All DOCUMENTS that evidence, concern, relate to, or reflect any claims or

8    demands for contribution, indemnity, or subrogation asserted by YOU against any

9    PERSON relating to the CLAIM.

10   **RESPONSE TO REQUEST FOR PRODUCTION NO. 39:**

11          Travelers objects that the request is overbroad and unduly burdensome as it is

12   not limited in scope or time.  Travelers objects to the extent the request seeks

13   information that is not relevant to the subject matter of this lawsuit or proportional to

14   the needs of the case.  Travelers further objects to the extent the request seeks

15   documents not in the possession, custody, or control of Travelers.  Travelers also

16   objects to this request as being vague and ambiguous.  Travelers further objects to the

17   extent the request seeks the disclosure of information protected by the attorney-client

18   privilege, the work-product doctrine, and/or the litigation privilege.  Travelers also

19   objects to the extent the request seeks documents that are confidential, private,

20   proprietary, and/or subject to trade secret protection.

21   **REQUEST FOR PRODUCTION NO. 40:**

22          The entire contents of all claims or investigative files created in response to the

23   CLAIM.  This request includes, but is not limited to, all DOCUMENTS that relate to

24   any review, handling, discussion, evaluation, processing, investigation, supervision,

25   or response to the CLAIM.

26   ///

27   ///

28

**DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO
PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

**RESPONSE TO REQUEST FOR PRODUCTION NO. 40:**

Travelers objects that the request is overbroad and unduly burdensome as it is not limited in scope or time. Travelers objects to the extent the request seeks information that is not relevant to the subject matter of this lawsuit or proportional to the needs of the case. Travelers further objects to the extent the request seeks documents not in the possession, custody, or control of Travelers. Travelers also objects to this demand as being overbroad, vague and ambiguous. Travelers further objects to the extent the request seeks the disclosure of information protected by the attorney-client privilege, the work-product doctrine, and/or the litigation privilege. Travelers also objects to the extent the request seeks documents that are confidential, private, proprietary, and/or subject to trade secret protection.

Subject to and without waiving said objections, Travelers responds as follows: Travelers has already produced responsive documents. Travelers will produce the non-confidential, non-privileged portions of its claim file responsive to the request that have not already been produced, which may contain additional responsive documents. Travelers also refers propounding party to the documents produced by Crown Valley Holdings, LLC, Sentinel Development Services, Inc., and AMCO Insurance Company in response to subpoenas, as well as the documents produced by Plaintiff, which contain additional responsive documents and are equally available to propounding party.

**REQUEST FOR PRODUCTION NO. 41:**

All claims handling manuals or similar documents prepared or maintained by YOU that set forth the procedures, instructions, rules, standards, or guidelines to be followed in connection with the handling, adjusting, investigation, or evaluation of property claims and documentation requirements that were in effect at the time PLAINTIFF made the CLAIM.

///

1  **RESPONSE TO REQUEST FOR PRODUCTION NO. 41:**

2       Travelers objects to the extent the request seeks information that is not relevant

3  to the subject matter of this lawsuit or proportional to the needs of the case. Travelers

4  further objects to the extent the request seeks documents not in the possession,

5  custody, or control of Travelers. Travelers also objects to this demand as being

6  overbroad, vague and ambiguous, including as to "claim handling manuals."

7  Travelers further objects to the extent the request seeks the disclosure of information

8  protected by the attorney-client privilege, the work-product doctrine, and/or the

9  litigation privilege. Travelers also objects to the extent the request seeks documents

10  that are confidential, private, proprietary, and/or subject to trade secret protection.

11  **REQUEST FOR PRODUCTION NO. 42:**

12       All DOCUMENTS that evidence, concern, relate to, or reflect the interpretation

13  or application of the POLICY provisions on which YOU rely to refuse or limited

14  payment of the CLAIM.

15  **RESPONSE TO REQUEST FOR PRODUCTION NO. 42:**

16       Travelers objects that the request is compound. Travelers objects to the extent

17  the request seeks information that is not relevant to the subject matter of this lawsuit

18  or proportional to the needs of the case. Travelers further objects to the extent the

19  request seeks documents not in the possession, custody, or control of Travelers.

20  Travelers also objects to this demand as being overbroad, vague and ambiguous.

21  Travelers further objects to the extent the request seeks the disclosure of information

22  protected by the attorney-client privilege, the work-product doctrine, and/or the

23  litigation privilege. Travelers also objects to the extent the request seeks documents

24  that are confidential, private, proprietary, and/or subject to trade secret protection.

25       Subject to and without waiving said objections, Travelers responds as follows:

26  Travelers has already produced responsive documents. Travelers will produce the

27  non-confidential, non-privileged portions of its claim file responsive to the request

28

- 30 -        8:16-cv-01397-CJC (SSx)

**DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO
PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

1  that have not already been produced, which may contain additional responsive

2  documents.  Travelers also refers propounding party to the documents produced by

3  Crown Valley Holdings, LLC, Sentinel Development Services, Inc., and AMCO

4  Insurance Company in response to subpoenas, as well as the documents produced by

5  Plaintiff, which contain additional responsive documents and are equally available to

6  propounding party.

7  **REQUEST FOR PRODUCTION NO. 43:**

8      All DOCUMENTS that evidence, concern, relate to, reflect, support or set forth

9  YOUR opinion or analysis regarding the application of any POLICY provisions to the

10  CLAIM.

11  **RESPONSE TO REQUEST FOR PRODUCTION NO. 43:**

12      Travelers objects that the request is compound.  Travelers objects to the extent

13  the request seeks information that is not relevant to the subject matter of this lawsuit

14  or proportional to the needs of the case.  Travelers further objects to the extent the

15  request seeks documents not in the possession, custody, or control of Travelers.

16  Travelers also objects to this demand as being overbroad, vague and ambiguous.

17  Travelers further objects to the extent the request seeks the disclosure of information

18  protected by the attorney-client privilege, the work-product doctrine, and/or the

19  litigation privilege.  Travelers also objects to the extent the request seeks documents

20  that are confidential, private, proprietary, and/or subject to trade secret protection.

21      Subject to and without waiving said objections, Travelers responds as follows:

22  Travelers has already produced responsive documents.  Travelers will produce the

23  non-confidential, non-privileged portions of its claim file responsive to the request

24  that have not already been produced, which may contain additional responsive

25  documents.  Travelers also refers propounding party to the documents produced by

26  Crown Valley Holdings, LLC, Sentinel Development Services, Inc., and AMCO

27  Insurance Company in response to subpoenas, as well as the documents produced by

28

**DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

1   Plaintiff, which contain additional responsive documents and are equally available to

2   propounding party.

3   **REQUEST FOR PRODUCTION NO. 44:**

4       All DOCUMENTS that evidence, concern, relate to, reflect, or constitute

5   COMMUNICATIONS relating to YOUR investigation of the CLAIM.

6   **RESPONSE TO REQUEST FOR PRODUCTION NO. 44:**

7       Travelers objects to the extent the request seeks information that is not relevant

8   to the subject matter of this lawsuit or proportional to the needs of the case.  Travelers

9   further objects to the extent the request seeks documents not in the possession,

10   custody, or control of Travelers.  Travelers also objects to this demand as being

11   overbroad, vague and ambiguous.  Travelers further objects to the extent the request

12   seeks the disclosure of information protected by the attorney-client privilege, the

13   work-product doctrine, and/or the litigation privilege.  Travelers also objects to the

14   extent the request seeks documents that are confidential, private, proprietary, and/or

15   subject to trade secret protection.

16       Subject to and without waiving said objections, Travelers responds as follows:

17   Travelers has already produced responsive documents.  Travelers will produce the

18   non-confidential, non-privileged portions of its claim file responsive to the request

19   that have not already been produced, which may contain additional responsive

20   documents.  Travelers also refers propounding party to the documents produced by

21   Crown Valley Holdings, LLC, Sentinel Development Services, Inc., and AMCO

22   Insurance Company in response to subpoenas, as well as the documents produced by

23   Plaintiff, which contain additional responsive documents and are equally available to

24   propounding party.

25   **REQUEST FOR PRODUCTION NO. 45:**

26       All DOCUMENTS that evidence, concern, relate to, reflect, or constitute

27   COMMUNICATIONS relating to YOUR adjustment of the CLAIM.

28

DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO
PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

**RESPONSE TO REQUEST FOR PRODUCTION NO. 45:**

Travelers objects to the extent the request seeks information that is not relevant to the subject matter of this lawsuit or proportional to the needs of the case. Travelers further objects to the extent the request seeks documents not in the possession, custody, or control of Travelers. Travelers also objects to this demand as being overbroad, vague and ambiguous. Travelers further objects to the extent the request seeks the disclosure of information protected by the attorney-client privilege, the work-product doctrine, and/or the litigation privilege. Travelers also objects to the extent the request seeks documents that are confidential, private, proprietary, and/or subject to trade secret protection.

Subject to and without waiving said objections, Travelers responds as follows: Travelers has already produced responsive documents. Travelers will produce the non-confidential, non-privileged portions of its claim file responsive to the request that have not already been produced, which may contain additional responsive documents. Travelers also refers propounding party to the documents produced by Crown Valley Holdings, LLC, Sentinel Development Services, Inc., and AMCO Insurance Company in response to subpoenas, as well as the documents produced by Plaintiff, which contain additional responsive documents and are equally available to propounding party.

**REQUEST FOR PRODUCTION NO. 46:**

All DOCUMENTS that evidence, concern, relate to, reflect or support YOUR contention that PLAINTIFF'S rental payments should have been abated under its lease agreement for the PREMISES.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 46:**

Travelers objects to the extent the request seeks information that is not relevant to the subject matter of this lawsuit or proportional to the needs of the case. Travelers further objects to the extent the request seeks documents not in the possession,

1    custody, or control of Travelers. Travelers also objects to this demand as being

2    overbroad, vague and ambiguous. Travelers further objects to the extent the request

3    seeks the disclosure of information protected by the attorney-client privilege, the

4    work-product doctrine, and/or the litigation privilege. Travelers also objects to the

5    extent the request seeks documents that are confidential, private, proprietary, and/or

6    subject to trade secret protection.

7          Subject to and without waiving said objections, Travelers responds as follows:

8    Travelers has already produced responsive documents. Travelers will produce the

9    non-confidential, non-privileged portions of its claim file responsive to the request

10   that have not already been produced, which may contain additional responsive

11   documents. Travelers also refers propounding party to the documents produced by

12   Crown Valley Holdings, LLC, Sentinel Development Services, Inc., and AMCO

13   Insurance Company in response to subpoenas, as well as the documents produced by

14   Plaintiff, which contain additional responsive documents and are equally available to

15   propounding party.

16   **REQUEST FOR PRODUCTION NO. 47:**

17         All DOCUMENTS that evidence, concern, relate to, reflect or support YOUR

18   contention that PLAINTIFF is not owed any benefits under the business personal

19   property provision of the POLICY.

20   **RESPONSE TO REQUEST FOR PRODUCTION NO. 47:**

21         Travelers objects to the extent the request seeks information that is not relevant

22   to the subject matter of this lawsuit or proportional to the needs of the case. Travelers

23   further objects to the extent the request seeks documents not in the possession,

24   custody, or control of Travelers. Travelers also objects to this demand as being

25   overbroad, vague and ambiguous. Travelers further objects to the extent the request

26   seeks the disclosure of information protected by the attorney-client privilege, the

27   work-product doctrine, and/or the litigation privilege. Travelers also objects to the

28

**DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO
PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

extent the request seeks documents that are confidential, private, proprietary, and/or subject to trade secret protection.

Subject to and without waiving said objections, Travelers responds as follows: Travelers has already produced responsive documents.  Travelers will produce the non-confidential, non-privileged portions of its claim file responsive to the request that have not already been produced, which may contain additional responsive documents.  Travelers also refers propounding party to the documents produced by Crown Valley Holdings, LLC, Sentinel Development Services, Inc., and AMCO Insurance Company in response to subpoenas, as well as the documents produced by Plaintiff, which contain additional responsive documents and are equally available to propounding party.

**REQUEST FOR PRODUCTION NO. 48:**

All DOCUMENTS that evidence, concern, relate to, reflect or support YOUR contention that PLAINTIFF is not owed any benefits under the business income and extra expense provision of the POLICY.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 48:**

Travelers objects to the extent the request seeks information that is not relevant to the subject matter of this lawsuit or proportional to the needs of the case.  Travelers further objects to the extent the request seeks documents not in the possession, custody, or control of Travelers.  Travelers also objects to this demand as being overbroad, vague and ambiguous.  Travelers further objects to the extent the request seeks the disclosure of information protected by the attorney-client privilege, the work-product doctrine, and/or the litigation privilege.  Travelers also objects to the extent the request seeks documents that are confidential, private, proprietary, and/or subject to trade secret protection.

Subject to and without waiving said objections, Travelers responds as follows: Travelers has already produced responsive documents.  Travelers will produce the

DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

1  non-confidential, non-privileged portions of its claim file responsive to the request

2  that have not already been produced, which may contain additional responsive

3  documents. Travelers also refers propounding party to the documents produced by

4  Crown Valley Holdings, LLC, Sentinel Development Services, Inc., and AMCO

5  Insurance Company in response to subpoenas, as well as the documents produced by

6  Plaintiff, which contain additional responsive documents and are equally available to

7  propounding party.

8  **REQUEST FOR PRODUCTION NO. 49:**

9      All DOCUMENTS that evidence, concern, relate to, reflect or support YOUR

10  contention that PLAINTIFF is not owed any benefits under the additional coverage

11  for newly acquired business personal provision of the POLICY.

12  **RESPONSE TO REQUEST FOR PRODUCTION NO. 49:**

13      Travelers objects to the extent the request seeks information that is not relevant

14  to the subject matter of this lawsuit or proportional to the needs of the case. Travelers

15  further objects to the extent the request seeks documents not in the possession,

16  custody, or control of Travelers. Travelers also objects to this demand as being

17  overbroad, vague and ambiguous. Travelers further objects to the extent the request

18  seeks the disclosure of information protected by the attorney-client privilege, the

19  work-product doctrine, and/or the litigation privilege. Travelers also objects to the

20  extent the request seeks documents that are confidential, private, proprietary, and/or

21  subject to trade secret protection.

22      Subject to and without waiving said objections, Travelers responds as follows:

23  Travelers has already produced responsive documents. Travelers will produce the

24  non-confidential, non-privileged portions of its claim file responsive to the request

25  that have not already been produced, which may contain additional responsive

26  documents. Travelers also refers propounding party to the documents produced by

27  Crown Valley Holdings, LLC, Sentinel Development Services, Inc., and AMCO

28

**DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

1    Insurance Company in response to subpoenas, as well as the documents produced by

2    Plaintiff, which contain additional responsive documents and are equally available to

3    propounding party.

4    **REQUEST FOR PRODUCTION NO. 50:**

5         All DOCUMENTS that evidence, concern, relate to, reflect or support YOUR

6    contention that the period of restoration of the PREMISES was from July 18, 2014

7    through October 31, 2014.

8    **RESPONSE TO REQUEST FOR PRODUCTION NO. 50:**

9         Travelers objects to the extent the request seeks information that is not relevant

10   to the subject matter of this lawsuit or proportional to the needs of the case.  Travelers

11   further objects to the extent the request seeks documents not in the possession,

12   custody, or control of Travelers.   Travelers also objects to this demand as being

13   overbroad, vague and ambiguous.   Travelers further objects to the extent the request

14   seeks the disclosure of information protected by the attorney-client privilege, the

15   work-product doctrine, and/or the litigation privilege.   Travelers also objects to the

16   extent the request seeks documents that are confidential, private, proprietary, and/or

17   subject to trade secret protection.

18        Subject to and without waiving said objections, Travelers responds as follows:

19   Travelers has already produced responsive documents.   Travelers will produce the

20   non-confidential, non-privileged portions of its claim file responsive to the request

21   that have not already been produced, which may contain additional responsive

22   documents.   Travelers also refers propounding party to the documents produced by

23   Crown Valley Holdings, LLC, Sentinel Development Services, Inc., and AMCO

24   Insurance Company in response to subpoenas, as well as the documents produced by

25   Plaintiff, which contain additional responsive documents and are equally available to

26   propounding party.

27   ///

28
                                          - 37 -                    8:16-cv-01397-CJC (SSx)

**REQUEST FOR PRODUCTION NO. 51:**

All DOCUMENTS that evidence, concern, relate to, reflect or support YOUR contention that the estimated opening date of PLAINTIFF'S restaurant was August 1, 2014.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 51:**

Travelers objects to the extent the request seeks information that is not relevant to the subject matter of this lawsuit or proportional to the needs of the case. Travelers further objects to the extent the request seeks documents not in the possession, custody, or control of Travelers. Travelers also objects to this demand as being overbroad, vague and ambiguous. Travelers further objects to the extent the request seeks the disclosure of information protected by the attorney-client privilege, the work-product doctrine, and/or the litigation privilege. Travelers also objects to the extent the request seeks documents that are confidential, private, proprietary, and/or subject to trade secret protection.

Subject to and without waiving said objections, Travelers responds as follows: Travelers has already produced responsive documents. Travelers will produce the non-confidential, non-privileged portions of its claim file responsive to the request that have not already been produced, which may contain additional responsive documents. Travelers also refers propounding party to the documents produced by Crown Valley Holdings, LLC, Sentinel Development Services, Inc., and AMCO Insurance Company in response to subpoenas, as well as the documents produced by Plaintiff, which contain additional responsive documents and are equally available to propounding party.

**REQUEST FOR PRODUCTION NO. 52:**

All recordings, including audio, video, voice, or transcripts of recordings, that evidence, concern, relate to, or reflect the CLAIM.

///

**RESPONSE TO REQUEST FOR PRODUCTION NO. 52:**

Travelers objects to the extent the request seeks information that is not relevant to the subject matter of this lawsuit or proportional to the needs of the case. Travelers further objects to the extent the request seeks documents not in the possession, custody, or control of Travelers. Travelers also objects to this demand as being overbroad, vague and ambiguous. Travelers further objects to the extent the request seeks the disclosure of information protected by the attorney-client privilege, the work-product doctrine, and/or the litigation privilege. Travelers also objects to the extent the request seeks documents that are confidential, private, proprietary, and/or subject to trade secret protection. Travelers objects to the extent the request seeks documents outside the possession of Travelers.

Subject to and without waiving said objections, Travelers responds as follows: Travelers has already produced responsive documents. Travelers will produce the non-confidential, non-privileged portions of its claim file responsive to the request that have not already been produced, which may contain additional responsive documents. Travelers also refers propounding party to the documents produced by Crown Valley Holdings, LLC, Sentinel Development Services, Inc., and AMCO Insurance Company in response to subpoenas, as well as the documents produced by Plaintiff, which contain additional responsive documents and are equally available to propounding party.

**REQUEST FOR PRODUCTION NO. 53:**

All recordings, including audio, video, voice, or transcripts of recordings, YOU received from any PERSON that evidence, concern, relate to, or reflect the CLAIM.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 53:**

Travelers objects to the extent the request seeks information that is not relevant to the subject matter of this lawsuit or proportional to the needs of the case. Travelers further objects to the extent the request seeks documents not in the possession,

DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO
PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

custody, or control of Travelers.   Travelers also objects to this demand as being overbroad, vague and ambiguous.   Travelers further objects to the extent the request seeks the disclosure of information protected by the attorney-client privilege, the work-product doctrine, and/or the litigation privilege.   Travelers also objects to the extent the request seeks documents that are confidential, private, proprietary, and/or subject to trade secret protection.   Travelers objects to the extent the request seeks documents outside the possession of Travelers.

Subject to and without waiving said objections, Travelers responds as follows: Travelers has already produced responsive documents.   Travelers will produce the non-confidential, non-privileged portions of its claim file responsive to the request that have not already been produced, which may contain additional responsive documents.   Travelers also refers propounding party to the documents produced by Crown Valley Holdings, LLC, Sentinel Development Services, Inc., and AMCO Insurance Company in response to subpoenas, as well as the documents produced by Plaintiff, which contain additional responsive documents and are equally available to propounding party.

**REQUEST FOR PRODUCTION NO. 54:**

All DOCUMENTS identified, referenced or relied upon in YOUR responses to PLAINTIFF'S Interrogatories, Set One served concurrently with this request.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 54:**

Travelers objects to the extent the request seeks information that is not relevant to the subject matter of this lawsuit or proportional to the needs of the case.   Travelers further objects to the extent the request seeks documents not in the possession, custody, or control of Travelers.   Travelers also objects to this demand as being overbroad, vague and ambiguous.   Travelers further objects to the extent the request seeks the disclosure of information protected by the attorney-client privilege, the work-product doctrine, and/or the litigation privilege.   Travelers also objects to the

DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)

1    extent the request seeks documents that are confidential, private, proprietary, and/or

2    subject to trade secret protection.

3       Subject to and without waiving said objections, Travelers responds as follows:

4    Travelers has already produced responsive documents. Travelers will produce the

5    non-confidential, non-privileged portions of its claim file responsive to the request

6    that have not already been produced, which may contain additional responsive

7    documents. Travelers also refers propounding party to the documents produced by

8    Crown Valley Holdings, LLC, Sentinel Development Services, Inc., and AMCO

9    Insurance Company in response to subpoenas, as well as the documents produced by

10    Plaintiff, which contain additional responsive documents and are equally available to

11    propounding party.

12

13

Dated: July 25, 2017                 WESTON & McELVAIN LLP

14

15

                  By: _____

16                        Aaron C. Agness

17                        Bryan A. Reynolds
                       Attorneys for Defendants,

18                        TRAVELERS CASUALTY
                       INSURANCE COMPANY OF

19                        AMERICA and COREY ORTEGA

20

21

22

23

24

25

26

27

28

**DEFENDANT TRAVELER CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO
PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

*Stars and Bar   LC v. Travelers Casualty Insurance C   pany of America, et al.*
USDC-CACD Southern Division, Case No. 8:16-cv-01397-CJC-SSx
Our File No. TR889

## PROOF OF SERVICE

I, Lucille R. Aguiluz, declare:

I am employed in the County of Los Angeles, state of California. I am over the age of 18 and not a party to the within action; my business address is 1960 East Grand Avenue, Suite 400, El Segundo, California 90245.

On July 25, 2017, I served a copy of the foregoing document described as: **DEFENDANT TRAVELERS CASUALTY INSURANCE COMPANY OF AMERICA'S RESPONSE TO PLAINTIFF'S STARS AND BARS, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)** on all interested parties in this action by placing true and correct copies thereof enclosed in sealed envelopes addressed as follows:

### [PLEASE SEE ATTACHED SERVICE LIST]

[X]   (BY MAIL): I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at El Segundo, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on July 25, 2017 at El Segundo, California.

_____
Lucille R. Aguiluz

1

*Stars and Bars, LLC v. Travelers Casualty Insurance Company of America, et al.*
USDC-CACD Southern Division, Case No. 8:16-cv-01397-CJC-SSx
Our File No. TR889

## SERVICE LIST

Boris Treyzon, Esq.
Renata Salo, Esq.
Darren D. Darwish, Esq.
**ABIR COHEN TREYZON SALO, LLP**
1901 Avenue of the Stars, Suite 935
Los Angeles, California 90067
Telephone:   (424) 288-4367
Facsimile:   (424) 288-4368
E-mail:       btreyzon@actslaw.com
             rsalo@actslaw.com
             ddarwish@actslaw.com

*Attorneys for Plaintiff,*
Stars and Bars, LLC

2

EXHIBIT C

Atkinson-Baker Court Reporters
www.depo.com

```
 1              UNITED STATES DISTRICT COURT FOR THE

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3

 4   STARS AND BARS, LLC, a Nevada      )
     limited liability company,        )
 5                                      )
                      Plaintiff,        )
 6                                      )
          vs.                           ) Case No.
 7                                      ) 8:16-cv-01397
     TRAVELERS CASUALTY INSURANCE       ) CJC (SSx)
 8   COMPANY OF AMERICA, a Connecticut  )
     corporation; COREY ORTEGA, an      )
 9   individual; and DOES 1 through 20,)
     Inclusive,                         )
10                                      )
                      Defendants.       )
11   ---------------------------------)
     AND RELATED CROSS-ACTION.          )
12   ---------------------------------)

13

14               VIDEOTAPED DEPOSITION OF

15              PERSON MOST KNOWLEDGEABLE

16                 STARS AND BARS, LLC

17                     BRIAN ROCHE

18               EL SEGUNDO, CALIFORNIA

19                     JUNE 8, 2018

20

21   ATKINSON-BAKER, INC.
     COURT REPORTERS
22   (800) 288-3376
     www.depo.com
23

24   REPORTED BY:  JENNY S. BOOKER, CSR NO. 9237, RPR, CLR

25   FILE NO.:     AC05CA2
```

1

Atkinson-Baker Court Reporters
www.depo.com

```
1              UNITED STATES DISTRICT COURT FOR THE

2                 CENTRAL DISTRICT OF CALIFORNIA

3

4    STARS AND BARS, LLC, a Nevada      )
     limited liability company,        )
5                                       )
                   Plaintiff,           )
6                                       )
          vs.                           ) Case No.
7                                       ) 8:16-cv-01397
     TRAVELERS CASUALTY INSURANCE       ) CJC (SSx)
8    COMPANY OF AMERICA, a Connecticut )
     corporation; COREY ORTEGA, an     )
9    individual; and DOES 1 through 20,)
     Inclusive,                         )
10                                      )
                   Defendants.          )
11   ----------------------------------)
     AND RELATED CROSS-ACTION.          )
12   ----------------------------------)

13

14

15

16        Videotaped Deposition of Person Most

17   Knowledgeable, Stars and Bars, LLC, BRIAN ROCHE,

18   taken on behalf of Defendant and Counter-Claimant

19   Travelers Casualty Insurance Company of America and

20   Defendant Corey Ortega, at 1960 East Grand Avenue,

21   Suite 400, El Segundo, California 90245, commencing

22   at 10:05 a.m., Friday, June 8, 2018, before

23   Jenny S. Booker, CSR 9237, RPR, CLR.

24

25
```

2

```
1                A P P E A R A N C E S:

2

3        FOR PLAINTIFF AND COUNTER-DEFENDANT
         STARS AND BARS, LLC:
4
         MARTORELL LAW APC
5        BY: OLIVIA O. BISSELL, ESQ.
         (Specially appearing)
6        6100 Center Drive
         Suite 1130
7        Los Angeles, California 90045
         (323) 840-1200
8        oliviabissell@gmail.com

9
         FOR DEFENDANT AND COUNTER-CLAIMANT
10       TRAVELERS CASUALTY INSURANCE COMPANY
         OF AMERICA AND DEFENDANT COREY ORTEGA:
11
         WESTON & McELVAIN LLP
12       BY: AARON C. AGNESS, ESQ.
         1960 East Grand Avenue
13       Suite 400
         El Segundo, California 90245
14       (213) 596-8000
         aagness@wmattorneys.com
15

16       ALSO PRESENT:

17       John Peace, Videographer

18

19

20

21

22

23

24

25
```

3

```
 1                    I N D E X

 2

 3   WITNESS:  Brian Roche

 4   EXAMINATION                              PAGE

 5         By Mr. Agness                        8

 6

 7                  E X H I B I T S

 8   NUMBER              DESCRIPTION          PAGE

 9   Exhibit 1    Travelers' Amended Notice of   29
                  Deposition of Person Most
10                Knowledgeable from Stars and
                  Bars, LLC
11
     Exhibit 2    Travelers' Amended Notice of   29
12                Deposition of Brian Roche

13   Exhibit 3    Declaration of Evan Kennedy   101
                  dated 10/17/14
14
     Exhibit 4    Declaration of Matt Connor    117
15                dated 10/14/14

16   Exhibit 5    Declaration of Robert Lehmeyer 144
                  dated 10/15/14
17
     Exhibit 6    Declaration of Royce Mealin   159
18                dated 10/15/14

19   Exhibit 7    Declaration of Bryan Sadler   174
                  dated 10/15/14
20
     Exhibit 8    Declaration of Blake Stolo    185
21                Rothenberg dated 10/17/14

22   Exhibit 9    Declaration of Thomas Mackie  192
                  dated 10/15/14
23
     Exhibit 10   Stars and Bars Program        201
24                Coordinator Tom Mackie
                  Job Description
25
```

4

PMK: Brian Roche
June 8, 2018

Atkinson-Baker Court Reporters
www.depo.com

```
 1              C O N T I N U E D

 2                E X H I B I T S

 3    NUMBER              DESCRIPTION              PAGE

 4    Exhibit 11   E-mail to Lisa Miller from       203
                   Brian Roche dated 7/17/14
 5
      Exhibit 12   E-mail string to Rachel          216
 6                 Griffiths and Cynthia Curtis
                   from Royd Despain dated 7/21/14
 7
      Exhibit 13   AmTrust North America Quote      223
 8                 No. 2486550; attachments

 9    Exhibit 14   E-mail string to Jonathan        228
                   Shumway from Joey Kirichkow
10                 dated 7/27/17

11    Exhibit 15   Travelers Custom Insurance       239
                   Policy for Stars and Bars
12
      Exhibit 16   E-mail string to Royd Despain    245
13                 from Sherlyn Simon dated
                   7/30/14
14
      Exhibit 17   Travelers Custom Insurance       267
15                 Policy for Stars and Bars

16    Exhibit 18   Photocopy of check to            272
                   Stars and Bars from Travelers,
17                 Check No. 85572451

18    Exhibit 19   Photocopy of check to            276
                   Stars and Bars from Travelers,
19                 Check No. 0001010975

20    Exhibit 20   Photocopy of check to            277
                   The Kristy Law Firm from
21                 Travelers, Check No. 86467104

22    Exhibit 21   Document titled "Receipt for     279
                   Advance Payment" dated 8/2
23
      Exhibit 22   Photocopies of checks            280
24
      Exhibit 23   Travelers Claim Acknowledgment   291
25
```

5

PMK: Brian Roche
June 8, 2018

Atkinson-Baker Court Reporters
www.depo.com

```
 1              C O N T I N U E D

 2              E X H I B I T S

 3   NUMBER              DESCRIPTION                 PAGE

 4   Exhibit 24   Acord Statement of No Loss         298

 5   Exhibit 25   Document titled "Company/Setup     300
                  Information"
 6

 7

 8

 9        U N A N S W E R E D   Q U E S T I O N S

10                                        PAGE   LINE

11   And then I'm just trying to understand   13     18
     the arrangement so far with Ms. Bissell
12   and Mr. Grivakes.

13

14

15        I N F O R M A T I O N   R E Q U E S T E D

16                                        PAGE   LINE

17   And do they exist somewhere?             303      9

18

19

20

21

22

23

24

25
```

6

PMK: Brian Roche
June 8, 2018

| | | |
|---|---|---|
| 1 | do it. | 01:34:59 |
| 2 | Q.   Well, like, for instance, specifically with | 01:34:59 |
| 3 | respect to Matt Connor, some of his payments were | 01:35:02 |
| 4 | made in cash; right? | 01:35:05 |
| 5 | A.   Correct. | 01:35:06 |
| 6 | Q.   Is there any documentation or recordkeeping | 01:35:07 |
| 7 | as to how much was paid and when in cash? | 01:35:11 |
| 8 | A.   I mean, I would just answer it the same | 01:35:14 |
| 9 | exact way that I'm answering it today and the same | 01:35:19 |
| 10 | way that I answered it during my exam under oath. | 01:35:21 |
| 11 | Okay? He -- in terms of documents, the declaration, | 01:35:24 |
| 12 | the e-mails exchanged between Tim Gillihan, Bob, and | 01:35:27 |
| 13 | myself, the reports that Tim Gillihan generated, | 01:35:30 |
| 14 | you know, those Excel sheets showing all of the | 01:35:35 |
| 15 | operating expenses that were listed out that were | 01:35:39 |
| 16 | provided to Tim Gillihan would be probably one of | 01:35:40 |
| 17 | the written records that would reflect that. | 01:35:45 |
| 18 | Q.   Well, do any of those show how much | 01:35:46 |
| 19 | cash and when those cash payments were made to | 01:35:49 |
| 20 | Matt Connor? | 01:35:53 |
| 21 | A.   They show how much cash was paid to him or | 01:35:53 |
| 22 | how much money was paid to him during that time. | 01:35:57 |
| 23 | Q.   It shows a total amount, for instance; | 01:35:58 |
| 24 | right? | 01:36:00 |
| 25 | A.   You asked me do any of those show the | 01:36:00 |

132

Atkinson-Baker Court Reporters
www.depo.com

| | | |
|---|---|---|
| 1 | I paid. | 03:35:08 |
| 2 | Q. Right. | 03:35:08 |
| 3 | A. Right. | 03:35:09 |
| 4 | Q. So, now, did you know of Inside Insurance | 03:35:11 |
| 5 | as of June 2014? | 03:35:13 |
| 6 | A. Yeah, of course. | 03:35:15 |
| 7 | Q. And how did you know Inside Insurance? | 03:35:16 |
| 8 | A. I had -- I was first introduced to one of | 03:35:18 |
| 9 | Inside Insurance's employee agents back in March of | 03:35:23 |
| 10 | 2014. | 03:35:28 |
| 11 | Q. Who was that? | 03:35:29 |
| 12 | A. A guy named Joey-something, for some other | 03:35:30 |
| 13 | deal unrelated to Stars and Bars. Some family-type | 03:35:34 |
| 14 | mud run we were trying to put together at the time. | 03:35:39 |
| 15 | Q. Like an event? | 03:35:41 |
| 16 | A. Yeah, it was an event. Me and some guys -- | 03:35:42 |
| 17 | they came to me with an idea for a family fun | 03:35:45 |
| 18 | run-type deal and tried to help them put it | 03:35:49 |
| 19 | together, and that's when I was first introduced to | 03:35:53 |
| 20 | the guy. | 03:35:55 |
| 21 | Q. And did you procure a policy through this | 03:35:56 |
| 22 | Joey at Inside Insurance with respect to that event? | 03:35:58 |
| 23 | A. I don't think so because the event never | 03:36:01 |
| 24 | took place. And I believe at that time I introduced | 03:36:04 |
| 25 | him to the guys that were kind of running it. I | 03:36:08 |

219

Atkinson-Baker Court Reporters
www.depo.com

```
 1    was, like, just the investor.  So I'm not sure if      03:36:10
 2    they actually did one or not.  I just remember         03:36:12
 3    sometime earlier in that year was the first time I     03:36:15
 4    was introduced to him through an e-mail or phone       03:36:17
 5    call from Bob.                                          03:36:20
 6        Q.   Bob was the one that introduced you to        03:36:20
 7    Inside Insurance?                                       03:36:24
 8        A.   Yes.                                           03:36:24
 9        Q.   And you said Joey -- was the last name like   03:36:27
10    Kirchkow?                                               03:36:31
11        A.   Something like that.  Kirchkow or something   03:36:32
12    like that.                                              03:36:34
13        Q.   K-i-r-c-h-k-o-w?  Something like that?        03:36:34
14        A.   Something similar to that, yeah.              03:36:37
15        Q.   And then prior -- so between the mud run      03:36:39
16    event and going to Inside Insurance to get insurance   03:36:44
17    for Stars and Bars, did you have any deal- --          03:36:49
18    dealings with Joey or Inside Insurance?                03:36:51
19        A.   Dealings in terms of what?  Can you clarify   03:36:53
20    that?                                                   03:36:55
21        Q.   Yeah.  I mean, trying to get a policy for     03:36:55
22    something or one of their companies individually,      03:36:58
23    POP Payments, you know.                                 03:37:03
24             Did you have any business relationship         03:37:05
25    or attempts to procure insurance through               03:37:07
```

220

Atkinson-Baker Court Reporters
www.depo.com

```
 1    Inside Insurance after the mud run, before Stars and        03:37:10

 2    Bars?                                                        03:37:16

 3         A.   No.                                                03:37:16

 4         Q.   So after the mud run, was the next                03:37:16

 5    interaction with Stars and -- strike that.  It's            03:37:19

 6    getting late.                                               03:37:22

 7              After the mud run, was the next interaction       03:37:22

 8    with Inside Insurance in order to obtain insurance          03:37:25

 9    for Stars and Bars?                                         03:37:29

10         A.   Yes.  And I'd like to clarify that.               03:37:29

11    Conversations with that guy about Stars and Bars'           03:37:34

12    insurance might have been taken place before the mud        03:37:37

13    run stuff, too, with Bob directly.  But those were          03:37:39

14    the only two deals that we talked with Inside about         03:37:42

15    doing insurance work.                                       03:37:48

16         Q.   And then Inside Insurance got quotes              03:37:49

17    for Stars and Bars for a variety of coverages,              03:37:51

18    including workers' comp, liquor liability, and              03:37:54

19    property?                                                   03:37:57

20         A.   There was a lot of e-mails exchanged with a       03:37:58

21    lot of different stuff.  So, yeah.                          03:38:01

22         Q.   But you remember those three coverages are       03:38:02

23    the ones that it sounded like you at least remember?        03:38:06

24         A.   Yes, because I paid Inside for those.  So,       03:38:09

25    yes.                                                        03:38:11
```

221

Atkinson-Baker Court Reporters
www.depo.com

| | | |
|---|---|---|
| 1 | BY MR. AGNESS: | 03:46:21 |
| 2 | Q. This, again, is a document that was | 03:46:24 |
| 3 | produced by Inside Insurance pursuant to a subpoena. | 03:46:26 |
| 4 | And it has my name at the top of the first page | 03:46:31 |
| 5 | because I printed the copy. So this is an e-mail | 03:46:35 |
| 6 | string, again in reverse chronological order, | 03:46:42 |
| 7 | ranging from July 17, 2014 to July 18, 2014. And | 03:46:46 |
| 8 | then it looks like it was again forwarded July of | 03:46:59 |
| 9 | 2017. | 03:47:04 |
| 10 | I wanted to direct your attention to this | 03:47:05 |
| 11 | first page of Exhibit 14. And if you look at the | 03:47:07 |
| 12 | e-mail from Joey, I was off on his name. It's | 03:47:12 |
| 13 | Kirichkow, so it's K-i-r-i-c-h-k-o-w. | 03:47:19 |
| 14 | He sends an e-mail on July 18th at | 03:47:24 |
| 15 | 4:53 p.m. to Sherlyn, S-h-e-r-l-y-n, Simon, and | 03:47:31 |
| 16 | Spencer Shumway saying, "Please bind." | 03:47:38 |
| 17 | Prior to July 18, 2014 at 4:53 p.m., isn't | 03:47:43 |
| 18 | it true that Stars and Bars did not have coverage | 03:47:54 |
| 19 | for property? | 03:47:56 |
| 20 | A. No. I don't believe that is true. | 03:47:57 |
| 21 | Q. And why do you believe -- not believe | 03:48:01 |
| 22 | that's true? | 03:48:03 |
| 23 | A. Because I sent this guy the signed proposal | 03:48:03 |
| 24 | in June, and I'm not a lawyer to determine whether | 03:48:13 |
| 25 | that constitutes a binding -- or whatever your legal | 03:48:20 |

229

Atkinson-Baker Court Reporters
www.depo.com

| | | |
|---|---|---|
| 1 | terms are. But I don't believe this was the first | 03:48:23 |
| 2 | time that coverage was bound for Stars and Bars. | 03:48:30 |
| 3 | And also, I remember there was some e-mail | 03:48:34 |
| 4 | about some policy issued and canceling it and then | 03:48:39 |
| 5 | reissuing another one. So the answer to your | 03:48:43 |
| 6 | question is no, I don't believe that to be true. | 03:48:50 |
| 7 | Q. When you said two reasons, one was you | 03:48:51 |
| 8 | believe it was sent to him in June, and two was | 03:48:56 |
| 9 | there were e-mails about canceling and renewing. So | 03:48:58 |
| 10 | let's address No. 2 first, e-mails about canceling | 03:49:01 |
| 11 | and renewing. | 03:49:04 |
| 12 | The e-mails you're referring to were after | 03:49:05 |
| 13 | July 18, 2014; correct? | 03:49:08 |
| 14 | A. They might have been -- I'm sorry. Repeat | 03:49:09 |
| 15 | the question. They were after July -- | 03:49:22 |
| 16 | Q. 18, 2014. | 03:49:23 |
| 17 | A. The e-mails I'm referring to were e-mails | 03:49:24 |
| 18 | that I saw in production between Inside and | 03:49:27 |
| 19 | Travelers, and they might have been on July 18th, | 03:49:30 |
| 20 | 2014. | 03:49:33 |
| 21 | Q. They -- do you know one way or another, as | 03:49:34 |
| 22 | you sit here today, whether they predated July 18, | 03:49:37 |
| 23 | 2014 at 4:53 p.m.? | 03:49:42 |
| 24 | A. No, I don't. | 03:49:43 |
| 25 | Q. And the e-mails that you're referring to | 03:49:44 |

230

PMK: Brian Roche
June 8, 2018

| | | |
|---|---|---|
| 1 | MS. BISSELL:  All right. | 03:51:59 |
| 2 | MR. AGNESS:  Okay. | 03:51:59 |
| 3 | BY MR. AGNESS: | 03:52:00 |
| 4 | Q.  So you believe a policy was issued or bound | 03:52:00 |
| 5 | before July 18, 2014 at 4:53 p.m. because you sent | 03:52:04 |
| 6 | something to Joey in June? | 03:52:10 |
| 7 | MS. BISSELL:  Compound.  Calls for a legal | 03:52:12 |
| 8 | conclusion. | 03:52:13 |
| 9 | Go ahead. | 03:52:14 |
| 10 | THE WITNESS:  I don't know what the legal | 03:52:15 |
| 11 | definition is for an issue of a policy or to bind or | 03:52:16 |
| 12 | bound a policy, but the proposal for Travelers for | 03:52:22 |
| 13 | insurance for Stars and Bars was sent to him in | 03:52:28 |
| 14 | June. | 03:52:32 |
| 15 | BY MR. AGNESS: | 03:52:33 |
| 16 | Q.  The quote you're referring to? | 03:52:33 |
| 17 | A.  The -- the paper that says, "Here's your | 03:52:35 |
| 18 | insurance coverage; sign it" and you've got | 03:52:38 |
| 19 | insurance.  So I don't know what the term for that | 03:52:40 |
| 20 | document is, but that sounds like a legal term that | 03:52:43 |
| 21 | you and my lawyer can quibble about. | 03:52:47 |
| 22 | Q.  Okay.  So you're saying there was a quote | 03:52:48 |
| 23 | provided for a Travelers policy in June of 2014? | 03:52:51 |
| 24 | MS. BISSELL:  Mischaracterizes testimony. | 03:52:54 |
| 25 | THE WITNESS:  Could you reask it, please? | 03:52:59 |

233

```
 1   I'm getting --                                      03:53:00

 2          MR. AGNESS:  Could you read it back,          03:53:00

 3   please.                                              03:53:02

 4          (The record was read by

 5          the reporter as follows:

 6          "Question:  Okay.  So you're saying

 7          there was a quote provided for a

 8          Travelers policy in June of 2014?"

 9          THE WITNESS:  Yes.  In June of 2014,          03:53:13

10   I received a quote for a Travelers policy.           03:53:14

11   BY MR. AGNESS:                                       03:53:17

12      Q.   And you also received quotes for other       03:53:21

13   insurance company policies; correct?                 03:53:23

14      A.   Yes.                                         03:53:25

15      Q.   And when did you tell Inside Insurance you   03:53:26

16   wanted to go forward with Travelers' quote?          03:53:34

17      A.   In June.                                     03:53:38

18      Q.   And what -- what evidence do you have of     03:53:39

19   that?                                                03:53:42

20      A.   Evidence that I spoke to Inside's agent      03:53:42

21   Joey.  Evidence that I e-mailed the signed proposal  03:53:49

22   in -- binding an insurance document to him in June.  03:53:55

23   Evidence that cash was sent in for it in June or     03:54:02

24   early July.  So I'd say those things.                03:54:09

25      Q.   Okay.  So let's go through each one.         03:54:12
```

234

```
 1            You said you spoke to him in June.  What do    03:54:15
 2   you recall discussing?                                  03:54:20
 3      A.   During what time frame?                          03:54:20
 4      Q.   I don't know.  You tell me.                       03:54:25
 5            How many times did you speak with him in        03:54:27
 6   June?                                                    03:54:28
 7      A.   Do you want to tell me what subject matter       03:54:28
 8   you want and then I can tell you the time frame and     03:54:31
 9   number of times I spoke to him, or do you want to       03:54:33
10   tell me how many -- do you want to start with how        03:54:37
11   many times I spoke to him and then bring in the          03:54:37
12   subject matter of those times?                           03:54:40
13      Q.   You just indicated to me -- and correct me      03:54:41
14   if I'm wrong -- that the evidence of you getting or      03:54:43
15   acquiring the Travelers policy in June was that you     03:54:49
16   spoke to him, you e-mailed him in June, and cash was    03:54:51
17   sent in.                                                 03:54:55
18      A.   Right.  So let me try to just --                 03:54:57
19      Q.   Well, hold on.  Let's just --                     03:54:58
20      A.   Okay.                                             03:54:59
21      Q.   Is that correct?                                  03:55:00
22      A.   Yes, correct.                                     03:55:01
23      Q.   Okay.  And so I'm saying:  When you spoke       03:55:02
24   to him in June, what did you discuss?                    03:55:05
25      A.   It was discussed about the policy for           03:55:07
```

235

Atkinson-Baker Court Reporters
www.depo.com

| 1  | Stars and Bars and the cost of the policy.  And | 03:55:14 |
| 2  | first it was discussed with him about getting a copy | 03:55:19 |
| 3  | of some certificate with the landlord's name on it. | 03:55:24 |
| 4  | That was right before we started around June 23rd or | 03:55:25 |
| 5  | 24th.  And then there were several quotes back and | 03:55:29 |
| 6  | forth that he was sending with regards to Travelers. | 03:55:33 |
| 7  | And around June 27th or 28th, he sent | 03:55:39 |
| 8  | the -- another revised proposal.  That was signed, | 03:55:47 |
| 9  | sent in to him via e-mail sometime in late June. | 03:55:52 |
| 10 | Around June 29th or June 30th.  And so that's what | 03:55:57 |
| 11 | we discussed during that time, the -- the policy, | 03:56:05 |
| 12 | the -- the amount, what it would cost. | 03:56:09 |
| 13 | He was also in communications with | 03:56:15 |
| 14 | Bob Lehmeyer during this whole time as well.  So | 03:56:16 |
| 15 | in June that's what was discussed with him, and the | 03:56:19 |
| 16 | signed proposal for Travelers was e-mailed to him | 03:56:22 |
| 17 | at that time. | 03:56:25 |
| 18 | Q.   And so do you have a copy of the e-mail | 03:56:25 |
| 19 | around June 29 or 30 sending it to -- the signed | 03:56:28 |
| 20 | proposal to Mr. Kirichow? | 03:56:34 |
| 21 | A.   Yeah.  I was -- | 03:56:36 |
| 22 | Q.   Sorry.  Kirichkow. | 03:56:38 |
| 23 | A.   Yeah.  It was -- it's in the stack of | 03:56:40 |
| 24 | stuff.  I mean, it's either produced or it's going | 03:56:42 |
| 25 | to be produced.  But it's in the stack of all the | 03:56:46 |

236

Atkinson-Baker Court Reporters
www.depo.com

```
 1    BY MR. AGNESS:                                      04:24:49
 2        Q.   But -- so what I want to know is:  Your     04:24:50
 3    testimony is that new stuff was damaged after       04:24:52
 4    July 22nd.  Is that your testimony?                 04:24:55
 5        A.   No.                                         04:24:58
 6        Q.   Okay.  Then let's start over again.         04:25:00
 7        A.   Yeah.                                       04:25:02
 8        Q.   So --                                       04:25:02
 9        A.   Go ahead.  Just ask your question.  I'm     04:25:04
10    going to try to answer it.  I don't believe my -- I  04:25:06
11    don't believe that my answer to that question was   04:25:07
12    no.                                                 04:25:09
13             MR. AGNESS:  Can you read back the question 04:25:10
14    that you read back already?                         04:25:12
15             (The record was read by                    04:25:12
16             the reporter as follows:
17             "Question:  The damage to Stars and
18             Bars' property in the space leased
19             at the Kaleidoscope Mall happened
20             before July 22nd, 2014; correct?")
21             THE WITNESS:  Listen, I'd say incorrect.    04:25:34
22    The extent of the damage was really not known at all 04:25:36
23    during that time.                                   04:25:40
24    BY MR. AGNESS:                                       04:25:42
25        Q.   So the extent was not known at all during  04:25:43
```

262

PMK: Brian Roche
June 8, 2018

| | | |
|---|---|---|
| 1 | that time. | 04:25:45 |
| 2 | Is it also your testimony that there was no | 04:25:47 |
| 3 | damage before July 22nd, 2014? | 04:25:49 |
| 4 | A.   No.   There was damage before July 22nd of | 04:25:51 |
| 5 | 2014. | 04:25:55 |
| 6 | Q.   In fact, before July 22nd, 2014, the | 04:25:55 |
| 7 | Category 3 or 4 Tsunami sewage spill that's been | 04:26:01 |
| 8 | shown in the papers had already happened; correct? | 04:26:04 |
| 9 | A.   You say that so cavalier as if it's like | 04:26:06 |
| 10 | no big deal.   I want to remind you, if I may, that | 04:26:12 |
| 11 | there were lives that were affected by this.   My | 04:26:15 |
| 12 | family's life has been affected by this, about | 04:26:19 |
| 13 | four years of work and time into this.   All of my | 04:26:21 |
| 14 | money has gone into this. | 04:26:25 |
| 15 | So to say it so cavalier like it's no big | 04:26:26 |
| 16 | deal and "Oh, by the way," I just take a little | 04:26:29 |
| 17 | offense to, Mr. Agness, respectfully. | 04:26:32 |
| 18 | Q.   Okay. | 04:26:34 |
| 19 | A.   So -- | 04:26:34 |
| 20 | Q.   Let me start over. | 04:26:35 |
| 21 | A.   So that diatribe aside, there was damage | 04:26:36 |
| 22 | that was occurring to Stars and Bars' property prior | 04:26:39 |
| 23 | to July 22nd and after July 22nd.   And the extent of | 04:26:43 |
| 24 | which really wasn't known at that time as to how bad | 04:26:47 |
| 25 | it was going to be. | 04:26:50 |

263

Atkinson-Baker Court Reporters
www.depo.com

```
1     Q.    I apologize if you think it was cavalier.       04:26:51

2     A.    No, I --                                        04:26:51

3     Q.    That was not my intention.                      04:26:54

4     A.    Okay.  Thank you.                               04:26:55

5     Q.    Not at all.                                     04:26:56

6           But -- so my question, then, is:  What          04:26:57

7     damage occurred after July 22nd that had not          04:27:01

8     occurred before?                                      04:27:05

9     A.    Well, when you're talking about sewage,         04:27:05

10    remember, this is not like water or fecal matter.     04:27:11

11    This is -- the term I've come to learn is called      04:27:15

12    Greywater sewage.  And the bacteria testing that      04:27:19

13    was done on it showed that the contamination had      04:27:21

14    animal product, waste, blood, contaminants.  This is  04:27:25

15    disgusting stuff.                                      04:27:35

16          And so when it gets onto walls and gets         04:27:36

17    behind walls and gets under walk-in coolers and gets  04:27:41

18    on stuff -- there was a period of time where it was   04:27:43

19    flowing and spewing and affecting a great large       04:27:51

20    area.  And that was ongoing after July 22nd.          04:27:56

21          And so to the extent that you don't really      04:28:01

22    know what damage was caused after that, it's not      04:28:03

23    really until, from what I've come to learn through    04:28:06

24    this process, that you have to go in and pull it all  04:28:09

25    out, gut it down to the bones, retest it.  So         04:28:12
```

264

1   there's a whole process that takes months, and not   04:28:16

2   just hypothetically.  In our case, it was taking   04:28:19

3   three or four months to do.   04:28:21

4          And so that damage is an ongoing bit of   04:28:23

5   damage, because once it gets back, it's sort of like   04:28:27

6   a cancer.  It metastasizes.  It affects the walls   04:28:30

7   and affects the studs and affects the walk-in and   04:28:33

8   the -- you know.  Basically everything having to do   04:28:36

9   with the restaurant where you go and eat and want to   04:28:37

10  have a clean, healthy meal, this contamination.   04:28:41

11         And it's not just a broad term I use.  We   04:28:43

12  had, like I said, bacteria testing done.  And it   04:28:45

13  showed traces of blood and animal products and   04:28:48

14  cleaning materials and, you know, all the stuff that   04:28:51

15  you would know that goes into a septic tank.   04:28:53

16         So I can't just say that what happened   04:28:57

17  after the 22nd because I'd say that the extent of   04:29:00

18  everything really wasn't known at that time.   04:29:03

19    Q.   Well, but --   04:29:04

20         MS. BISSELL:  Good time for a break?   04:29:06

21         MR. AGNESS:  Not yet.   04:29:07

22         MS. BISSELL:  Okay.   04:29:08

23  BY MR. AGNESS:   04:29:08

24    Q.   So you're saying that damage started before   04:29:09

25  July 22nd, but it's an ongoing process, and you   04:29:13

265

Atkinson-Baker Court Reporters
www.depo.com

1    Q.   Okay.  So on this Page 22, do you see it    04:45:26

2  says business personal property limit, 113,000?    04:45:31

3    A.   Yes.  I see where it says that.    04:45:34

4    Q.   Is that your understanding of what the    04:45:36

5  business personal property limit was in the    04:45:38

6  Travelers policy that Stars and Bars is suing over?    04:45:41

7    A.   No.    04:45:42

8    Q.   What do you believe the business personal    04:45:43

9  property limit to be?    04:45:46

10    A.   I believe there's several enhancements    04:45:47

11  to that under various terms, being:  Eating    04:45:50

12  establishment, premises rented by you, and something    04:45:55

13  with 250- or 300,000 of coverage, also that said    04:46:08

14  something about new eating establishment.    04:46:10

15         So there was two or three other areas in    04:46:13

16  addition to this that I believe the policy covered    04:46:15

17  and should have covered.  And I made those known to    04:46:19

18  Corey Ortega in numerous e-mails.  And there's a    04:46:25

19  record of his letters back stating that those    04:46:29

20  coverages do apply for this policy.    04:46:33

21    Q.   Stating that those policies do not apply    04:46:37

22  for this policy?    04:46:39

23    A.   Do apply for this apply.    04:46:40

24    Q.   So Corey sent a letter to you saying that    04:46:40

25  those coverages do apply for the policy?    04:46:42

268

1    A.    It was my reading of a letter that he sent    04:46:45

2    in response to my inquiries over the phone, in    04:46:46

3    person, and in an e-mail saying, "Corey, please    04:46:49

4    specifically tell me why my policy covers these    04:46:51

5    things."    04:46:57

6        And he sent a very detailed six- or    04:46:58

7    seven-page letter back sometime in October.  And in    04:47:01

8    it, it listed those items, and it said:  This policy    04:47:04

9    covers for this and that.  And so it listed those    04:47:08

10   things out and said that the policy covers it.    04:47:12

11       Now, whether he was able to justify in his    04:47:14

12   mind that we had the items to make up that amount,    04:47:17

13   that's where the bad faith comes in.    04:47:22

14       But it was my belief from the very    04:47:24

15   beginning that we had those enhancements on here for    04:47:26

16   eating establishment, new restaurant, premises    04:47:30

17   rented by you, and three or four of those things    04:47:32

18   that I referenced to him in multiple e-mails.    04:47:35

19   Q.    Travelers paid the $113,000 that was at    04:47:38

20   least for business personal property without the    04:47:44

21   enhancements you're referring to; correct?    04:47:46

22   A.    Correct.  Yes.    04:47:48

23   Q.    And that was in October of 2014; correct?    04:47:49

24   A.    Yes.    04:47:51

25   Q.    And at least as to the business personal    04:47:52

269

Atkinson-Baker Court Reporters
www.depo.com

1    property, which is different than these additional        04:47:54

2    coverages you're talking about, Travelers fully paid      04:47:58

3    the limit; right?                                          04:48:02

4        A.    No.                                              04:48:02

5        Q.    No?                                              04:48:03

6        A.    No.                                              04:48:04

7        Q.    Okay.                                            04:48:04

8        A.    I believe there was other limits in terms       04:48:06

9    of damage or debris removal, up to like 25,000 bucks      04:48:08

10   or something like that.  Like I said, there was           04:48:13

11   three or four other areas in that business personal       04:48:16

12   property category, which is, in my mind, separate         04:48:19

13   from the operating expenses or continuing operating       04:48:21

14   expenses; separate from the business loss, which is       04:48:24

15   lost profits or revenues.                                 04:48:26

16         So just in that first phase, I don't feel           04:48:27

17   like Travelers paid the full amount that they were        04:48:30

18   obligated to pay under the policy.                         04:48:35

19       Q.    But you acknowledge that they paid $113,000     04:48:38

20   for business personal property; right?                    04:48:39

21       A.    Yes.                                             04:48:41

22       Q.    The premium on this policy is on the second     04:48:41

23   page, and it says $3,792.                                 04:48:53

24         Do you see that?                                    04:48:56

25       A.    Yes.  I see where it says "Provisional          04:48:57

270

Atkinson-Baker Court Reporters
www.depo.com

```
 1    show its expenses?                              05:01:30
 2        A.   Yes.                                   05:01:31
 3        Q.   Okay.  The -- I'm just going to take you  05:01:31
 4    through some where I have questions.  I don't want  05:01:37
 5    to take you through every one; otherwise, we'd be  05:01:38
 6    here for another --                             05:01:41
 7        A.   Sure.                                  05:01:41
 8        Q.   -- whole weekend.                      05:01:42
 9             But if you just go to the second page of  05:01:43
10    this --                                         05:01:45
11        A.   Yeah.                                  05:01:46
12        Q.   -- which is TR 306, the check is written  05:01:46
13    out to Dylan, D-y-l-a-n, Bruns, B-r-u-n-s.      05:01:51
14             Who is that?                           05:01:57
15        A.   That is the guy that was there helping us  05:01:57
16    with some of the flooding that was taking place at  05:02:01
17    the premises.                                   05:02:05
18             Yeah, it was -- he was like one of the  05:02:06
19    workers.  It's Morgan's brother also.  But he was  05:02:09
20    out visiting for the week, and he was there helping  05:02:13
21    us.  You know --                                05:02:15
22        Q.   So it's -- it was Morgan's brother helping  05:02:17
23    do clean-up?                                    05:02:20
24        A.   Yeah.  I mean, I don't know if "clean-up"  05:02:21
25    was the word.  I mean, you have to understand that  05:02:23
```

282

PMK: Brian Roche
June 8, 2018

Atkinson-Baker Court Reporters
www.depo.com

```
 1    it was really -- we didn't really understand the          05:02:25
 2    extent of what was going on with this, and so we          05:02:27
 3    just thought that it was something we could just          05:02:29
 4    clean up and something that we could possibly be          05:02:31
 5    open.  At this time that I wrote the check, that it       05:02:33
 6    could be open, you know, in -- in like a week or so.      05:02:37
 7    And then it wasn't until later that we learned that       05:02:40
 8    it was something totally entirely different, a month      05:02:43
 9    later or a couple months later.  And so this was          05:02:46
10    just work that he was doing at that time in regards       05:02:48
11    to some of the flooding.                                  05:02:51
12         Q.   And is it your handwriting other than the       05:02:55
13    signature?                                                05:02:58
14         A.   Yes.                                            05:02:58
15         Q.   And what's the date on it?                      05:02:58
16         A.   July 18th.                                      05:03:01
17         Q.   And the amount is $1,000; right?                05:03:03
18         A.   Yes.                                            05:03:06
19         Q.   Okay.  If you go to page TR 310 --              05:03:07
20         A.   Okay.                                           05:03:20
21         Q.   -- can you read who's on the "Payee" line?      05:03:21
22         A.   I don't remember.  The answer [sic] is can     05:03:26
23    I read.                                                   05:03:30
24         Q.   I mean, my best guess was --                    05:03:35
25         A.   My chicken scratch is horrible.                 05:03:36
```

283

Atkinson-Baker Court Reporters
www.depo.com

```
 1       Q.   Do you know why -- what this doc- -- this        05:06:07

 2   page is pertaining to?                                     05:06:10

 3       A.   It looks like it appears to be a withdrawal       05:06:12

 4   slip from my company POP Payments.  And I don't know       05:06:18

 5   what the date is.  I can't tell what the date is on        05:06:26

 6   this.  But if you know because you have the bank           05:06:29

 7   statements to correlate them, why don't you tell me        05:06:34

 8   and I could probably refresh my memory.                    05:06:36

 9       Q.   Well, as you sit here today, do you know          05:06:38

10   why this withdrawal of POP Payments in the amount of       05:06:40

11   12,000 was done?                                           05:06:44

12       A.   I think there was -- depending on the            05:06:45

13   time period, there was hundreds of thousands of            05:06:48

14   dollars that was withdrawn and used and paid for           05:06:49

15   towards the pre-opening expenses of Stars and Bars,        05:06:53

16   the post-blood clean-up stuff.  So it could have           05:06:57

17   been in relation to any of that stuff.                     05:06:59

18       Q.   So let me ask you again:  As you sit here         05:07:01

19   today, though, do you know what this page TR 327 --        05:07:02

20   what this withdrawal was for?                              05:07:08

21       A.   No, because I don't know what date this was       05:07:09

22   on.                                                        05:07:10

23       Q.   Okay.  The next two pages are also                05:07:11

24   withdrawals where the customer says "POP Payments."        05:07:21

25           Do you see that?                                   05:07:25
```

286

Atkinson-Baker Court Reporters
www.depo.com

```
 1    on September 15th of 2014?"                        05:15:55
 2         Q.   Well, that's a different question.  That's 05:15:56
 3    not the question.                                  05:15:58
 4         A.   It is.                                    05:15:58
 5         Q.   The question is:  When's the first time you 05:15:58
 6    had direct contact with someone from Travelers?    05:16:00
 7         A.   My answer is I believe Inside Insurance is 05:16:03
 8    a representative/partner/agent of Travelers, and so 05:16:06
 9    that would have been sometime in March of 2014.    05:16:10
10         Q.   And so who do you believe was your first  05:16:13
11    contact with Inside Insurance you're talking about 05:16:16
12    in March of 2014?                                  05:16:19
13         A.   The Joey guy.                             05:16:20
14         Q.   Okay.  Now, as of March of 2014, did you 05:16:21
15    have the loss?                                      05:16:25
16         A.   No.                                       05:16:25
17         Q.   Okay.  Who's the first person who works for 05:16:25
18    Travelers that you spoke to after the loss?        05:16:29
19         A.   My answer is I don't know the relationship 05:16:35
20    between Inside and Travelers, if Inside works for  05:16:37
21    Travelers as you asked.  But I did speak with      05:16:41
22    Inside Insurance on the 17th, 18th about this issue. 05:16:44
23    So I think you're trying to clarify something that's 05:16:51
24    a legal question.                                   05:16:56
25         But I spoke to Inside Insurance, and I'm       05:16:56
```

294

PMK: Brian Roche
June 8, 2018

Atkinson-Baker Court Reporters
www.depo.com

| | | |
|---|---|---|
| 1 | saying that that is who Travelers is, since they are | 05:16:58 |
| 2 | able to bind coverage.  They are a representative of | 05:17:01 |
| 3 | Travelers.  And so on July 17th is when I -- I spoke | 05:17:04 |
| 4 | to them. | 05:17:11 |
| 5 | Q.   Okay.  Who did you speak with? | 05:17:11 |
| 6 | A.   I spoke to -- sorry.  I spoke to Joey. | 05:17:14 |
| 7 | I spoke to the two girls that work in the office | 05:17:21 |
| 8 | there.  Sheri- -- Sherilynn, S-h-e-r-i-l-y-n-n | 05:17:25 |
| 9 | [sic], and Shawna, I believe.  So Sherilynn and | 05:17:32 |
| 10 | Shawna were the only two points of contact at Inside | 05:17:36 |
| 11 | at this time on July 18th. | 05:17:41 |
| 12 | Q.   Who is the first person that you understand | 05:17:42 |
| 13 | to be directly employed by Travelers that you spoke | 05:17:48 |
| 14 | with? | 05:17:51 |
| 15 | A.   I'm going to say that's the same answer, | 05:17:51 |
| 16 | Joey, Shawna, and Sherilynn on July 17th, that | 05:17:55 |
| 17 | they -- | 05:18:05 |
| 18 | Q.   So your testimony is that you believe their | 05:18:05 |
| 19 | employer is Travelers?  That's your testimony? | 05:18:08 |
| 20 | A.   My testimony is I don't know that | 05:18:11 |
| 21 | relationship.  So if -- | 05:18:12 |
| 22 | Q.   Well -- | 05:18:12 |
| 23 | A.   -- you want to ask me who did you speak to | 05:18:12 |
| 24 | other than anybody that works at Inside Insurance or | 05:18:16 |
| 25 | other than those people, then I'm happy to answer | 05:18:19 |

295

EXHIBIT D

DEPOSITION OF JONATHAN SHUMWAY

Certified Copy

UNITED STATES DISTRICT COURT FOR THE

CENTRAL DISTRICT OF CALIFORNIA

STARS AND BARS, LLC, a Nevada ) Case No.: 8:16-cv-01397-CJC
limited liability company, )
)
            Plaintiff, )
)
        v )
)
TRAVELERS CASUALTY INSURANCE )
COMPANY OF AMERICA, a )
Connecticut corporation; COREY )
ORTEGA, an individual, and DOES )
1 through 20, inclusive, )
)
            Defendants. )
_____)

VIDEOTAPED DEPOSITION OF JONATHAN SHUMWAY

TAKEN ON MONDAY, JUNE 18, 2018

Reported By: Kristiaan Ruiz
CSR No. 13984



PLATINUM REPORTERS & INTERPRETERS
Certified Shorthand Reporters
Post Office Box 6070 - San Pedro, California 90734-6070 - (310) 241-1450

```
 1              UNITED STATES DISTRICT COURT FOR THE

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3

 4   STARS AND BARS, LLC, a Nevada  ) Case No.: 8:16-cv-01397-CJC
     limited liability company,     )
 5                                  )
                  Plaintiff,        )
 6                                  )
                      v             )
 7                                  )
     TRAVELERS CASUALTY INSURANCE   )
 8   COMPANY OF AMERICA, a          )
     Connecticut corporation; COREY )
 9   ORTEGA, an individual, and DOES)
     1 through 20, inclusive,       )
10                                  )
                  Defendants.       )
11   _____)

12

13

14

15            VIDEOTAPED DEPOSITION OF JONATHAN SHUMWAY, taken

16        before Kristiaan Ruiz, a Certified Shorthand Reporter

17        for the State of California, with principal office in

18        the County of Los Angeles, commencing at 10:58 a.m.,

19        Monday, June 18, 2018, at 6100 Center Drive, Suite 1130,

20        Los Angeles, California 90045.

21

22

23

24

25
```



DEPOSITION OF JONATHAN SHUMWAY

```
1     APPEARANCES OF COUNSEL:

2

3     FOR THE PLAINTIFF:

4          AFFELD GRIVAKES, LLP
           BY:  CHRISTOPHER GRIVAKES
5          ATTORNEY AT LAW
           2049 Century Park East
6          Suite 2460
           Los Angeles, California 90067
7          310-979-8700

8

9     FOR THE DEFENDANT:

10         WESTON & MCELVAIN, LLP
           BY:  WYNN KANESHIRO
11         ATTORNEY AT LAW
           1960 E. Grand Avenue
12         Suite 400
           El Segundo, California 90245
13         213-596-8000

14

15    THE VIDEOGRAPHER:

16         JOSE LAVERA

17

18    ALSO PRESENT:

19         BRIAN ROCHE

20

21

22

23

24

25
```



DEPOSITION OF JONATHAN SHUMWAY

```
 1                        I N D E X

 2

 3   EXAMINATION BY:                              PAGE

 4   Mr. Grivakes                                   8

 5   Ms. Wynn                                      70

 6

 7                        EXHIBIT
     MARKED                                       PAGE
 8
     PLAINTIFF'S:
 9
     1 - P&C Producer Appointment Form; 2/15/2011  29
10
     2 - Travelers Netappoint; 2/15/2011           31
11
     3 - Travelers Agency Contract; 1/28/2008      32
12
     4 - Travelers Agency Administration License   35
13       Support Unit; 4/20/2012

14   5 - Agency License Details from the California 36
         Department of Insurance
15
     6 - E-mails between Jonathan Shumway and      37
16       Brian Roche; 12/14/17

17   7 - E-mails between Jonathan Shumway and      38
         Brian Roche; 11/17/2017
18
     8 - Commercial Insurance Application; 2/17/2014 39
19
     9 - Proposal by Inside Insurance; 6/25/2014 to 6/25/2015  41
20
     10 - Commercial Insurance Application; 6/24/2014  44
21
     11 - E-mail string between Sherlyn Simon, Jonathan  44
22        Shumway and Joey Kirichkow, 7/27/2017

23   12 - E-mail string between Royd Despain, Rachel  47
          Griffiths and Cynthia Curtis; 7/21/2014
24
     13 - E-mail between Sherlyn Simon and Royd    49
25        Despain; 7/21/2014
```



14 - E-mail between Royd Despain and Cynthia      52
     Curtis; 7/30/2014

15 - E-mail between Royd Despain and Sherlyn      53
     Simon; 7/30/2014

16 - E-mail between Brian Roche and Shaunna       55
     Gage;  8/1/2014

17 - E-mail between Brian Roche and Shaunna       57
     Gage; 8/4/2014

18 - E-mail between Brian Roche and Shaunna       59
     Gage; 8/4/2014

19 - E-mail between Brian Roche and Shaunna       62
     Gage; 8/4/2014

20 - E-mail between Brian Roche and Shaunna       62
     Gage; 8/29/2014

21 - E-mail between Brian Roche and Shaunna       64
     Gage; 8/1/2014

22 - E-mail between Brian Roche and Shaunna       65
     Gage; 8/5/2014

23 - Declaration pages of Policy for Stars and    66
     Bars, LLC; 8/1/2014

24 - E-mail between Aaron Agness and Jonathan     67
     Shumway; 11/13/2017


DEFENDANTS:                                       PAGE

25 - Quote for Stars and Bars; 6/24/2014          71

26 - Memo to Jonathan Shumway from Security       73
     National Insurance Company; 7/28/2014

27 - List of documents produced to Travelers      74

28 - E-mail between Royd Despain, Rachel Griffiths 79
     and Cynthia Curtis; 7/21/2014

29 - Declaration pages for Policy of Stars and Bars, 81
     LLC; 7/18/2014



DEPOSITION OF JONATHAN SHUMWAY

1    30 - E-mail between Sherlyn Simon and Royd          82
         Despain; 7/30/2014

2

     31 - Travelers Notice of Cancellation For           96
3        Non-payment of Premium; 9/29/2014

4    32 - List of documents provided to Travelers        98

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1    requested, I fulfilled that request within the time period

2    they asked.

3        Q    And did they ever follow up with any communications

4    to talk to you about any of those documents?

5        A    Not that I recall.

6        Q    Do you recall getting any e-mails from that firm?

7        A    No.

8        Q    What is the relationship between Inside Insurance

9    and Travelers?

10       A    We are a licensed agency producer for Travelers,

11   which means we have the right to sell their products.

12       Q    Do you have the right to do anything else other than

13   sell their products?

14       A    No.

15       Q    When you say you have the right to sell their

16   products, what does that mean?

17       A    So we have the right to sell their auto, home,

18   commercial lines, specialty products, whatever they offer.

19   We submit an application, get a quote, and if it's approved,

20   then we can write that policy with Travelers.

21       Q    When you say we can write that policy, what do you

22   mean?

23       A    We can --

24       Q    Issue it?

25       A    Well, we don't have the right to issue a policy.



DEPOSITION OF JONATHAN SHUMWAY

```
 1   that much I do know.  Now what was said between in those

 2   conversations I really -- I don't know those specifics.

 3       Q    How do you know it had to go back and forth with an

 4   underwriter?

 5       A    Mostly because I reviewed those e-mails and could

 6   see that it was going back and forth between an underwriter,

 7   but had I not seen those I would not have known that that was

 8   the process.

 9       Q    All right.  So there's documents that led you to

10   understand that one of your agents in charge of this

11   particular file had communications with an underwriter?

12       A    Yes and CSR.

13       Q    CSR --

14       A    Our customer service representative.

15       Q    Okay.  What's the difference between one of your

16   agents and the CSR?

17       A    So the agent is the producer, the one who writes the

18   business, and then we also have customer service reps inside

19   of our agency, those are W-2 employees, and they assist the

20   agents in both writing and servicing the accounts, mostly

21   servicing.

22       Q    Now what authority does Inside Insurance provide the

23   agents who -- the producers who write the business?

24       A    As far as -- sorry.  Explain what you --

25       Q    What authority do you provide your agents to
```



DEPOSITION OF JONATHAN SHUMWAY

1  actually go ahead and do the work you just described to get

2  coverage for an account that doesn't involve your personal

3  involvement?

4      A    Yeah, they have full approval.

5      Q    Okay.  So your agents have the authority from you to

6  to --

7      A    From Travelers really, not from me.

8      Q    Okay.  From Travelers to go ahead and go through the

9  process of obtaining quotes, getting approval and binding

10  coverage?

11     A    Yes.

12     Q    And your customer service reps are the people that

13  assist the agents during that process?

14     A    Yes.

15     Q    Have you spoken to any Inside Insurance agents or

16  customer service reps about Stars and Bars?

17     A    Yes.

18     Q    Who have you spoken to?

19     A    To Joey Kirichkow.

20     Q    How do you spell that?

21     A    J-O-E-Y.  Kirichkow is K-I-R-I-C-H-K-O-W.

22     Q    Anybody else?

23     A    No.

24     Q    And how many times have you spoken to Joey?

25     A    Oh, not very much, once or twice.



DEPOSITION OF JONATHAN SHUMWAY

1    loss of some sort.

2        Q     Okay.

3        A     The underwriter at Travelers wanted a no loss letter

4    signed and Joey and Sherlyn, who was the CSR helping Joey on

5    the account, Sherlyn Simon, she no longer works for our

6    company, they came to me.  They said, Travelers would like

7    this no loss letter signed, and I said, okay.  What's the

8    problem?  They said, well, the neighbor next door had a loss,

9    and I said, okay.

10       Let me get clarification.  Did Stars and Bars have a

11   loss or did the neighbor next door have a loss? They said the

12   neighbor next door had a loss, and I said, then why do you

13   have a problem signing a no loss letter?  He said, I don't

14   know.  He said, it seems to me like if Stars and Bars didn't

15   have a loss, then couldn't they sign a no loss letter?  And

16   that's about what I remember from those conversations.

17       Q     Do you remember being copied on any e-mails in

18   conjunction with that issue?

19       A     I don't.  I probably was, but I get copied on

20   hundreds of e-mails from agents that just want to make sure

21   I'm in the loop of things.  So staying up to date on all of

22   these issues is hard.

23       Q     All right.  Have you told me everything that you

24   recall about your conversations with Joey four years ago?

25       A     Yes.  That's everything I recall.



DEPOSITION OF JONATHAN SHUMWAY

1      A     Yes.

2      Q     Do you see in the upper right-hand corner the date

3  of February 15, 2011?

4      A     Yes.

5      Q     Do you see down below where there's various boxes

6  checked for various states that Utah's checked?

7      A     Yes.

8      Q     Is it your understanding that this is the form that

9  whereby Inside Insurance was appointed by Travelers?

10     A     This form doesn't look familiar as the form, but it

11  is a standard insurance form so I would assume yes, that they

12  have their specific agency contracts, but yes, that is what

13  it looks like.

14     Q     And you see on the first page on the upper left

15  there's a reference to Travelers?

16     A     Yes.

17     Q     All right.  You don't recognize this particular form

18  but it is a standard form?

19     A     Yes, this is a standard insurance form.

20     Q     Do you have any reason to disbelieve that this is --

21  or any reason to believe that this is not a true and accurate

22  form that references Travelers appointment of your agency?

23     A     No.

24     Q     I'm going to mark as Exhibit 2 a document called

25  Travelers Netappoint.  Do you recognize this document?



DEPOSITION OF JONATHAN SHUMWAY

```
 1              (Exhibit 2 was marked for identification by
 2        Plaintiff's counsel.)
 3        A    I do not.
 4        Q    You see at the top that there's a Travelers name and
 5   then the umbrella symbol; do you see that?
 6        A    Yes.
 7        Q    And right underneath that there's a reference to
 8   producer data sheet for Jonathan Shumway; do you see that?
 9        A    Yes.
10        Q    And underneath that there's a date that corresponds
11   with the date on the document I just showed you which is
12   February 15, 2011?
13        A    Yes.
14        Q    You see that there's a Travelers agency code right
15   underneath the bar that says agency information?
16        A    Yes.
17        Q    And that code is 0CLZ62, right?
18        A    Yes.
19        Q    Is that the code that Travelers is assigned to your
20   agency?
21        A    Yes.
22        Q    And you remember that that's the code, right?
23        A    Yes.
24        Q    And this form has various boxes checked under line
25   of business, right?
```



DEPOSITION OF JONATHAN SHUMWAY

1        Q      All right.   I'm going to mark as Exhibit 4 a

2   document on Travelers letterhead and it looks like it's

3   called Agency Administration License Support Unit.  Do you

4   see that there's a letter to Inside Insurance dated April 20,

5   2012?

6               (Exhibit 4 was marked for identification by

7        Plaintiff's counsel.)

8        A      Yes.

9        Q      And do you see that Travelers writes, we are pleased

10  to confirm that you have been appointed to represent

11  Travelers in the following states and underwriting companies

12  and then it lists California?

13       A      Yes.

14       Q      Do you see that the date of appointment was

15  effective as of April 18, 2012?

16       A      Yes.

17       Q      Is it your understanding that that's the date that

18  Travelers appointed Inside Insurance to handle business in

19  California for the three listed companies?

20       A      Yes.

21       Q      And that would include Standard Fire Insurance,

22  Travelers Commercial Insurance Company and Travelers Property

23  Casualty Insurance Company?

24       A      Yes.

25       Q      I'm going to mark as Exhibit 5 a document that's a



DEPOSITION OF JONATHAN SHUMWAY

1     Q     And then next to that is an agency contract which is

2     the same one that we already marked as Exhibit 3 to this

3     deposition; do you see that?

4     A     Yes.

5     Q     And that's the original contract that you're

6     referring to?

7     A     Yes.

8     Q     I'm going to mark as Exhibit 7, this is an e-mail

9     from you to Mr. Roche dated November 17, 2017.  Do you

10    recognize this document?

11          (Exhibit 7 was marked for identification by

12    Plaintiff's counsel.)

13    A     Yes.

14    Q     And did you write Mr. Roche on November 17, 2017?

15    A     Yes.

16    Q     And did you attach a Travelers contract which you

17    signed in February 2011?

18    A     Yes.

19    Q     If you turn to the attachments, it looks like

20    there's a Travelers Netappoint and that's the same document

21    that we already marked as Exhibit 2; correct?

22    A     Correct.

23    Q     And then there's also a producer appointment form.

24    That's the same document we already marked as Exhibit 1;

25    correct?



DEPOSITION OF JONATHAN SHUMWAY

```
 1      A     Correct.

 2      Q     And so you were sending Exhibits 1 and 2 to

 3  Mr. Roche and telling him these are the things that I signed

 4  with Travelers in February 2011; right?

 5      A     Correct.

 6      Q     Now you mentioned that you had something to do with

 7  the application process, right?

 8      A     Correct.

 9      Q     Have you ever seen the application for Stars and

10  Bars?

11      A     I probably have at some point but not -- I don't

12  recall.

13      Q     Okay.  I'm going to mark as next in order which I

14  think is No. 8 and this is a Commercial Insurance

15  Application.  In the upper right there's a date of February

16  17, 2014; do you see that?

17          (Exhibit 8 was marked for identification by

18      Plaintiff's counsel.)

19      A     Yes.

20      Q     And below that there's a reference to Stars and

21  Bars; do you see that?

22      A     Yes.

23      Q     And then to the right on the top first box on the

24  left there's a contact named Jonathan Shumway; do you see

25  that?
```



DEPOSITION OF JONATHAN SHUMWAY

1      A    Yes.

2      Q    Why is your name appearing here as opposed to one of

3  your independence?  Is this standard way of doing it?

4      A    Yeah.  So we use a management system called

5  EasyLinks and the applications are just in a template, and so

6  most of them will come out with my name on it unless an agent

7  changes a name, which they often.

8      Q    All right.  And can you tell which agent was

9  involved in generating this application?

10     A    I know that the agent in our agency that worked on

11 this account is Joey Kirichkow.  So he probably would have

12 been working with Sherlyn Simon and between the two of them

13 they most likely were the ones completing these applications,

14 but again I do not recall.  I don't recall who completed

15 these, whether it was Sherlyn or Joey or how exactly it was

16 done.

17     Q    All right.  And what was the context of your seeing

18 this document, if you've ever seen it?  Let's start again.

19 Have you seen this particular document, Exhibit 8, before?

20     A    I don't recall.

21     Q    And you mentioned that you may have seen an

22 application.  What was the context of your seeing an

23 application for Stars and Bars?

24     A    Oh, I don't recall that either.

25     Q    I'll mark as Exhibit 9 a proposal presented by



```
 1    Inside Insurance for a policy effective June 25, 2014.  Do

 2    you recognize what this document is?

 3              (Exhibit 9 was marked for identification by

 4        Plaintiff's counsel.)

 5        A    It is an insurance proposal.

 6        Q    What is an insurance proposal?

 7        A    The proposal for coverage for a particular

 8    business.

 9        Q    And who generates this document?

10        A    This one would be generated through the Travelers

11    online rating system.  At the end of the quote there's a

12    button that allows you to print out a proposal.

13        Q    So with the time the agent goes into the Travelers

14    cloudbase system to generate a quote, it will -- there's a

15    screen that allows you to click on a box and generate a

16    proposal?

17        A    Yes.

18        Q    And do you know whether this was a proposal that was

19    generated by Joey Kirichkow?

20        A    I don't.

21        Q    Do you see in the lower right-hand corner there's a

22    reference to S & B 006866?

23        A    (Inaudible.)

24        Q    Do you know what that is?

25        A    I have no idea.
```



DEPOSITION OF JONATHAN SHUMWAY

```
 1      Q    Did you produce documents in this case?

 2      A    I'm sorry.

 3      Q    Did you give documents to Weston and McElvain?

 4      A    Yes.

 5      Q    Did you put little numbers on the lower right-hand

 6  corner --

 7      A    Not that I recall.

 8      Q    All right.  Do you recall providing this document to

 9  either Travelers lawyers or to Mr. Roche?

10      A    I don't recall what -- yeah.  I'm sorry.  I don't

11  recall the documents given to Travelers.

12      Q    Do you have any reason to believe that this is not a

13  document that was generated by Inside Insurance on or about

14  June 25, 2014?

15      A    No.

16      Q    If you look at the second page in the lower

17  left-hand corner, there's a reference to created on 6/25/2014

18  by Inside Insurance, LLC; do you see that?

19      A    Yes.

20      Q    Is that something that the Travelers cloudbase

21  system would automatically generate when you would go through

22  the process of obtaining a quote?

23      A    Yes.

24      Q    And does this form that you're looking at that's

25  been marked as Exhibit 9 appear to be in the standard form
```



DEPOSITION OF JONATHAN SHUMWAY

```
 1    This one has a date of June 24, 2014 in the upper right-hand

 2    corner.  Now going back to Exhibit 8, you'll see -- going

 3    back to Exhibit 8, you'll see that there's a February date

 4    for the application and then we got a June date for the

 5    application.  Do you see the difference between Exhibits 8

 6    and 10?

 7              (Exhibit 10 was marked for identification by

 8         Plaintiff's counsel.)

 9         A    Yes.

10         Q    Do you know why a second application was generated

11    on June 24, '14?

12         A    I do not.

13         Q    Have you ever spoken to anybody about that?

14         A    No, I have not.

15         Q    I'm going to mark as Exhibit 11 an e-mail string

16    between various people, including Sherlyn, S-H-E-R-L-Y-N,

17    Simon and Joey --

18              (Exhibit 11 was marked for identification by

19         Plaintiff's counsel.)

20         A    Kirichkow.

21         Q    Kirichkow.  On the first page at the top it looks

22    like Joey sent you this e-mail chain on July 27, 2017.  Do

23    you see that at the very first --

24         A    Yes.

25         Q    At the very top of this?
```



DEPOSITION OF JONATHAN SHUMWAY

```
 1      A    Yes.

 2      Q    Why did he do that?

 3      A    I'm guessing that's in response to the request for

 4   e-mail documents from Travelers.

 5      Q    And below that it looks like he's forwarding some

 6   messages, some prior e-mail messages, right?

 7      A    Yes.

 8      Q    And there's one from Sherlyn Simon to Joey dated

 9   July 18, 2014, right?

10      A    Yes.

11      Q    And you're copied on that, right?

12      A    Yes.

13      Q    And she writes perfect, processing both GL and

14   Liquor as we speak; do you see that?

15      A    Yes.

16      Q    And that's in response to an e-mail from Joey to

17   Sherlyn saying please bind?

18      A    Yes.

19      Q    And he did that earlier that day, right?

20      A    Yes.

21      Q    And even though his e-mail says 4:53 p.m., that's

22   California time which is two hours earlier?

23      A    Just one.

24      Q    Just one, okay.  Sorry.

25      A    You're good.
```



DEPOSITION OF JONATHAN SHUMWAY

```
 1       Q      Thank you.  So Joey writes Sherlyn and says, please
 2  bind, and she says that's what she's doing, right?
 3       A      Right.
 4       Q      And when she says processing as we speak, what does
 5  that mean?
 6       A      That means she would go in to those last few screens
 7  or get on the phone with the underwriter, finalize everything
 8  and bind for the client.
 9       Q      Now when it says GL, what does that refer to?
10       A      General liability.
11       Q      And liquor, what does that refer to?
12       A      The liquor liability.
13       Q      And were there any other coverages that you're aware
14  of that Stars and Bars was trying to get from Travelers at
15  this time?
16       A      Yes, property coverage.
17       Q      And property was not being bound at this time?
18       A      It was -- again -- no.  I'm not going to speculate,
19  but this quote as presented is a package quote that includes
20  general liability and property coverage.
21       Q      Okay.  The reference to GL by Sherlyn is shorthand
22  for the whole --
23       A      The package, yes.
24       Q      And this is insurance speak and you recognize it?
25       A      Yes.
```



DEPOSITION OF JONATHAN SHUMWAY

1    Q    Thank you.  Have you ever had any dealings with

2  anybody by the name of Royd Despain?

3    A    Yes.

4    Q    Who is Royd Despain?

5    A    He is our commercial -- small commercial underwriter

6  at Travelers, our direct contact.

7    Q    And have you had contact with him?

8    A    Yes, lots of times.

9    Q    And do you know who Rachel Griffiths is?

10   A    She was the sales rep for Travelers at this time.

11   Q    And at this time means 2014, right?

12   A    Yes.  She no longer works for them.

13   Q    And who is Cynthia Curtis?

14   A    I do not know Cynthia Curtis.

15   Q    I'm going to mark as Exhibit 12 an e-mail chain that

16  starts with an e-mail from Mr. Despain to Ms. Griffiths on

17  July 21, 2014.  Have you seen this e-mail exchange before?

18        (Exhibit 12 was marked for identification by

19    Plaintiff's counsel.)

20    A    I don't recall it specifically.  I probably have

21  read through these, but I don't recall this one

22  specifically.

23    Q    Now in the top e-mail Mr. Despain writes, I see that

24  the package was issued, it was within their authority.

25  What's your understanding of what he's communicating here?



DEPOSITION OF JONATHAN SHUMWAY

1      A     That we issued the policy and it probably -- we had

2   gotten permission or the system gave us permission to bind.

3      Q     The Stars and Bars policy?

4      A     Yes.

5      Q     And when you say we, you mean Inside Insurance?

6      A     Yes, Inside Insurance.

7      Q     And so Mr. Despain is wondering whether Inside -- or

8   he's saying that Inside had the authority to issue or bind

9   coverage for Stars and Bars, right?

10     A     Yes.

11     Q     And below that there's an e-mail from Rachel

12  Griffiths to Cynthia Curtis and Royd Despain; do you see

13  that?

14     A     Yes.

15     Q     She says, I just got off the phone with Jonathan's

16  assistant.  Who was your assistant at this time?

17     A     She's probably referring to Sherlyn, but I don't

18  know for sure; but it would be Sherlyn or Shaunna is my other

19  assistant, but I don't know how much Shaunna had to do with

20  this account, so.

21     Q     Okay.  And then Rachel's saying that your assistant

22  is trying to issue Stars and Bars.  Did your assistants have

23  the wherewithal to do that?

24     A     Yes.

25     Q     As long as the system allowed them to do it?



DEPOSITION OF JONATHAN SHUMWAY

```
 1      A    Or underwriter approval, yes.

 2      Q    I see.  Then Rachel says, I didn't see that you

 3  approved this risk, she's telling Mr. Despain and Ms. Curtis

 4  that, so I told her to refer it to you and talk to you on

 5  Monday.  Do you know whether that happened?

 6      A    I don't.

 7      Q    And then Mr. Despain writes back on Monday because

 8  this e-mail is dated Friday, July 18.  On Monday, July 21 he

 9  says, I see that the package was issued, it was within their

10  authority.  So basically he's saying that he didn't need to

11  talk to them, right?

12      A    It sounds like it, but yeah.  I couldn't speak to

13  that conversation.

14      Q    I'm going to mark as Exhibit 13, this is an e-mail

15  string between Sherlyn Simon and Mr. Despain on July 21,

16  2014.  Have you ever seen these e-mails before?

17          (Exhibit 13 was marked for identification by

18      Plaintiff's counsel.)

19      A    I probably have.  Again I read these through but

20  it's been a while.

21      Q    And these are -- this is an e-mail that was pulled

22  from your system?

23      A    Yes.

24      Q    And you recognize the e-mail address for Sherlyn

25  Simon as being Ssimon@insideinsurance.net?
```



DEPOSITION OF JONATHAN SHUMWAY

```
1        A     Yes.

2        Q     And she writes, Hi, Royd.  Thank you for your

3   response.  As stated below, yes I was able to bind Stars and

4   Bars on Friday, July 18; do you see that?

5        A     Yes.

6        Q     Have you ever spoken to Sherlyn about her binding

7   Stars and Bars coverage on July 18?

8        A     Not in four years, no.

9        Q     All right.  And did you speak to her four years ago

10  about this?

11       A     I would guess that we probably had conversations

12  about it.

13       Q     And I don't want you to guess.  I mean --

14       A     I don't know.  I don't recall.

15       Q     -- your understanding that you did speak with her?

16       A     I don't recall.

17       Q     Do you think you did?

18       A     You know what, I really -- other than them coming in

19  and asking me questions about the no loss letter, I don't

20  recall how much involvement I had on this one and I

21  apologize, but I don't recall the conversations I had.

22       Q     Is Sherlyn still with you?

23       A     She is not.

24       Q     Do you know where she is?

25       A     She just switched jobs.  I think she's with what's
```



DEPOSITION OF JONATHAN SHUMWAY

```
 1      Q    Fair enough.  You could only tell me what you know.

 2      A    Yeah.

 3      Q    I'm going to mark as Exhibit 14 an e-mail from

 4  Mr. Despain to Cynthia Curtis.  I'm doing this to refresh

 5  your recollection.  First of all, have you ever seen this

 6  e-mail before?

 7           (Exhibit 14 was marked for identification by

 8      Plaintiff's counsel.)

 9      A    Same as these others.  I probably have.  I don't

10  recall specifically.

11      Q    But this isn't an e-mail that you're copied on, is

12  it?

13      A    It doesn't appear that I was copied on this.

14      Q    Do you know if this was ever forwarded to you?

15      A    I don't recall.

16      Q    Do you know if you ever produced it?

17      A    I don't recall.

18      Q    Does this in anyway refresh your memory that a

19  policy issued by Travelers was canceled on or about July

20  30th?

21      A    You know what, I'm sorry.  I can't.  Other than what

22  I can see in writing here, I don't recall the specifics of

23  that circumstance of what appears to be canceled.

24      Q    What is a flat cancel?

25      A    That means to cancel without any premium so that
```



Platinum Reporters (310) 241-1450

DEPOSITION OF JONATHAN SHUMWAY

1    there was no premium owed or due or --

2        Q    Okay.  And have you ever encountered a situation

3    where a policy was canceled and then immediately reissued?

4        A    It occasionally happens, yeah.

5        Q    And do you know why it happened here?

6        A    I do not.

7        Q    Have you ever spoken to anybody about why it

8    happened here?

9        A    No.

10       Q    Do you know whether a statement of no loss was

11   issued for the first policy that was issued by Travelers?

12       A    I do not.

13       Q    I'm going to mark as Exhibit 15, this is an e-mail

14   from Sherlyn of your agency to Mr. Despain at Travelers dated

15   July 30, 2014.  Now Sherlyn was your assistant, right?

16            (Exhibit 15 was marked for identification by

17       Plaintiff's counsel.)

18       A    Yes.

19       Q    Did she have a title at the agency?

20       A    Customer service representative.

21       Q    And she was one of three full-time employees -- W-2

22   employees, right?

23       A    Yes.

24       Q    And she reported to you?

25       A    Yes.



DEPOSITION OF JONATHAN SHUMWAY

1     Q     And did she report to you on every case or client

2     that you guys had?

3     A     No, not all of them.

4     Q     What was the deciding factor when she would report

5     things to you and when she wouldn't?

6     A     If there was something unusual, something she needed

7     help -- needed help with.

8     Q     Is a statement of no loss an unusual thing?

9     A     No, not really.  Not way out of the ordinary.

10    Q     She writes Mr. Despain on July 30th, please find

11    attached the statement of no loss for Stars and Bars; do you

12    see that?

13    A     Yes.

14    Q     Do you recall speaking with Sherlyn in or about July

15    30, 2014 regarding the statement of no loss?

16    A     I could not speak to the date.  I can only speak to

17    the conversations that I referred to earlier in her asking me

18    can the client sign this, and I said why do you have

19    concerns, because the neighbor -- the tenant next door had a

20    claim and they're worried about that, and I said, again, did

21    our client have a claim?  No, our client did not have a

22    claim; and other than that I couldn't tell you dates or the

23    order of the no loss letter.

24    Q     Okay.  I'm going to mark as Exhibit 16, this is an

25    e-mail from Shaunna Gage to Brian Roche with a CC to her



DEPOSITION OF JONATHAN SHUMWAY

```
 1      Q    I want you to turn to page three of four.

 2      A    Okay.

 3      Q    And there's parts of this that are underlined; do

 4   you see that?

 5      A    Yes.

 6      Q    And these are Mr. Roche's responses to Shaunna

 7   Gage's e-mail which we marked as Exhibit 17; correct?

 8      A    Yes.

 9      Q    Do you understand that he's responding to her,

10   right?

11      A    Yes.

12      Q    And on page three under statement of no losses

13   Mr. Roche writes, The restaurant above us had their pipes

14   backflow into our unit and caused some damage last week.

15   Their insurance company Nationwide has accepted all liability

16   and covered all the costs of clean up and replacement.  What

17   do we do with this form now that there is some loss but not

18   my doing since we aren't open and the guys upstairs are

19   taking full responsibility?  Did you read that when you got

20   this e-mail?

21      A    I don't recall.

22      Q    Now Mr. Roche is talking about the fact there's been

23   some damage to his property, right?

24      A    It appears so, yes.

25      Q    Yes.  And he wants to know what he's supposed to do
```



DEPOSITION OF JONATHAN SHUMWAY

```
 1    with the statement of no loss form, right?

 2        A    Yes.

 3        Q    And do you know whether your agency provided any

 4    advice to him as to what he should do?

 5        A    That's the conversation I'm referring to when I tell

 6    you Shaunna and Joey came to me and said the restaurant next

 7    door had a loss.  Is he okay to sign this?  And I said, Did

 8    Brian have a loss or did the restaurant next door have a

 9    loss?  And they said the restaurant next door had a loss so

10    why didn't he sign?

11        Q    And so what they told you wasn't really what

12    Mr. Roche was saying, was it?

13        A    I don't recall the specifics other than -- yeah,

14    what I'm reading here and my conversations.

15        Q    Because Mr. Roche is telling you guys, listen, I

16    have some damage in my place from these guys, right?

17        A    Yes.

18        Q    And so he's relying on your agency to figure out

19    what to do, right?

20        A    Yes.

21        Q    Okay.  Let's mark as Exhibit 18, this is an e-mail

22    from Shaunna Gage to Mr. Roche with a CC to you, amongst

23    others, dated August 4, 2014.  Did you get this e-mail?

24             (Exhibit 18 was marked for identification by

25        Plaintiff's counsel.)
```



DEPOSITION OF JONATHAN SHUMWAY

```
1      A    I was copied on it, yes.

2      Q    Okay.  So your testimony is you think you got

3   this?

4      A    Yes.

5      Q    All right.  Under the statement of no losses section

6   Shaunna's saying, go ahead and sign and date the form; do you

7   see that?

8      A    Yes.

9      Q    This form simply means that you have not had any

10   losses for which you are responsible; do you see that?

11      A    Yes.

12      Q    The loss you describe below is not your

13   responsibility, so the statement is still correct; you see

14   that?

15      A    Yes.

16      Q    And do you know whether this was an accurate

17   statement when Shaunna made it?

18      A    It sounds like a conversation that we had, again

19   referring back to that conversation.

20      Q    So is it your understanding that the statement of no

21   loss form is a request for losses for which the perspective

22   insured is responsible?

23      A    Yes.

24      Q    And if somebody else is responsible and causes some

25   damage, then that's not a loss that you would have to put on
```



Platinum Reporters (310) 241-1450

DEPOSITION OF JONATHAN SHUMWAY

```
 1    the form, right?

 2        A    Right.

 3        Q    And so in this case a neighbor upstairs has a

 4    problem, the problem finds its way downstairs to Stars and

 5    Bars, but because it's the neighbors fault that's not

 6    something that Stars and Bars has to disclose to Travelers on

 7    the no loss form, right?

 8        A    Yes.

 9        Q    And that's the way you've been doing business with

10    Travelers for many years?

11        A    I don't know.  That circumstance is pretty unusual,

12    so I don't recall any other circumstance like that.

13        Q    All right.  Have you ever had any feedback from

14    Travelers that the advice that Shaunna gave with your

15    blessing on Exhibit 18, the advice she gave Mr. Roche on

16    August 4, 2014, has Travelers ever told you that that was

17    incorrect?

18        A    No.

19        Q    Do you know if a statement of no loss was provided

20    by Stars and Bars?

21        A    I don't.

22        Q    Per the request on Exhibit 18?

23        A    I don't recall whether or not.  I don't know.

24        Q    I'll mark as Exhibit 19, it's an e-mail chain

25    between Mr. Roche and Shaunna Gage dated in August 2014.  In
```



DEPOSITION OF JONATHAN SHUMWAY

1      A    Yes.

2      Q    And it has a issue date of July 18, 2014 on the

3   second page on the right-hand side?

4      A    Yes.

5      Q    And then the policy period is July 18, 2014 to July

6   18, 2015?

7      A    Yes.

8      Q    Would this policy support the discussion in Exhibit

9   No. 28 that your assistant changed effective dates to July 18

10  and she's trying to issue Stars and Bars?

11     MR. GRIVAKES:  Objection.  Lacks foundation.

12     THE WITNESS:  Yes.

13     MR. GRIVAKES:  Leading.

14  BY MS. KANESHIRO:

15     Q    I'm going to mark as Exhibit 30 an e-mail dated July

16  30, 2014 from Sherlyn Simon to Royd Despain.  Can you please

17  take a look at that e-mail and all the e-mails -- prior

18  e-mails prior to that.  Specifically, we can go to the -- if

19  you take a look at the last page?

20          (Exhibit 30 was marked for identification by

21      Defendant's counsel.)

22     A    Okay.

23     Q    Is that an example of a statement of no loss we've

24  been talking about?

25     A    Yes.



DEPOSITION OF JONATHAN SHUMWAY

1    Q    And then if you look at the middle portion in all

2    caps it says, I certify that I am not aware of any losses,

3    accidents or circumstances that might give rise to a claim

4    under the insurance policy whose number is shown above; do

5    you see that?

6    A    Yes.

7    Q    So your understanding is that if a loss occurs that

8    an -- well, what is your understanding as to what this

9    statement means?

10   A    That if the insurer is aware of a loss that may

11   rise -- that may give a claim, that that's what it's talking

12   about

13   Q    Under a claim under its own policy?

14   A    Yes.

15   Q    Okay.  So earlier when we were talking about Exhibit

16   18, this is the e-mail from Shaunna Gage to Brian Roche,

17   where in the middle of the page under statement of no loss it

18   says -- she said, this form simply means you have not had any

19   losses for which you are responsible.  The loss you describe

20   below is not your responsibility, so the statement is still

21   correct; do you see that?

22   A    Yes.

23   Q    You didn't see this e-mail before she sent it out to

24   Mr. Roche; correct?

25   A    Oh, I don't recall.



DEPOSITION OF JONATHAN SHUMWAY

```
 1      Q    Is it normal for your assistants to check in with
 2   you first before sending an e-mail?
 3      A    No.
 4      Q    How about if it's an e-mail on a substantive
 5   question?
 6      A    Yeah.  Yeah.
 7      Q    Okay.  They might ask you --
 8      A    They might ask me questions like in this case they
 9   did.
10      Q    But you don't remember if she talked to you about
11   sending this e-mail?
12      A    No, I do not.
13      Q    So with respect to -- in conjunction with Exhibit
14   No. 30 for the statement of no loss, so your understanding is
15   that this statement is correct if the insurer is not making a
16   claim under its own policy?
17      MR. GRIVAKES:  Objection.  Leading.
18      THE WITNESS:  Correct.
19   BY MS. KANESHIRO:
20      Q    If a loss occurs that another individual is
21   responsible for under their policy, then this statement would
22   be correct?
23      MR. GRIVAKES:  Objection.  Leading.
24      THE WITNESS:  Yes, correct.
25   ///
```



DEPOSITION OF JONATHAN SHUMWAY

```
 1   saved?

 2       A    As long as they're in the main e-mail box, then I

 3   believe those stay on the server.

 4       Q    Okay.

 5       A    But that's a question for our I.T. Department.  I

 6   couldn't answer that.

 7       Q    So you don't know how e-mail correspondence is

 8   save?

 9       A    Yeah, I don't.

10       Q    Okay.  So the effective date of the policy issued to

11   Stars and Bars was dated July 18, 2014, and this e-mail from

12   Ms. Simon is dated July 30, 2014 where she's attaching a

13   statement of no loss.  Do you have any understanding as to

14   what Inside knew about any losses to Stars and Bars during

15   that time frame?

16       A    Only from the e-mails that we've seen, as far as the

17   timeline goes, that's all I can testify to.

18       Q    Okay.

19       THE VIDEOGRAPHER:  This marks the end of media number one

20   to the June 18, 2018 video deposition of Jonathan Shumway.

21   We're off the record at 1:07.

22           (Off the record.)

23       THE VIDEOGRAPHER:  We're back on the record.  This marks

24   the beginning of media number two to the June 18, 2018 video

25   deposition of Jonathan Shumway.  Time on my video monitor is
```

